# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSÉ LUIS CERÓN SARRIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>   v.<br><br>TELUS INTERNATIONAL (CDA) INC., JEFFREY PURITT, VANESSA KANU, GOPI CHANDE and MICHAEL RINGMAN<br><br>Defendants | Case No. 1:25-CV-00889-VM<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

## AMENDED CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## <u>TABLE OF CONTENTS</u>

NATURE OF THE ACTION AND OVERVIEW ........................................................ 1

JURISDICTION AND VENUE .............................................................................. 7

PARTIES ......................................................................................................... 7

RELEVANT NON-PARTIES ................................................................................ 9

SUBSTANTIVE ALLEGATIONS ........................................................................ 11

   I.   Background ........................................................................................ 11
      A.  Telus' Businesses and Service Lines ............................................ 11
      B.  Telus Makes a Series of Acquisitions Purportedly to Add AI To Its Product Offerings 13
   II.  CWs Report That, Due to Inexperienced Engineers and Staff, Telus was Unable to Develop AI Products or Technologies for Customers Beyond Mere Unprofitable "Pilot" Products ......................................................................................... 15
   III.  Telus' Margins Decline Because It Is Unable to Offer Customers AI Products Beyond Mere "Pilot" Products at Low Rates and at Excessive Cost to Itself ............... 20
   IV.  Telus' Effort to Implement AI Cost Efficiency Initiatives for Its Own Operations to Combat Declining Customer Demand and Resulting Margin Pressures Likewise Fails .. 21
   V.  Telus was Undercut by Competitors on Pricing, Further Adversely Impacting Revenues and Margins ..................................................................................... 24

MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS .................... 25

   I.   February 9, 2023 Press Release ............................................................ 25
   II.  February 9, 2023 Earnings Call ............................................................ 27
   III.  2022 Form 20-F ............................................................................... 28
   IV.  February 16, 2023 Analyst Day Call ..................................................... 31
   V.  May 4, 2023 Earnings Call ................................................................. 38
   VI.  May 12, 2023 Annual General Meeting ................................................ 40
   VII.  July 13, 2023 Guidance Update Call .................................................... 42
   VIII. August 4, 2023 Earnings Call ............................................................. 46
   IX.  October 30, 2023 Press Release .......................................................... 50
   X.  November 3, 2023 Earnings Call ......................................................... 52
   XI.  2023 Form 20-F Filed with the SEC on February 9, 2024 ......................... 56
   XII. February 9, 2024 Earnings Call .......................................................... 61

DEFENDANTS BEGIN TO REVEAL THE TRUTH OVER MULTIPLE DISCLOSURES WHILE CONTINUING TO MISLEAD INVESTORS ................................................. 63

   I.   May 9, 2024 Press Release and Earnings Call .......................................... 63
      A.  Defendants Partially Reveal the Truth in the May 9, 2024 Press Release and Earnings Call ................................................................................ 63
      B.  Continued False and Misleading Statements on Telus' May 9, 2024 Earnings Call ..... 64
   II.  False And Misleading Statements During the May 21, 2024 Investor Conference .......... 66
   III.  Defendants Partially Reveal the Truth in the August 2, 2024 Press Release and on the August 2, 2024 Earnings Call ............................................................ 69

POST CLASS PERIOD EVENTS ......................................................................... 74

SCIENTER .................................................................................................... 75

ii

I.    Defendants' End of Class Period Admissions .................................................... 76
     A.   Defendants' Admission They Were Conducting Pilot Programs Strongly Supports
          Scienter ................................................................................................................ 76
     B.   Defendants Admitted That They Were Harmed by Fierce Price Competition and Their
          Cost Transformation Initiatives Failed Which Supports an Inference of Scienter ........ 77
II.   Defendants Held Themselves Out as Knowledgeable ...................................... 80
III.  Telus' Shift to AI Became a Major Focus of the Company and Supports Scienter ......... 83

LOSS CAUSATION ........................................................................................................ 85

CLASS ACTION ALLEGATIONS ................................................................................ 90

THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES ..................... 92

NO SAFE HARBOR ........................................................................................................ 94

FIRST CLAIM ................................................................................................................ 95

SECOND CLAIM ............................................................................................................ 98

PRAYER FOR RELIEF .................................................................................................. 99

JURY TRIAL DEMANDED ............................................................................................ 100

Court-appointed Lead Plaintiff Mohommed Mohiuddin ("Lead Plaintiff" or "Plaintiff"), individually and on behalf of all others similarly situated, by and through his undersigned attorneys, brings this class action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder by the United States Securities and Exchange Commission ("SEC"), individually and on behalf of all persons and entities that purchased or otherwise acquired TELUS International (Cda) Inc. ("Telus", "Telus International", "Telus Digital", "TI" or the "Company") subordinate voting shares ("Equity Shares") between February 9, 2023 and August 1, 2024, inclusive (the "Class Period"). Plaintiff alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Telus with the SEC; (b) review and analysis of press releases and media reports issued by and disseminated by Telus; (c) review and analysis of reports of securities and financial analysts, news articles, and other commentary and analysis concerning Telus and the industry in which it operates; (d) review of other publicly available information concerning Telus; (e) interviews with individuals who are former employees; and (f) review of pertinent court filings. Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of the Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.    Plaintiff brings this securities class action alleging that throughout the Class Period,

Defendants knowingly and materially misrepresented the operational and financial success, profitability, status and prospects of the Company to investors.

2.      Telus International purports to design, build, and deliver digital solutions for customer experience, including artificial intelligence ("AI") services, cloud solutions, and user experience/user interface design. Historically, Telus International's primary business was customer experience management ("CX" or "CXM") for business call centers. As technology evolved, Telus began offering additional solutions to supplement its legacy CX services, including digital solutions ("Digital Solutions"), and "trust, safety and security" ("Trust and Safety") services. Telus' Trust and Safety and CX offerings were historically high-margin products.

3.      Eager to capitalize on the popularity of AI and its seemingly unlimited potential to increase market share and revenue from developing AI products for customers, in 2020, Telus acquired the "data annotation" business of Lionbridge Technologies Inc. ("Lionbridge AI"). However, Telus did not have the budget to hire engineers and staff with the appropriate experience to develop and implement actual AI products or services. Thus, during the Class Period, Telus was unable to develop its AI products beyond mere "pilot" projects.

4.      According to confidential witnesses ("CWs"), throughout the Class Period, Telus had no significant AI products (technology or software) to sell.  The only AI services Telus had after its acquisition of Lionbridge AI were those related to the "annotation" of data maintained by clients and helping clients refine their machine-learning endeavors. That service, provided by Telus' "crowdsourced" army of contractors, was largely manual, resulting in higher, not lower, costs to customers who were expecting lower prices from AI-related products resulting from cost efficiencies achieved with automation.

5.      Moreover, attempting to develop AI products and services in-house required

Defendants to divert numerous engineers from working on higher margin products and non-engineers to work on AI teams. These in-house engineers did not have experience, training or education in AI, but were diverted to such projects in lieu of hiring qualified AI engineers externally, because Telus did not have the budget to do so. This, in turn, drove costs higher because of the additional manpower, time and resources required.

6.      To maintain the outward appearance of AI capability, Telus went so far as to confer titles on personnel making it appear they had significant experience and competence in AI, when such personnel in fact were not engineers and had no training or background in AI, much less expertise.

7.      Despite having no working AI product to offer customers beyond mere "pilots," throughout the Class Period, Defendants repeatedly touted Telus' purported AI capabilities, claiming, *inter alia*, that Telus offered "next-generation" and "end-to-end" "AI data" and "AI advisory" solutions, a "proprietary" "cognitive AI suite" of products, and that Telus' "services support the full lifecycle of its clients' AI-led transformation journeys[.]" Defendants further sought to differentiate Telus as having a competitive advantage in AI, comparing Telus to "selling the picks and shovels" in the AI "gold rush for years to come" and claiming "we have AI enablement competencies of consequence, and we are better positioned than most to help enable this gold rush[.]" At the end of the Class Period, Defendants admitted what the CWs described—that Telus had no significant AI offerings beyond "pilot" and "experimental" projects.

8.      Moreover, because Telus could not charge full price for its undisclosed "pilot" and "experimental" AI products, unbeknownst to investors, this substantially compressed its margins on the revenue side.

9.      At the same time, Telus' AI initiatives substantially compressed its margins on the

cost side because AI initiatives took an extraordinary amount of personnel and time, as Telus did

not have engineers with previous sophisticated experience in AI, and Telus diverted such personnel

from higher-margin legacy projects to AI—none of which was disclosed to investors during the

Class Period. Moreover, Telus' legacy AI data annotation services were extraordinarily headcount-

intensive, and the costs of importing vast amounts of data and cleaning it further compressed Telus'

AI-related margins on the cost side.

10.    Additionally, faced with declining margins due to macroeconomic and Company-

specific-factors, Defendants claimed they were implementing a cost reduction strategy that would

quickly return Telus' margins to its highly-touted historically high levels. One of the levers

Defendants claimed they would use to achieve such cost efficiencies was to capitalize on Telus'

purported AI technology to drive internal efficiencies, a phenomenon Defendant Puritt frequently

referred to as "drinking our own champagne" or "eating our own gourmet cooking."  However, as

Defendants admitted at the end of the Class Period, Telus came nowhere close to achieving these

highly-touted touted cost-efficiencies. Telus' failure to achieve the assured cost efficiencies was

due in substantial part to its lack of adequate AI and other technology, which Defendants claimed

would also facilitate Telus' own internal efficiencies (in short, the "gourmet cooking" turned out

to be a "nothingburger").

11.    By the end of the Class Period, Defendants could no longer conceal the substantial

adverse effects of Telus' AI initiatives from investors because traditionally high-margin sales to

the Company's second largest client, Meta Platforms, Inc. (formerly known as Facebook, Inc.)

("Meta Platforms" or "Meta"), had continued to decline to the point that the adverse effects of the

AI initiatives overcame sales from higher margin products. As Defendant Puritt admitted at the

end of the Class Period, low-margin "still nascent" AI initiatives "cannibalized" more high-margin

services, including CX management and Trust and Safety services, such that by the end of the Class Period, their effect on Telus' Company-wide Adjusted EBITDA[1] margins could no longer be masked. Because, as Defendants acknowledged, Telus did not break down its reported results by service lines, investors could not decipher the extent of the AI initiatives' adverse impact on Telus' margins from its financial statements during the Class Period, but had to rely only on the Company's other public statements, which glossed over any such effect.

12.     While Defendants disclosed the foregoing adverse facts, in whole or in part, only at or near the end of the Class Period, they were well aware of them throughout the Class Period, as Defendants repeatedly touted that they were "supremely confident" in their "strong visibility" into their financial and operational results, not just because they were aware of their own product offerings, pricing and expenses, but because they were constantly "in discussions with clients in terms of planning their projects and priorities," and as a "direct consequence of" "conversations [Telus' CEO was] personally having with existing and prospective customers."

13.     Defendants revealed the truth over a series of partially corrective disclosures. On May 9, 2024, Telus revealed that it was working on "pilot" projects in AI for "many" customers (raising the question of whether Telus could charge full price for such "pilot" projects); Telus was "seeing pressure on our margins"; and that while Trust and Safety was "one of our higher margin businesses," AI data solutions was "below average." In response to these disclosures, the price of Telus stock declined on the NYSE from a closing price of $7.77 USD on May 8, 2024, to close at $6.36 USD on May 9, 2024 (a decrease of 18.14%), on more than quadruple the prior day's trading volume.

14.     On August 2, 2024, Defendants announced poor financial results due, in large part,

---

[1] Earnings Before Interest, Taxes, Depreciation, and Amortization.

to the fact that Telus' transition towards an "AI fueled business" had "***necessitate[d] some cannibalization*** of our tenured and higher margin CX work" "***with still nascent and relatively lower margin AI revenue streams***." Puritt also acknowledged that competition on pricing had adversely impacted Telus which had not kept its prices competitive and had forced Telus to lower its prices, contrary to Defendants' assurances during the Class Period, and that Telus' AI offerings especially had put the Company in the "***unendurable position***" of "allow[ing] for this ***complete eradication of margin yields*** in order to enjoy the revenue upside" and that margins would continue to remain depressed as Telus was "***going to have to take it on the chin a little bit in terms of our historical margin profile[.]***"

15.     Defendants also acknowledged that they were unable to achieve their previously assured cost efficiencies to boost margins, with Defendant Chande admitting that such cost efficiency initiatives were still "working through the systems and the processes" and taking "longer than expected," and Defendants were still "looking at how do we reduce our costs"—contrary to Defendants' prior statements which conveyed the impression that such cost efficiencies were readily and quickly achievable.

16.     In response to these disclosures, the price of Telus stock declined on the NYSE from a closing price of $6.48 USD on August 1, 2024, to close at $4.15 USD on August 2, 2024 (or 36%), on unusually heavy trading volume (more than 8.5 times the prior day's trading volume), and continued to decline over the next few trading days to close at $2.96 USD on August 7, 2024, on similarly heavy volume.

17.     All told, from the February 9, 2023 Press Release issued at the beginning of the Class Period, the price of Telus stock declined from a close of $21.73 USD on the NYSE on February 9, 2023, to close at $4.15 USD on August 2, 2024, the day after the end of the Class

Period, a decline of over 80%, and continued to decline thereafter. Accordingly, as a result of Defendants' misrepresentations and omissions of the material facts alleged herein, Plaintiff and the Class have suffered substantial damages.

**JURISDICTION AND VENUE**

18.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

20.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District, and Telus stock was traded on the NYSE in this District.

21.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

22.    Lead Plaintiff Mohommed Mohiuddin, as set forth in the certification filed with his motion to serve as lead plaintiff (ECF Nos. 13-15), incorporated by reference herein, purchased Telus International Equity Shares during the Class Period, and suffered damages as a result of the federal securities law violations alleged herein.

23.    Defendant Telus International is incorporated under the laws of the Province of

British Columbia, with its principal executive offices located in Vancouver, British Columbia. Telus is a subsidiary of Telus Corporation ("Telus Corp" or "Telus Corporation"), which is also its largest customer and controlling shareholder. Telus International's subordinate voting shares trade on the New York Stock Exchange ("NYSE") exchange under the symbol "TIXT," and on the Toronto Stock Exchange ("TSX") also under the symbol "TIXT". As of February 13, 2025, TIXT reported that 111,267,697 subordinate voting shares were issued and outstanding.

24.     On June 13, 2024, Telus announced that, as of September 2024, it was rebranding itself to Telus Digital. According to Telus, this rebrand "reflects the [C]ompany's evolved business strategy to become the AI-fueled CX partner of choice for global and disruptive brands and fortifies its role as a forward-thinking industry leader focused on continued technological advancement and innovation."

25.     Defendant Jeffrey Puritt ("Puritt") led Telus International since 2008 and served as its President and Chief Executive Officer ("CEO") at all relevant times since 2016, until his retirement announced on August 2, 2024 (effective September 3, 2024), at which time he was appointed Executive Vice Chair of the Telus International Board. Since 2016, Puritt also served as a member of Telus International's Board of Directors, and as Executive Vice President of Telus Communications Inc., a wholly-owned subsidiary of Telus Corporation.

26.     Defendant Vanessa Kanu ("Kanu") was the Company's Chief Financial Officer ("CFO") from September 7, 2020 until February 9, 2024, when Telus announced that Kanu was leaving Telus effective March 31, 2024.

27.     Defendant Gopi Chande ("Chande") has been the Company's CFO since March 2024, replacing Defendant Kanu. Prior to March 2024, Defendant Chande spent fourteen years in various positions at Telus Corporation, including as Senior Vice-President Finance and Treasurer.

28.     Defendant Michael Ringman ("Ringman") has been the Company's Chief Information Officer ("CIO") since May 2012.

29.     Defendants Puritt, Kanu, Chande, and Ringman (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional and other investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## RELEVANT NON-PARTIES

30.     Confidential Witness ("CW") 1 was employed at Telus Communications Inc., a wholly-owned subsidiary of Telus Corporation and affiliate of Telus International, and held a senior analyst role focused on customer experience and automation over several years until the end of 2022. As part of CW-1's job responsibilities, CW-1 contributed to automation and AI initiatives, and provided cross-functional support and training across various operational and leadership levels for Telus Communications and Telus International's employees. At the time that CW-1 was in the senior analyst role, approximately 60% of company managers' time was to be spent coaching other employees, which CW-1 did. As part of CW-1's responsibilities, CW-1 observed software development and backend support practices involving numerous Telus

9

International personnel. CW-1 also interacted with Telus International employees who worked as programmers and coders on the back end of agent assistance and on customer-facing solutions. In addition, CW-1 collaborated with Telus International team members supporting pre-launch testing efforts for new features and offerings.

31. CW-2 was employed as an Account Director, Business Development by WT Blocker Corp., commercially known as WillowTree ("WillowTree"), from 2021 (upon its acquisition of MAARK) until January 2023 when WillowTree was acquired by Telus International (announced on October 27, 2022, and closing on January 3, 2023). CW-2 worked in the same capacity at Telus from January 2023 to CW-2's departure in February 2024 as Account Director, Business Development, focused on customer success, helping existing clients and selling them more services, as well as looking for new customers and closing deals with them. CW-2 participated in weekly calls with WillowTree senior-most management, including WillowTree's head, Tobias Dengel, as well as monthly "all hands" calls with Telus senior management, discussing operational and financial matters.

32. CW-3 was a Senior Software Engineer at WillowTree from 2021 to May 2023 (and a Software Engineer at WillowTree prior to that), and from the acquisition of WillowTree by Telus International, worked in that same capacity under the Telus International umbrella. Among other responsibilities at WillowTree/Telus, CW-3 developed apps and wrote software programs for clients for mobile devices.

33. CW-4 was a Software Engineer at WillowTree from Summer 2021 to Spring 2024, and from the acquisition of WillowTree by Telus International, worked in that same capacity under the Telus International umbrella. As part of CW-4's responsibilities, CW-4 worked on WillowTree/Telus' contracts with multiple major corporate customers. CW-4 was also part of

WillowTree's hiring team prior to the Telus acquisition. The office building where CW-4 worked housed both legacy WillowTree employees and Telus employees. After being diverted to work on training WillowTree employees in AI, CW-4 participated in daily "standup" meetings, at which status updates were discussed.

<strong>SUBSTANTIVE ALLEGATIONS</strong>

I.    **Background**

      A.  **Telus' Businesses and Service Lines**

34.    Telus International was founded in 2005 as an in-house customer care provider for its parent corporation, Telus Corporation, one of Canada's largest telecommunication companies. In 2005, seeking a strategic in-house partner for its CX solutions, Telus Corporation acquired a controlling interest in Ambergris Solutions, a boutique CX provider in the Philippines catering to traditional U.S.-based enterprise clients. Ambergris was subsequently re-branded as Telus International and, from 2008 to 2014, made a number of internal investments, as well as external acquisitions to expand its service offerings to clients.

35.    Telus International was spun off as a public company in February 2021, completing its IPO with an initial market capitalization of $8.5 billion. Telus employs approximately 78,000 people in 31 countries.

36.    Telus purports to design, build, and deliver digital solutions for customer experience, including digital and AI services, cloud solutions, and user experience/user interface design. As stated in its SEC filings during the Class Period, Telus focuses on four key service lines: (i) CX management; (ii) Trust and Safety; (iii) AI Data Solutions; and (iv) Digital Solutions. In addition, the Company tracks revenue by product type and by its "industry verticals": (i) Technology and Games; (ii) Communications and Media; (iii) e-Commerce & FinTech; (iv) Healthcare, (v) Banking, Financial Services, and Insurance ("BFSI"); and (vi) all others.

37.     Telus International's CX management service line consists of customer service support and management of clients' customer experience services across diverse channels, including digital channels or touchpoints such as websites, mobile phone access, and automation-assisted call centers, to help provide a hassle-free and satisfying experience encouraging customer loyalty. Telus' Trust and Safety service line focuses largely on "content moderation," including (i) establishing customers' trust in Telus' clients' online offerings and a feeling of safety that would encourage customers to communicate and transact more; and (ii) moderating content on social media platforms to ensure user safety, as well as the accuracy and reliability of information.

38.     Telus' AI Data Solutions service line was formed with the data annotation business (*e.g.*, supporting machine learning) that Telus acquired from Lionbridge Technologies Inc. in late 2020, and the computer vision data annotation capabilities that Telus obtained through its acquisition of India-based Playment in 2021. At the outset of the Class Period, AI Data Solutions consisted primarily of data annotation services, which were rendered largely by crowdsourced contractors geographically dispersed across the world.

39.     Telus' Digital Solutions service line provides clients with customer experience support as Telus' clients' interactions with customers increasingly occurred over digital channels, such as websites and other digital media and touchpoints, and supporting clients' digital transformations and innovations across its clients' digital networks. Telus sought to enhance its "next generation" digital service offerings primarily through acquisitions, including Lionbridge, and subsequently, WillowTree.

40.     During the Class Period, Telus had three clients that accounted for a significant portion of the Company's revenue—Telus Corporation; Meta Platforms (formerly known as Facebook), and Google. Telus Corporation was Telus' largest client and accounted for

approximately 15.8%, 20.6% and 24.7% of Telus' revenues for the fiscal years ended December 31, 2022, 2023 and 2024, respectively. In 2022 and 2023, Telus' second largest client was Meta, which accounted for approximately 14.4% and 11.2% of Telus' revenues for the fiscal years ended December 31, 2022 and 2023, respectively. By 2024, however, Meta had fallen to be Telus' third largest client, accounting for under 10% of its annual revenues. In 2022 and 2023, Google was Telus' third largest client, and in 2024 became the second largest client, surpassing Meta. Google accounted for approximately 10.9%, 13.1% and 14.3% of Telus' revenues for the years-ended December 31, 2022, 2023 and 2024, respectively.

41.      Telus earns its revenue from clients primarily pursuant to contracts, generally in the form of master services agreements. The master services agreement with Telus Corporation, the Company's parent and majority shareholder, expires in January 2031, and provides for a minimum annual spend of $200 million. However, the master services agreements with Telus' other clients do not have a minimum annual spend or require a specific volume of services. Moreover, the terms of these master service agreements are very flexible and permit Telus' clients to delay, postpone or even terminate contracted services at their discretion and with limited notice. As a result, the volume of work performed for specific clients or the revenue generated can vary from year to year, and a major client in one year may not generate the same level of revenue in any subsequent year.

42.      Because of the nature of the long-term pricing structure for the largest clients, Telus bears the brunt of the risk of cost overruns, completion delays, resource requirements, wage inflation and adverse movements in exchange rates.

### B.    Telus Makes a Series of Acquisitions Purportedly to Add AI To Its Product Offerings

43.      Due to the increasing popularity of AI, Defendants sought to include AI capabilities in Telus' offerings to clients. Indeed, Defendant Puritt informed investors during earnings calls

prior to the Class Period that the industry trend was towards automation and cloud and AI-based solutions, as a prelude to explaining that Telus was timely entering the AI market. Defendants knew Telus' path to growth and retaining existing clients was through AI. Thus, Telus had to be seen as having AI capabilities to offer to clients. They initially endeavored to obtain such capabilities through a series of acquisitions.

44.    Starting with Telus' acquisition of the AI division of Lionbridge Technologies, Inc. in December 2020, Telus expanded its digital customer experience footprint by introducing "AI Data Solutions" to its services. Lionbridge AI was a provider of crowd-based training data through various service offerings and the use of a proprietary annotation solution used in the development of AI algorithms to power machine learning. Data annotation is the process of labeling data needed to train AI systems. Lionbridge AI's largest client was Google, accounting for 65% of Lionbridge AI's revenue in 2019.

45.    To further bolster its AI offerings, on July 2, 2021, Telus acquired Playment, an India-based leader in computer vision tools and services specializing in 2D and 3D image, video and LiDAR (light detection and ranging), and data labeling and annotation for images, including imaging used in the autonomous driving and other industries. The Playment acquisition purportedly positioned Telus to support technology and large enterprise clients developing AI-powered solutions across a variety of markets.

46.    In 2021, with the added capabilities of Playment, Telus rebranded the Lionbridge AI business as Telus International AI Data Solutions and claimed to be one of only two globally scaled, managed AI training data and data annotation services providers in the world. On Telus' February 16, 2023 Analyst Day Call, Defendant Puritt described AI Data Solutions as "a very topical area that we invested meaningfully in back in 2020 through our acquisition of Lionbridge

AI[]" and claimed that Telus has seen "tremendous growth in this portfolio, and we're only just scratching the surface of the full opportunity here with generative AI use cases[.]"

47.    After the acquisitions of Lionbridge and Playment, Defendant Puritt stated that Telus was not "merely a backseat passenger in this [AI] disruption," and with these technologies, would "capitalize on the growth in need for AI data annotation and computer vision services, the picks and shovels as I like to call them, to help our clients leverage AI opportunities."

48.    To further bolster its digital and technology offerings, on October 27, 2022, Telus announced a definitive agreement to acquire WillowTree, a digital product provider focused on end user experiences, such as native mobile applications and unified web interfaces, for $1.1 billion, net of assumed debt. WillowTree, headquartered in Charlottesville, Virginia, operated 13 global studios across the United States, Canada, Brazil, Portugal, Spain, Poland and Romania, and resulted in the addition of over 1,000 team members to Telus. The acquisition closed on January 3, 2023. In its public statements during the Class Period, Telus portrayed the WillowTree acquisition as adding to Telus' own purported substantial AI capabilities "at scale."

## II.    CWs Report That, Due to Inexperienced Engineers and Staff, Telus was Unable to Develop AI Products or Technologies for Customers Beyond Mere Unprofitable "Pilot" Products

49.    Throughout the Class Period, contrary to the impression Defendants' statements conveyed about Telus' AI prowess, Telus had no significant AI offerings (technology or software) to sell. Rather, the only service in the AI realm which Telus offered was the "annotation" of existing data maintained by clients, helping clients to refine their machine-learning processes. This included the collection, annotation and validation of training data for various machine learning applications, including data categorization and (with the acquisition of Playment) autonomous vehicles.

50.    However, Telus' data annotation service was a highly labor-intensive, and largely

manual one, which was provided by Telus' "crowdsourced" army of independent contractors, primarily located outside North America, who did not otherwise have significant AI expertise. The manual nature of the work they did resulted in substantial headcount-related expenditures for Telus, which reduced Telus' margins for these services.

51.     According to CW-2, during Summer 2023 and continuing into 2024, with AI increasingly becoming a "buzzword" in the industry, Telus began placing more emphasis on AI internally, including at WillowTree, then under the Telus umbrella. However, CW-1 stated that, based on CW-1's experience with Telus personnel that CW-1 worked with or encountered, Telus personnel did not have the background or experience in AI to develop AI capabilities.

52.     Based on CW-1's experience, rather than hire employees with AI experience, to save costs, Telus used the personnel it had, reassigning them from non-AI related roles—even though they had no AI training, experience or credentials—into roles requiring AI knowledge, such as to try to develop ideas for AI offerings. For example, Telus took personnel from call centers to work as systems analysts for AI. CW-1 stated that CW-1's understanding from conversations with others at the Company, was that this major skills gap also led to revenues losses from delays in product launches. CW-4 further confirmed that employees at WillowTree did not have experience in AI. The engineers working in AI had no AI background and were not required to have any different training or certifications in it. CW-4 added that there was not a single LLM[2] engineer on staff at WillowTree and that "not a single LLM engineer built anything for WillowTree."

53.     To maintain the outward appearance of AI capability, CW-1 observed that Telus went so far as to confer misleading titles on certain of its personnel that outwardly suggested they

---

[2] Large Language Model (a type of artificial intelligence that can generate human language and perform related tasks).

had AI expertise, when such personnel, in fact, were not engineers and had no training or background in AI, much less expertise. CW-1 cited several examples, including a Telus employee who publicly carried the title of manager of technology architecture, artificial intelligence and automated customer experience, and one who publicly carried a title as manager of agent technology, when such employees had no relevant credentials for those positions.

54.    According to CW-1, Telus' push of unqualified personnel into inappropriate roles led to operational inefficiencies due to this mismatch in qualifications. Based on CW-1's experience with Telus, these practices (lack of hiring of external personnel experienced and qualified in AI) were reportedly driven by budget constraints.

55.    CW-2 corroborated CW-1's account, reporting that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and into 2024, Telus began diverting numerous WillowTree engineers (and non-engineers) from lucrative work on digital solutions to "internal projects" that did not generate revenue, and consisted of so-called "AI teams" to try to develop AI capabilities for Telus, notwithstanding their lack of AI experience. Unsurprisingly, these Telus employees were unable to produce AI products or services that contributed significantly to revenues during the Class Period.

56.    CW-3 also confirmed that WillowTree employees that worked on AI projects during CW-3's tenure did not have experience or training in AI, and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI—"a lot more people than would usually be on non-billable projects."  CW-3 also stated that, while WillowTree had focused on digital and voice prior to its acquisition by Telus, around May 2023 there was a pivot to AI, along with a push for engineers to write blog posts and make posts about AI on social media to create the appearance that WillowTree/Telus

17

was involved in AI, but this was "superficial," and was not what WillowTree was doing at the time. CW-3 was not aware of any functioning AI product at the Company during CW-3's tenure.

57.    CW-4 also corroborated that the push to pivot to AI internally came in the March to May 2023 time frame, after ChatGPT was publicly introduced. The push to redirect engineers toward AI development had initiated from Telus but WillowTree's C-suite also quickly pushed for the WillowTree division to "get on this."

58.    Moreover, according to CW-2, there was significant consternation within Telus' WillowTree division at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience, and which were not generating revenue due to budgetary constraints. Inevitably, this caused margin pressure for Telus, since on the cost side, Telus was expending more costs on having more personnel work for longer amounts of time trying to develop products for which they did not have the relevant background, rather than hiring experienced personnel who could do so more efficiently, *i.e.*, more quickly and with less manpower. Meanwhile on the revenue side, such employees were being diverted from high-margin, paid projects, to work on development projects that generated no revenue, significantly decreasing overall revenues for Telus. CW-4 corroborated that when WillowTree employees worked on trying to develop AI projects, such work was non-billable.

59.    According to CW-2, Telus' tactic during this time was to approach clients with other offerings, such as traditional or digital CX, or content moderation, and once Telus had its "foot in the door", try to upsell the client on potential AI add-ons, in the hopes that Telus, together with its client, could in time co-develop some AI-related feature for which the client might be an "early adopter." But at the time, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers to possibly co-develop something the customer

might be interested in. CW-4 provided one example where CW-4 assisted with work on an app that could respond to inquiries about where to stay in a given region that was to be pitched to a potential customer (a hotel brand) who did not ask for it, and after it was pitched, the potential customer did not buy it. According to CW-4, customers were not asking for such integrated products because they were "easy to hijack" and customers did not want them on their sites if they were not going to work 100% of the time. Thus, in reality, Telus was merely pitching "pilot" projects that Defendant Puritt disclosed for the first time at the end of the Class Period. During the Class Period, however, investors were unaware just how "nascent" and "experiment[al] on a relatively small scale" Telus' dips into AI were, or that, consequently, Telus could not charge anything close to its normal rates for them.

60.    CW-4 stated that Telus had no proprietary AI technology and had not created any LLMs or innovative AI technologies, nor did it have staff with the expertise or background for developing AI technologies.  Instead, Telus used other companies' products to pass off as its own. As set forth further below, CW-4 stated that the Company would use products such as OpenAI's ChatGPT or Google's Gemini, build an "app" around it that was simply a user interface, and "just put their logo on it," but this was something any app company, or any company with in-house developers, could do. Accordingly, CW-4 stated, customers were not interested in Telus' AI offerings.

61.    Defendant Puritt ultimately confirmed these CW accounts at the end of the Class Period, admitting that Telus had no concrete AI offerings beyond its legacy, largely manual and crowd-sourced data annotation service that were capable of generating significant revenues. Instead Telus had only been able to develop AI "pilot" programs for which it could not charge sufficient rates because, as Puritt acknowledged, "it's hard to charge full freight for a pilot when

you're trying to prove out your credentials and capabilities and you're experimenting at a relatively small scale in order to avoid potential catastrophe[.]" Due to Telus' employees' inexperience with AI, these pilot programs were costly to develop, contributing to Telus cutting its touted cost efficiency savings estimate in half for 2024, from $60 million to $30 million.

**III.    Telus' Margins Decline Because It Is Unable to Offer Customers AI Products Beyond Mere "Pilot" Products at Low Rates and at Excessive Cost to Itself**

62.    Defendant Puritt admitted at the end of the Class Period that Telus' margins were below expectations because Telus had only developed "experimental," "pilot" AI products, for which it could not charge "full freight" like it could have for a fully developed and tested AI product, resulting in lower revenues and compressed margins.  Defendant Puritt noted during Telus' August 2, 2024 Earnings Call that "***when*** we demonstrate the capability set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had yet to do so.

63.    Telus' AI initiatives also substantially compressed its margins on the cost side, because those AI initiatives were very expensive for Telus.  For example, as CW-1 and CW-2 confirmed, work on such projects took an extraordinary amount of personnel, as well as extra time, because Telus did not have engineers with previous sophisticated experience in AI, requiring more people and more time to work on projects that were not done nearly as efficiently as they could have been by AI-experienced employees.  The resultant higher costs decreased Telus' margins on its AI initiatives. In addition, Telus' legacy AI data annotation services were extraordinarily headcount-intensive, and the costs of importing vast amounts of data and cleaning it before it could be annotated (which CW-1 stated were significant) further compressed Telus' AI-related margins on the cost side.

64.    Moreover, Telus' large-scale diversion of personnel from higher-margin legacy

projects to work on AI projects further depressed Telus' overall margins by giving up work on those higher-margin projects. Indeed, Defendant Puritt admitted at the end of the Class Period that Telus' transition "towards a … AI fueled business" "*necessitates some cannibalization* of our tenured and higher-margin CX work."

65.    In fact, during Telus' May 9, 2024 Earnings Call, Telus' CFO, Defendant Chande, acknowledged, "an increase of 13%" in "goods and services purchased" due to increased costs for contractors hired for Telus' AI data solutions annotation business.

66.    Defendants were able to mask declining margins during the Class Period because Telus still generated a significant (albeit declining) amount of revenue from Meta, its second-largest customer for most of the Class Period, for which it did high-margin content moderation work. This was made possible in part because Telus did not break out revenues or margins by service line. However, as Telus' high-margin revenues from Meta continued to decline over the Class Period, Telus' low margins on its AI initiatives became impossible to hide any longer. Indeed, at the end of the Class Period, Defendant Puritt admitted that Telus' low-margin, still-nascent AI initiatives had "cannibalized" its more high-margin services. The shift in the business mix, marked by a decline in sales to Meta and an increase in the efforts to gain revenues from lower-margin AI offerings, thus further adversely impacted Telus' overall margins during the Class Period.

## IV.    Telus' Effort to Implement AI Cost Efficiency Initiatives for Its Own Operations to Combat Declining Customer Demand and Resulting Margin Pressures Likewise Fails

67.    Throughout the Class Period, one of the primary levers Defendants claimed would achieve cost efficiencies was Telus' ability to capitalize on the same AI and technology solutions it was purportedly offering its customers, to drive Telus' own internal efficiencies, a phenomenon Puritt referred to as "drinking our own champagne" or "eating our own gourmet cooking." At any

hint of a dip in margins during the Class Period, Defendants immediately reassured investors that Telus would quickly return to its historically high margins through its implementation of readily available levers to achieve cost efficiency, particularly the internal application of its purported AI capabilities.

68.     Thus, on July 13, 2023, Defendants issued a press release providing a preliminary view of Telus' second quarter results and revision to its 2023 full-year outlook. The release disclosed that Telus was experiencing margin pressures from macroeconomic conditions resulting in a decline in revenues and reduced its 2023 guidance. However, the release reassured investors that Telus had added "significant cost efficiency programs," including "further automation and generative AI enabled solutions to further optimize our cost structure."

69.     During an investor call that same day (the "July 13, 2023 Guidance Update Call"), Defendant Puritt reaffirmed that Telus had "actioned multiple cost efficiency programs that include… accelerating automation and Generative AI initiatives within our internal processes and platform." Defendant Kanu added that Telus' guidance now "implies an improvement in our adjusted EBITDA margin in the second half [of 2023], which is primarily attributed to our in-progress cost efficiency program as we…implement further automation and Gen AI solutions internally."  Kanu stated that "certain of the actions already completed to date will yield *in y[ea]r* savings benefit of approximately $40 million the impact of which will be seen more meaningfully in the second half [of 2023]" (and the "full benefit" in 2024) and that "while our adjusted EBITDA margins in Q2 were below what they have been historically, with our already completed and in-progress cost efficiency programs, we expect our Q4 exit EBITDA margin to be back up to the 23% ZIP Code."

70.     On August 4, 2023, Defendants assured investors that "we have now successfully

actioned meaningful cost savings" and "efficiency"— touting the "benefits we stand to realize by deploying generative AI solutions within our own operations"—and that "[d]ue to the strong progress and execution of these and other remediation efforts … we expect to quickly return to our typical 20% plus adjusted EBITDA margin for the balance of the year." Subsequently, during a November 3, 2023 Earnings Call, Puritt claimed "we're deploying AI-enabled and automation capability inside TI to drive down our own cost to … create that headroom we need so we can continue to enjoy our targeted margins."

71.    In truth, and as Defendants later admitted, Telus was unable to generate cost efficiencies from "AI-enabled and automation capability" to return margins at Telus' historical levels, as Defendants assured investors. Defendants' subsequently-admitted "need for more time" to "deploy[] more automation inside our business" and "migrate to a more GenAI-enable environment" was due to Telus employees' lack of AI expertise, which had also hampered Telus' ability to produce any significant AI offering to clients during the Class Period, beyond "experimental" "pilot" projects and legacy, relatively low-tech data annotation services. The lack of such capability meant Telus had no "gourmet cooking" available to achieve any internal cost efficiencies either.

72.    At the end of the Class Period, during Telus' August 2, 2024 Q2 Earnings Call, Defendants admitted that their cost efficiency initiatives were not being achieved but were "taking a little longer than expected" and "are a bit forward to roll out." Thus, Defendant Chande stated, Telus had "***reduced the in-year financial benefits from our ongoing efficiency and transformation initiatives*** to reflect our revised expectations for what can be achieved in 2024. Of the $60 million planned in-year [2024] savings that we disclosed earlier this year, ***we now assume half or approximately $30 million can be realized in 2024[.]***"

73.     In sum, Telus' failure to achieve the assured cost efficiencies was due in substantial part to its lack of adequate AI and other technology it claimed would also facilitate its own internal efficiencies.

## V.    Telus was Undercut by Competitors on Pricing, Further Adversely Impacting Revenues and Margins

74.     Although, prior to and during the Class Period, Defendants assured investors that Telus could command high prices for its products because they provided a better overall value proposition than its competitors, and that Telus would continue to focus on profitability rather than chase revenues or market share, in fact, Defendants admitted at the end of the Class Period that competitors consistently beat Telus on pricing and took away market share and revenues, which had forced Telus to cut its prices as well, reducing revenues and margins. Indeed, CW-4 stated that WillowTree's rates were also considered very high in the industry, and that CW-4 personally was reassigned to an internal non-billable AI training project after WillowTree lost a client because its rates were too high.

75.     During Telus' August 2, 2024 Earnings Call, Defendant Puritt admitted, for the first time, that "***we just keep losing opportunities because of price[.]***" and that Telus kept being "told in the postmortem [after losing out on sales to competitors] that ***we were just too expensive*** and the competition we're [sic] willing to provide a similar solution." Puritt explained that "a lot of our competitors are either private companies" or otherwise not targeting "the same kind of profitable margin yield as we" and thus "their focus on price has been considerably less important. They're looking for the land grab and just revenue growth."

76.     Accordingly, Telus had "decided that we can't keep missing out on opportunities" and had cut prices on its products to stem the "complete eradication of margin yields[.]" Puritt admitted this meant that that "we're going to have to intentionally lower expectations in the near

24

term" "so that we can get back on track for revenue growth[,]" and that Telus had concluded it needed to "once again focus on winning opportunities, getting in the door with these clients." Puritt further admitted that this came at the expense of margins, and that margins would remain depressed for some time as Telus sought to regain the market share it had lost due to its overpriced products during the Class Period, stating, "we're going to have to take it on the chin" "in terms of our historical margin profile so that we can enjoy the upside on the revenue[.]"

## MATERIALLY FALSE AND MISLEADING CLASS PERIOD STATEMENTS

77.     Throughout the Class Period Defendants made materially false statements to the market regarding: (1) Telus' AI capabilities and growth; (2) margins; (3) purported favorable impact of cost-cutting and cost-efficiency initiatives; and (4) loss of revenue and margin pressure due to competition and pricing. Plaintiff asserts that all statements set forth below that are bolded and underlined were materially false and/or misleading when made for the reasons set forth therein. Non-bolded statements are included for context.

## I.     February 9, 2023 Press Release

78.     On February 9, 2023, Telus issued a press release, attached as Exhibit 99.1 to a Form 6-K filed with the SEC and signed by Defendant Kanu, announcing the Company's financial results for the fourth quarter and full year 2022 (the "February 9, 2023 Press Release"). In the February 9, 2023 Press Release, Telus describes itself as a Company that "designs, builds, and delivers" AI solutions:

> TELUS International (NYSE and TSX: TIXT), a leading digital customer experience innovator that **designs, builds, and delivers next-generation solutions, including AI** and content moderation, for global and disruptive brands…

79.     The same sentence was repeated in several of Telus' press releases, attached as Exhibit 99.1 to Form 6-K filed with SEC and each signed by Defendant Kanu, on May 4, 2023, July 13, 2023, August 4, 2023, November 3, 2023, and February 9, 2024. Press releases with the

same language were filed as Exhibit 99.1 to Form 6-K filed with SEC and signed by Defendant

Chande on May 9, 2024, and August 2, 2024. The same false and misleading language was

repeated in press releases posted to the investor relations section of Telus' website on April 10,

2023, May 10, 2023, June 1, 2023, and October 30, 2023.

80.     The statement cited in the preceding paragraphs was materially false and

misleading when made or omitted to state material facts necessary to make the statements not

misleading because it gave the false impression that Telus had meaningful ability to "design, build

and deliver[]" "AI" solutions when, in reality, Telus used its existing employees who had no AI

experience to try and develop AI products, and never had any true AI offerings during the Class

Period beyond pilot programs, as evidenced by the following:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to May 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience,

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) CW-4 reported that Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies.  Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

g)  According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter; and

h)  Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full price), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that.

## II.    February 9, 2023 Earnings Call

81.    On February 9, 2023, Telus held its fiscal fourth quarter 2022 earnings call (the "February 9, 2023 Earnings Call") with analysts to discuss its financial results. Throughout the February 9, 2023 Earnings Call, Puritt emphasized the purported benefits of AI for Telus and falsely claimed that Telus' content moderators were "**[w]orking alongside AI technology, where TI has meaningful capability at scale to bring to bear**."

82.    Puritt also portrayed the WillowTree acquisition as adding to Telus' own purported substantial AI capabilities "at scale," stating:

> **[W]e've also secured an exciting infusion of digital talent at scale into our already robust end-to-end digital transformation capabilities**, including premium content moderation services, **AI data solutions** and IT lifecycle services.

83.    The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Telus had fully-developed AI products and "meaningful [AI] capability at scale," and that Telus had hired "talent" with AI experience when, in reality, Telus used its existing employees who had no AI experience to try and develop AI products and, thus, Telus was unable to develop any meaningful AI offerings beyond pilot programs at discounted prices during the Class Period, as evidenced by:

a)  During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background

or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

g) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full price), and on the August 2, 2024 Earnings Call that "*when we demonstrate the capability* set that we have, we can *then* look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that; and

i) Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe[.]"

### III.    2022 Form 20-F

84.    On February 9, 2023, Defendants filed Telus' 2022 Annual Report on Form 20-F with the SEC for the period ended December 31, 2022, signed by Defendant Puritt (the "2022

Form 20-F"). The 2022 Form 20-F contained false and misleading risk disclosures presented as mere hypotheticals, instead of risks that were actually occurring.

85.     For instance, under section entitled "Business & Operational Risks" Telus purported to warn that *if* new services and technology are offered by competitors, then Telus *may not be* successful in responding to clients' needs rendering Telus' service offering uncompetitive, when, in fact, increased competition by competitors was already occurring, and Telus was already losing market share to the competition. Thus, the risk had already materialized:

> Our growth, profitability and the diversity of our revenue sources depend on our ability to develop and adopt new technologies to expand our existing offerings, proactively identify new revenue streams and improve cost efficiencies in our operations, all while meeting rapidly evolving client expectations. Although we are focused on maintaining and enhancing the range of our offerings, **we may not be successful in anticipating or responding to our clients' expectations and the integration of our technology solutions into our offerings may not achieve the intended enhancements or cost reductions in our operations**. **New services and technologies offered by our competitors may make our service offerings uncompetitive, which may reduce our clients' interest in our offerings and our ability to attract new clients. Our failure to innovate, maintain technological advantages or respond effectively and timely to changes in technology could have a material adverse effect on our business, financial performance, financial condition and cash flows**.

86.     The statements in the preceding paragraphs were materially false and misleading when made, because Telus was *already* losing market share to competition and due in part to its high prices, and was forced to lower prices on its products, and rushed "pilot" programs for sale at discounted prices to combat the price competition, which was having a material adverse effect on its business and financial condition (*e.g.*, on revenues, costs and margins). As a result, the 2022 Form 20-F did not accurately portray Telus' then-current financial situation or business prospects because the warned about risk had materialized, as evidenced by:

a) During CW-2's tenure from March 2021 to February 2024, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

29

b) According to CW-1 and CW-2, Telus' diversion of inexperienced personnel to AI resulted in more man hours and higher costs and delays spent on projects trying to develop products for which they did not have the relevant background;

c) During CW-2's tenure from March 2021 to February 2024, CW-2 stated that employees were being diverted from high-margin, paid projects, to work on development projects that generated no revenue, significantly decreasing overall revenues for Telus;

d) As CW-1 and CW-2 confirmed, work on AI projects took an extraordinary amount of personnel, as well as extra time, because Telus' did not have engineers with previous sophisticated experience in AI, requiring more people and more time to work on projects that were not done nearly as efficiently as they could have been. The resultant higher costs decreased Telus' margins on its AI initiatives;

e) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects, for which it could not charge full prices, putting downward pressure on margins and on August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that;" and

f) During Telus' August 2, 2024 Earnings Call, Defendant Puritt admitted, for the first time, that "***we just keep losing opportunities because of price***," and that Telus kept being "told in the postmortem [after losing out on sales to competitors] that ***we were just too expensive*** and the competition we're [sic] willing to provide a similar solution."

87.    Additionally, under the section entitled "Financial Risks" Telus purported to warn

that ***if*** the pressure on pricing models continues, then Telus ***may be*** unable to maintain profitability:

> **If we are unable to accurately forecast our pricing models or optimize the mix of products and services we provide to meet changing client demands, or if we are unable to adapt to changing pricing and procurement demands of our clients, our business, financial performance, financial condition and cash flows may be adversely affected**.
>
> ***
>
> **If we make inaccurate assumptions in pricing our contracts, our profitability may be negatively affected. In addition, if the number of our clients that request alternative pricing models continues to increase in line with industry trends, we may be unable to maintain our historical levels of profitability under these evolving alternative pricing models and our financial performance may be adversely affected, or we may not be able to offer pricing that is attractive relative to our competitors**. Some of our clients' [sic] may continue to evolve their procurement methodology by increasing the use of alternative methods, such as reverse auctions. These methods may impact our ability to gain new business and maintain profit margins, and may require us to adapt our sales techniques, which we may be unsuccessful in doing in a timely manner or at all.

88.    The statements in the preceding paragraphs were materially false and misleading

when made because, at the time, Telus was ***already*** experiencing pressure on pricing and losing market share to competition, forcing Telus to lower its prices, including through pilot programs, which had a material adverse effect on its margins and profitability. As a result, the 2022 Form 20-F did not accurately portray Telus' then current financial situation or business prospects because the risk being warned of had materialized, as evidenced by:

a) During CW-2's tenure from March 2021 to February 2024, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

b) According to CW-1 and CW-2, Telus' diversion of inexperienced personnel to AI resulted in more man hours and higher costs and delays spent on projects trying to develop products for which they did not have the relevant background;

c) During CW-2's tenure from March 2021 to February 2024, CW-2 stated that employees were being diverted from high-margin, paid projects, to work on development projects that generated no revenue, significantly decreasing overall revenues for Telus;

d) As CW-1 and CW-2 confirmed, work on AI projects took an extraordinary amount of personnel, as well as extra time, because Telus' did not have engineers with previous sophisticated experience in AI, requiring more people and more time to work on projects that were not done nearly as efficiently as they could have been. The resultant higher costs decreased Telus' margins on its AI initiatives;

e) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects, for which it could not charge full prices, putting downward pressure on margins and on August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that;" and

f) During Telus' August 2, 2024 Earnings Call, Defendant Puritt admitted, for the first time, that "***we just keep losing opportunities because of price***," and that Telus kept being "told in the postmortem [after losing out on sales to competitors] that ***we were just too expensive*** and the competition we're [sic] willing to provide a similar solution."

## IV.    February 16, 2023 Analyst Day Call

89.    On February 16, 2023, Defendants held a call with analysts and investors (the "February 16, 2023 Analyst Day Call"). During the February 16, 2023 Analyst Day Call, Defendant Puritt claimed that because of Telus' "prescient" acquisition of Lionbridge AI, the Company was uniquely prepared to benefit from the coming "gold rush":

**As a result of our Lionbridge AI acquisition back in December 2020, we have AI enablement competencies of consequence, and we are better positioned than most to help enable this gold rush for years to come. It's like we're selling the picks and shovels**.

90.    Puritt went on to tout that Telus' purported unique proprietary technology combining AI and content moderation services set it apart in the content moderation space, even to the point where other competitors were exiting the market, leaving Telus to capture the market share, when in reality, Telus was losing market share and revenue, particularly from one of its largest clients, Meta, and did not have any unique or significant AI offerings for content moderation, much less ones that gave it a competitive advantage:

**TI has purposefully put together the combination of new economy services of AI and content moderation that I think go together, just like peanut butter and jelly**.

Despite significant technology advancements, harmful content is still making its way to consumers. We feel brands should be doing more. **We have a unique value proposition here, and we're not alone in that view**. []

**Other than Accenture, no one else has what we have in this space**. As you can see from the image taken [] on the screen here, this is a space that seemingly everyone wants to get into, but I suspect many don't realize just how difficult it is to do well at scale and on a sustained basis.

There are many players in this space. It's very fragmented, and some participants are actually exiting in whole or in part. TI is not shying away. We see keeping the online world safe as a societal requirement and an exciting opportunity.

**TI holds a position of scale [a]s 1 of only 2 providers with more than 10% overall share**. And trust and safety isn't just content moderation for social platforms.

91.    During the February 16, 2023 Analyst Day Call, in response to a question about whether ChatGPT was a threat or an opportunity for Telus, Defendant Ringman's response was that "**we are a premium provider. We are not here to solve the simple tasks**..."

92.    The statements in the preceding paragraphs were materially false and misleading when made because Telus had no meaningful AI capabilities beyond manually-intensive data

annotation and premature "pilot" projects and thus, Telus was not a "premium provider." Defendants' statements gave the false impression that Telus had fully-developed AI products at scale and, thus, was gaining market share over the competition when, in reality, Telus did not have an meaningful AI capabilities and was losing market share, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

g) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full price), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that;

    i)    Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe"; and

    j)    Defendant Puritt's admission during Telus' August 2, 2024 Earnings Call, that Telus was losing out to the competition, stating: "***we just keep losing opportunities because of price***," and that Telus kept being "told in the postmortem [after losing out on sales to competitors] that ***we were just too expensive*** and the competition we're [sic] willing to provide a similar solution."

93.    During a question-and-answer session on the February 16, 2023 Analyst Day Call, an analyst asked Defendants how confident they were in their revenue guidance if customers started looking to reduce costs, to which Defendant Puritt doubled down and stated they were "supremely confident" of their visibility into the guidance they provided, notwithstanding any customer sensitivity, and that Puritt had not seen any reason to doubt revenues:

**Ramsey Clark El-Assal**, Barclays Bank PLC, Research Division
I was wondering if your revenue visibility changes at different points in the cycle, when clients start looking at cost reduction, maybe start reprioritizing a bit. *Does that impact your ability to kind of see what's coming and project out what might come in*, which I guess is a sneak[y] way to ask about confidence in the annual guide, but it's a more general question.

**Jeffrey D. Puritt**, President, CEO & Director
Fair question. *I feel supremely confident in our visibility into what we've guided for 2023.* I think it's a fair observation that the rotation into higher sensitivity and focus on efficiency in [sic] year for many of our clients is changing perhaps some of the conversation. But **I haven't seen a deterioration, degradation or change of consequence that makes me feel less certain about our ability to anticipate and predict where we think our revenues will be this year**.

94.    The above statements were materially false and misleading when made because Defendants were seeing lower revenues from selling pilot projects at discounted prices, and were forced to cut prices on other products because they had continually been undercut on pricing by competitors, which placed significant downward pressure on margins, as evidenced by:

    a)    CW-1 and CW-2's accounts that, rather than hire employees with AI experience, to save costs, Telus used the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings;

b) CW-2's account that although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and into 2024, Telus began diverting numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) As a result of (a) and (b) above, Telus was unable to develop any meaningful AI products beyond, according to CW-2, only case-by-case basis pitches to customers;

d) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects and on May 21, 2024 that Telus could not charge full prices for such pilots because "***it's hard to charge full freight for a pilot*** when you're trying to prove out your credentials and capabilities and you're experimenting at a relatively small scale," and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that; and

e) Defendant Puritt's admission during Telus' August 2, 2024 Earnings Call, that Telus had been forced to cut prices on its products because Telus was losing out to the competition, stating: "***we just keep losing opportunities because of price***," and that Telus kept being "told in the postmortem [after losing out on sales to competitors] that ***we were just too expensive*** and the competition we're [sic] willing to provide a similar solution."

95.    On the February 16, 2023 Analyst Day Call, Beth Howen, Telus' Chief Transformation Officer, speaking on behalf of Telus, described Telus' "comprehensive set of offerings and solutions" for its customers. Howen explained that Telus' portfolio includes "**the AAA trifecta of analytics, artificial intelligence and automation**," which Telus combines "**to support some of the world's largest and most disruptive brands**…" While explaining how Telus serves one of its customers, Howen claimed that Telus had AI capabilities that were so developed they were "heavy":

> For this customer, **TI leveraged our heavy capabilities in AI and machine learning to develop a workforce management solution**. In this solution, we delivered forecasting and prediction, workforce scheduling, lead management, time and work data collection as well as task and activity management.

96.    Also on the February 16, 2023 Analyst Day Call, Defendant Ringman, presented a slide to analysts, which displayed Telus' "AI Cognitive Suite" which Ringman described as Telus' "full suite of cognitive AI capabilities":



**This slide represents our full suite of cognitive AI capabilities. We have invested in building a wide gamut of services from voice and text to images.** These AI accelerators form the building blocks and can be used in any combination to enhance or expand or even simplify our environment, as well as develop next-generation solutions.

97.    Defendant Puritt added, in response to a question about "new technologies around AI," that Telus had been prescient by building out such technology ahead of time:

I think there's finally a recognition that technology is merely an enabler for a better business outcome but everybody here sees and senses if they're not leveraging technology more effectively so that their customers can self-serve, so that they can automate those channels, reduce the overall cost to serve whilst at the same time, continuing to grow their share of wallet, increase lifetime average revenue, they're missing the boat. And so again, **we feel like we've been quite prescient in building out the scope and scale of our technology-enabled service line so that we have something relevant to say and sell to all of these businesses**.

98.    The statements in the preceding paragraphs were materially false and misleading when made because, as the speakers knew or recklessly disregarded, Telus did not have a "wide gamut" of AI products and services or "heavy" AI capabilities. Nor did Telus have a "proprietary"

"cognitive AI suite" as the slide Telus showed to analyst represented. Otherwise, Telus merely had data annotation and pilot projects. Thus, Defendants' statements gave the false impression that Telus had a fully developed suite of AI products beyond pilot programs when, in reality, Telus only had minimal AI offerings provided in pilot programs, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

g) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full price), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that;

i)  Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe"; and

j)  Defendant Puritt's admission during Telus' August 2, 2024 Earnings Call, that Telus was losing out to the competition, stating: "***we just keep losing opportunities because of price***," and that Telus kept being "told in the postmortem [after losing out on sales to competitors] that ***we were just too expensive*** and the competition we're [sic] willing to provide a similar solution."

99.   Moreover, upon reviewing the above slide about Telus' purported "proprietary" "cognitive AI suite," CW-4 stated, "none of this is developed by TI or WillowTree." According to CW-4, teams at the Company would use Open AI's ChatGPT or Google's Gemini product to build an app using it as an Application Programming Interface ("API"), which allows one application to request information from another, to connect to other sites with information. But even then, CW-4 said, "[i]t was a different company that built the API, we just plugged it in." CW-4 stated that there was nothing "proprietary" about this "suite" of purported products or services. Rather, they were merely a collection of products or services made by other companies that were presented by Telus under its label. Customers could get these products elsewhere or develop them in-house if they had their own developers. Thus there was little interest in the Company's AI offerings. CW-4 added that during CW-4's tenure, at best, the Company was just using ChatGPT as an API, just "building apps around it" (such as a user interface, sometimes known as a "wrapper") and "put[ting] their logo on it," but that this was not innovative as "any app company can do it."

**V.   May 4, 2023 Earnings Call**

100.   On May 4, 2023, Defendants held an earnings call to discuss Telus' first quarter financial results (the "May 4, 2023 Earnings Call"). During the May 4, 2023 Earnings Call, Puritt misleadingly claimed that Telus would benefit from its investments in the AI space due to its supposed "comprehensive solutions" for AI:

**[Telus] is well positioned to benefit from the continued proliferation of AI**

**through [its] meaningful and ongoing investments in this space** and to support the emerging ecosystem, including multiple fee clients **with the development of core generative AI data sets** [an] area experiencing extraordinary growth.

*** 

As part of our generic AI software engineering services, we're advising clients contemplating the use of Gen AI-based technology, and **we're able to design, build and deliver bespoke software engineering and data science services specifically geared for Gen AI applications [and] process automation for Gen AI workflows**.

101.    The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Telus was experiencing "improved growth rates" and was "well positioned to benefit from the continued proliferation of AI through [its] meaningful and ongoing investments in this space," when in reality Telus only had minimal AI offerings provided in pilot programs and no experienced staff to develop AI products, as evidenced by:

a)  During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b)  Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c)  During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d)  CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e)  CW-3 was not aware of any functioning AI product at WillowTree;

f)  According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus,

only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

g) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that; and

i) Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe[.]"

## VI.    May 12, 2023 Annual General Meeting

102.    On May 12, 2023, Defendant Puritt discussed the Company's reaffirmed outlook, emphasizing that Telus was "**at the beginning of [its] next chapter of growth with disruptive tech like generative AI**," and falsely claiming that Telus was "**equipped to develop and deliver cutting-edge AI solutions**":

> Our outlook for 2023 was reaffirmed earlier this month, which calls for continued profitable growth and assumes macroeconomic conditions begin to stabilize. Looking longer term, we believe we're at the beginning of our next chapter of growth **with disruptive tech like generative AI**, augmented and virtual reality applications and the metaverse, having the potential to impact all industries. TI is at the center of these opportunities, working with clients who seek to streamline, optimize and modernize their processes to enable scalable digital solutions and premium customer experiences.
>
> ***
>
> **TELUS International is equipped to develop and deliver cutting-edge AI solutions**….

103.    The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading

because they gave the false impression that Telus had "disruptive… generative AI" technology

that equipped Telus to deliver "cutting-edge AI solutions" and continue to drive growth, when in

reality Telus only had minimal AI offerings provided in pilot programs, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW-2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

g) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024,  Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies.  Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that."  But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that; and

i) Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at

a relatively small scale in order to avoid potential catastrophe[.]"

**VII.    July 13, 2023 Guidance Update Call**

104.    On July 13, 2023, after market close, Telus held a call with analysts to discuss anticipated Q2 2023 results and revisions to its full year outlook for 2023 (the "July 13, 2023 Guidance Update Call"), including that purportedly due to "global macroeconomic" conditions, FY 2023 margins were expected to be slightly lower, in the range of 21.3% to 22.0%. During the July 13, 2023 Guidance Update Call, Defendant Puritt falsely assured investors that Telus had taken the initiative to reduce costs and improve efficiency, stating:

> Again, while it was initially our hope that the macroeconomic landscape would stabilize and demand would return to normal more quickly, it became increasingly apparent that we could no longer wait and we, too, would have to more aggressively reduce staff levels across our organization to better match the shifting demand from the technology sector, in particular. To this end, we've actioned **multiple cost efficiency programs that include** both team member reduction along with **accelerating automation and Generative AI initiatives within our internal processes and platform."**

105.    Similarly, Defendant Kanu stated that, despite the "significant global macroeconomic pressures," Telus' updated guidance implies improvement in cost efficiency programs:

> This implies **an improvement in our adjusted EBITDA margin in the second half, which is primarily attributed to our in-progress cost efficiency program as we** both rightsize our team to match demand and **implement further automation and Gen AI solutions internally.**

106.    The above statements were materially false and misleading when made because Telus was not "accelerating automation and Generative AI initiatives." Rather, Telus was using its existing employees who had no AI experience to try and develop AI products and, thus, Telus was unable to develop any meaningful AI offerings beyond pilot programs during the Class Period externally for sale or internally to gain cost efficiencies, and therefore Defendants' purported expectations of improvements in EBITDA lacked any reasonable basis, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

g) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

h) According to CW-1 and CW-2, Telus' diversion of inexperienced personnel to AI resulted in more man hours and higher costs and delays spent on projects trying to develop products for which they did not have the relevant background;

i) During CW-2's tenure from March 2021 to February 2024, CW-2 stated that employees were being diverted from high-margin, paid projects, to work on development projects that generated no revenue, significantly decreasing overall revenues for Telus;

j) As CW-1 and CW-2 confirmed, work on AI projects took an extraordinary amount of personnel, as well as extra time, because Telus' did not have engineers with previous sophisticated experience in AI, requiring more people and more time to work on projects that were not done nearly as efficiently as they could have been. The resultant higher costs decreased Telus' margins on its AI initiatives;

k) Defendant Puritt admissions on May 9, 2024 that Telus had only been selling "pilot" AI

43

projects and on the August 2, 2024 Earnings Call that "*when we demonstrate the capability* set that we have, we can *then* look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that; and

l)    As a result of Telus' inability to develop any significant AI capabilities, it was unable to generate any cost efficiencies from the application of its AI initiatives internally.

107.    During the July 13, 2023 Guidance Update Call, while reassuring analysts that Telus was quickly overcoming the Q2 hiccup in lowered margins, Defendant Kanu touted Telus' consistent growth and profitability track record in all kinds of macroeconomic conditions, including "historical compound annual growth rates across revenue, adjusted EBITDA, adjusted diluted earnings per share and free cash flow growth each being well over 30%" "over the past 5 years," and stated that **in addition, "we see meaningful opportunities being amplified by generated AI adoption" which "will be a tailwind" for Telus**.

108.    When asked by an analyst whether there were changes in, or impact from, the pricing environment and whether Telus had been able to pass those on, Defendant Puritt stated that although the pricing environment had gotten more competitive, Telus believed that because of its "**unique differentiated AI**" and other capabilities "that are really focused on delivering a superior client experience," Telus would be able to win on its value-for-the-money proposition, *i.e.*, without cutting prices:

> **[W]e anticipate that because of our unique differentiated AI and part enable [sic] capabilities that are really focused on delivering a superior client experience, but we think there's value for money to be recognized in that we'll continue to be able to distinguish ourselves from the competition[.]**

109.    During a question and answer session on the July 13, 2023 Guidance Update Call, an analyst asked about Telus' opportunities with the parent, Telus Corporation. Defendant Puritt responded that the parent was using Telus' AI capabilities "now more than ever" and that as a result, Telus was able successfully sell those same capabilities to clients:

And as I mentioned on last quarter's earnings call, there really is a counter cyclicality to the relationship TI enjoys [with Telus Corporation and] the opportunities to continue to enable TELUS [Corporation] in its own digital transformation journey **now more than ever using our AI capabilities and then thereafter to take those referenceable instances on the road, so to speak, continue to be a real source of optimism and confidence, frankly, for the continued future success of TI**.

110. The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Telus had "unique [and] differentiated AI" capabilities presenting a "value" proposition that "distinguish[ed]" it from competitors and that its "AI capabilities" would bring "continued future success," when in reality Telus had only had minimal AI offerings provided in pilot programs at discounted prices which materially impacted margins, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which

the customer might be an early adopter;

g) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that; and

i) Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe[.]"

## VIII.    August 4, 2023 Earnings Call

111.    On August 4, 2023, Telus held its fiscal second quarter 2023 earnings call (the "August 4, 2023 Earnings Call") with analysts to discuss the Company's results. During the August 4, 2023 Earnings Call, Defendant Puritt assured investors that Telus' competitive position was strong, and that Telus was still uniquely positioned in the AI space to deliver solutions to clients:

> I want to reiterate my belief that TI's long-term investment thesis is very much intact and **our competitive positioning remains strong**. Indeed **there are meaningful opportunities ahead in digital transformation and generative AI, in particular … areas where [Telus] is uniquely positioned and credentialed to design, build, and deliver differentiated, responsible, and market-leading solutions for our clients**.

112.    Puritt also highlighted Telus' purported generative AI capabilities, stating:

> **We see generative AI as a net positive development for our business, thanks to our existing capabilities and the benefits we stand to realize by deploying generative AI solutions within our own operations and on behalf of our clients. To this end, TELUS International has a comprehensive suite of data-driven end-to-end generative AI solutions that integrate the best of GenAI capabilities and human expertise to transform digitally-led customer experiences across the entire customer journey**.

113.    Puritt added that Telus' "sales funnel continues to be very, very robust" and that the "conversations [he was] personally having with existing and prospective customers continue to indicate a desire to procure from us **the very capabilities that we've perfected over the last many years, including, in particular, more recently our exciting new GenAI-enabled capabilities**."

114.    The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Telus had a purported "comprehensive suite" of fully-developed AI products that was beating out the competition such that Telus did not have to lower prices and which not only resulted in cost savings for Telus' business but was also driving increased sales growth when, in reality, Telus had only had minimal AI offerings from pilot programs offered at discounted prices, which materially impacted margins, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f)  According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

g)  CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024,  Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies.  Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h)  Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "*when we demonstrate the capability* set that we have, we can *then* look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that;

i)  Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe[;]" and

j)  Defendant Puritt's admission during Telus' August 2, 2024 Earnings Call, that Telus was losing out to the competition, stating: "*we just keep losing opportunities because of price*," and that Telus kept being "told in the postmortem [after losing out on sales to competitors] that *we were just too expensive* and the competition we're [sic] willing to provide a similar solution."

115.    Also on the August 4, 2023 Earnings Call, Defendants assured investors that despite the "near-term pressure" on margins, "<u>**we have now successfully actioned meaningful cost savings**</u>" and "<u>**efficiency**</u>"— including the "<u>**benefits we stand to realize by deploying generative AI solutions within our own operations**</u>"—and that "<u>**[d]ue to the strong progress and execution of these and other remediation efforts … we expect to quickly return to our typical 20% plus adjusted EBITDA margin for the balance of the year**</u>."

116.    The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Telus had successfully developed an entire suite of AI products that was both driving internal cost savings as well as stronger sales that would allow

Telus to "quickly return to our typical 20% plus adjusted EBITDA margin[.]" In reality, Telus only had minimal AI offerings provided in pilot programs at discounted prices which materially impacted margins. Thus, Defendants lacked any reasonable basis for claiming Telus was achieving cost savings and higher sales that would lead to the restoration of historical EBITDA levels, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

g) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h) According to CW-1 and CW-2, Telus' diversion of inexperienced personnel to AI resulted in more man hours and higher costs and delays spent on projects trying to develop products for which they did not have the relevant background;

i) During CW-2's tenure from March 2021 to February 2024, CW-2 stated that employees

were being diverted from high-margin, paid projects, to work on development projects that generated no revenue, significantly decreasing overall revenues for Telus;

j) As CW-1 and CW-2 confirmed, work on AI projects took an extraordinary amount of personnel, as well as extra time, because Telus' did not have engineers with previous sophisticated experience in AI, requiring more people and more time to work on projects that were not done nearly as efficiently as they could have been. The resultant higher costs decreased Telus' margins on its AI initiatives;

k) As corroborated by CW-1, Telus' AI data annotation services were extraordinarily headcount-intensive, and the costs of importing vast amounts of data and cleaning it further compressed Telus' AI-related margins on the cost side;

l) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that;

m) Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe[;]" and

n) As a result of Telus' inability to develop any significant AI capabilities, it was unable to generate any cost efficiencies from the application of its AI initiatives internally.

## IX.    October 30, 2023 Press Release

117.    On October 30, 2023, Telus issued a press release stating that, as a "a leading digital customer experience (CX) innovator **that designs, builds and delivers next-generation solutions, including artificial intelligence (AI)**," it was announcing the launch of Fuel iX which it billed as its **"enhanced solution backed by the power of generative AI (GenAI) to deliver end-to-end CX innovation and AI-fueled intelligent experiences (iX)**." Telus claimed that with Fuel iX, it was providing customers "**a comprehensive suite of services, combin[ing] digital consulting, data services and analytics, web and mobile application development, and an AI-fueled platform.**"

118.    These statements were materially false and misleading when made or omitted to

50

state material facts necessary to make the statements not misleading because they gave the false impression that Telus "designs, builds and delivers … artificial intelligence (AI)" products, had a "comprehensive suite" of fully developed AI products and that Fuel iX was a significant AI product that would drive its AI business, when in reality, Fuel iX was nothing more than a ChatGPT wrapper (*i.e.*, a user interface to access ChatGPT), and Telus had no AI products beyond data annotation and pilot projects, as evidenced by:

a) During CW-2's tenure from March 2021 to February 2024, Fuel iX did not generate any revenue;

b) CW-4 stated that during CW-4's tenure from Summer 2021 to Spring 2024, Fuel iX was little more than a product(s) that other companies had built, *i.e.*, ChatGPT, which was created by OpenAI. CW-4 stated that it was commonly understood within WillowTree's engineers that the Fuel iX moniker was a meaningless, marketing label, but did not constitute any substantive product or innovation, adding that the common refrain among WillowTree's engineering community, where it purportedly originated was that "nobody knows what Fuel iX is," not even the people who built it. CW-4 stated that "we [engineers] all knew it was ChatGPT" packaged under a "wrapper" (*e.g.*, a user interface) "with the Company's name on it." CW-4 added that the Company's descriptions of other products as "powered by Fuel iX," was an "empty" statement, and represented another instance of the Company taking a product developed and built by someone else, "and just pasting your logo on it";

c) CW-4 also reported generally that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings

d) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

e) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

f) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023,

51

WillowTree employees that worked on AI projects during did not have experience or training in AI, and was not aware of any functioning AI product at WillowTree;

g) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that;

i) Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe[;]" and

j) Defendant Puritt's admission during Telus' Q2 2024 earnings call on August 2, 2024 that Fuel iX had not generated any revenue and, thus, Telus only "expect[ed] to start seeing meaningful revenue contributions from Fuel iX in 2025."

## X. November 3, 2023 Earnings Call

119.    On November 3, 2023, Telus held its fiscal third quarter 2023 earnings call (the "November 3, 2023 Earnings Call") with analysts to discuss its Q3 financial results. During that call, Defendant Puritt falsely claimed Telus was "**seeing good momentum and demand this year, in particular, led by the work we do to support market-leading generative AI foundational model builders**…"

120.    In response to an analyst question about possible further cuts in business from Meta, Defendant Puritt falsely reassured investors that they would be able to "**turn[] things around**" "**particularly … in the AI space**," when in reality, the AI space is where Telus was losing profitability. Moreover, Puritt suggested Telus could win more business from Meta by leveraging its AI offerings, when in reality, Telus had no significant AI capabilities to offer Meta in the area of content moderation (or otherwise):

**I think one of the sources of turning things around is really leveraging our**

**capability set, particularly, as I referred to earlier, in the AI space**.

I think, obviously, content moderation in particular has seen an interesting evolution as many of our clients, particularly in the social media space, look to rely more and more on AI-enabled capabilities as a first line of identification and defense, and less and less so on human digital engagement where possible. And so, we hope, we believe that once again, **we have what the doctor is ordering in terms of addressing this opportunity and evolution.**

121.    Later during the November 3, 2023 Earnings Call, an analyst asked about demand for AI work, in response to which Defendant Puritt falsely assured investors that Telus was positioned to benefit from its "**differentiated**" and "**comprehensive**" AI offerings, and "**expertise and experience,**" which led to AI consulting and upselling services for clients:

**Stephanie Doris Price,** CIBC Capital Markets, Research Division
In terms of AI…. Just curious around what you're seeing in terms of demand outside of your largest customers. And what portion of your customer base is looking at AI work at this point?

**Jeffrey D. Puritt,** President, CEO & Director
So, almost everybody is talking to us about AI….But I think **we really do have something quite unique, differentiated because of the AI experience and expertise and because of the comprehensive nature of the offering, where we can engage in a conversation in terms of a consulting advisory basis to really explore, together with our customers, the art of the possible and how their environment might lend itself favorably to GenAI implementation and adoption** to help both their own internal team members exploit that capability, as well as to better serve their customers.

122.    The above statements were materially false and misleading when made because Telus did not have differentiated or comprehensive AI products and those working on AI had no AI experience or expertise, as evidenced by:

a)    During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b)    Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree

employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

g) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "*when we demonstrate the capability* set that we have, we can *then* look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that;

i) Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe[.]"

123.    Later during the November 3, 2023 Earnings Call, Defendant Puritt falsely assured investors that because Telus could "drink our own champagne, eat our own gourmet cooking," it would be able to "drive down our own cost" in order to realize their targeted margins:

> And so, as you heard Vanessa detail in her prepared remarks earlier, **we have undertaken a fairly comprehensive optimization effort** that's not just right-sizing labor to demand, **but also looking to, as you've heard me say often in these calls, drink our own champagne, eat our own gourmet cooking, where we're deploying AI-enabled and automation capability inside TI to drive down our own cost to serve to create that headroom we need so we can continue to enjoy our targeted margins**.

124. The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Telus was already successfully "deploying AI-enabled and automation capability inside TI to drive down our own cost" ("drink[ing] our own champagne") and, thus, could "create that headroom we need so we can continue to enjoy our targeted margins." However, in reality, Telus had no AI offerings beyond labor-intensive data annotation and pilot programs being offered at discounted prices—because Telus *lacked* AI experience and expertise—and, therefore, was not able to drive down its own internal costs, which materially adversely impacted margins, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

g) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI

55

technologies, nor did it have any staff with the expertise or background for developing AI technologies.  Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h)  According to CW-1 and CW-2, Telus' diversion of inexperienced personnel to AI resulted in more man hours and higher costs and delays spent on projects trying to develop products for which they did not have the relevant background;

i)  During CW-2's tenure from March 2021 to February 2024, CW-2 stated that employees were being diverted from high-margin, paid projects, to work on development projects that generated no revenue, significantly decreasing overall revenues for Telus;

j)  As CW-1 and CW-2 confirmed, work on AI projects took an extraordinary amount of personnel, as well as extra time, because Telus' did not have engineers with previous sophisticated experience in AI, requiring more people and more time to work on projects that were not done nearly as efficiently as they could have been.  The resultant higher costs decreased Telus' margins on its AI initiatives;

k)  Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "*when we demonstrate the capability* set that we have, we can *then* look to expand the margin yield derived from that."  But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that;

l)  Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe[;]" and

m)  As a result of Telus' inability to develop any significant AI capabilities, it was unable to generate any cost efficiencies from the application of its AI initiatives internally.

## XI.    2023 Form 20-F Filed with the SEC on February 9, 2024

125.    On February 9, 2024, Telus issued a press release announcing its Q4 2023 and FY 2023 results (the "February 9, 2024 Release").  In the February 9, 2024 Release, Telus announced Kanu's departure from the Company effective March 31, 2024.

126.    The same day, February 9, 2024, Defendants filed Telus' 2023 Annual Report on Form 20-F with the SEC for the fiscal year ended December 31, 2023, signed by Defendant Puritt (the "2023 Form 20-F").  In the "Business Overview" section of the 2023 Form 20-F, in describing "Our Operations and Principal Activities," Defendants falsely proclaimed: "**We design, build and**

**deliver next-generation solutions, including AI** and content moderation, to enhance the CX for global and disruptive brands. **The Company's services support the full lifecycle of its clients' AI-led transformation journeys[**.]"

127.   The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Telus had meaningful ability to "design, build and deliver[]" AI solutions when, in reality, Telus used its existing employees who had no AI experience to try and develop AI products and never had any AI offerings beyond pilot programs, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to May 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience,

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies.  Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

g) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter; and

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that.

128. In addition, the 2023 Form 20-F contained false and misleading risk disclosures presented as mere hypotheticals when, in fact, the risks had already materialized.

129. For instance, under the section entitled "Business & Operational Risks" Telus purported to warn that ***if*** new services and technology are offered by competitors, then Telus ***may not be*** successful in responding to clients' needs, rendering Telus' service offering uncompetitive, when, in fact, increased competition was already occurring, and Telus was already losing market share to competitors. Thus, the risk had already materialized:

> **Changes in technology and client expectations could outpace our service offerings and the development of our internal tools and processes, which could have a material adverse effect on our business, growth, financial performance, financial condition and cash flows**.
>
> Our growth, profitability and the diversity of our revenue sources depend on our ability to develop and adopt new technologies to expand our existing offerings, proactively identify new revenue streams and improve cost efficiencies in our operations, all while meeting rapidly evolving client expectations. Recent and rapid developments with respect to and the popularization and commercialization of AI have created additional pressures on our business with respect to both the need to develop AI-related offerings to meet customer expectations and remain competitive and to integrate AI into our business processes and tools in order to create cost efficiencies. **Although we are focused on maintaining and enhancing the range of our offerings, we may not be successful in anticipating or responding to our clients' expectations and the integration of our technology solutions into our offerings may not achieve the intended enhancements or cost reductions in our operations**. **New services and technologies offered by our competitors may make our service offerings uncompetitive, which may reduce our clients' interest in our offerings and our ability to attract new clients**. **This may increasingly become a challenge for us with respect to revenue derived from our customer experience (CX) business, which may be negatively impacted by**

**the introduction of AI capabilities into our marketplace. Our failure to innovate, maintain technological advantages or respond effectively and timely to changes in technology could have a material adverse effect on our business, financial performance, financial condition and cash flows.**

130.    The statements in the preceding paragraphs were materially false and misleading when made, because Telus was ***already*** losing market share to competition and lowering prices and offering pilot programs to combat the price competition, which was having a material adverse effect on its business and financial condition (*e.g.*, on revenues, costs and margins). As a result, the 2022 Form 20-F did not accurately portray Telus' then current financial situation or business prospects, as evidenced by:

a) During CW-2's tenure from March 2021 to February 2024, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

b) According to CW-1 and CW-2, Telus' diversion of inexperienced personnel to AI resulted in more man hours and higher costs and delays spent on projects trying to develop products for which they did not have the relevant background;

c) During CW-2's tenure from March 2021 to February 2024, CW-2 stated that employees were being diverted from high-margin, paid projects, to work on development projects that generated no revenue, significantly decreasing overall revenues for Telus;

d) As CW-1 and CW-2 confirmed, work on AI projects took an extraordinary amount of personnel, as well as extra time, because Telus' did not have engineers with previous sophisticated experience in AI, requiring more people and more time to work on projects that were not done nearly as efficiently as they could have been.  The resultant higher costs decreased Telus' margins on its AI initiatives;

e) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects, for which it could not charge full prices, putting downward pressure on margins and on August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that;" and

f) During Telus' August 2, 2024 Earnings Call, Defendant Puritt admitted, for the first time, that "***we just keep losing opportunities because of price,***" and that Telus kept being "told in the postmortem [after losing out on sales to competitors] that ***we were just too expensive*** and the competition we're [sic] willing to provide a similar solution."

131.    Additionally, under section entitled "Financial Risks" Telus purported to warn to

warn that *if* the pressure on pricing models continues, then Telus *may be* unable to maintain profitability, when, in fact those pricing pressures were already occurring, and Telus was already losing market share to the competition. Thus, the risk had already materialized:

> **If we are unable to accurately forecast our pricing models or optimize the mix of products and services we provide to meet changing client demands, or if we are unable to adapt to the changing pricing and procurement demands of our clients, our business, financial performance, financial condition and cash flows may be adversely affected**.
>
> Industry pricing models are evolving, and companies are increasingly requesting transaction- or outcome-based pricing or other alternative pricing models, which require us to accurately forecast the cost of performance of the contract against the compensation we expect to receive. Also, **we are seeing the commoditization of our services in the market place, where our competitors are offering services similar to ours at a lower cost. While we believe our services to be of higher quality, this commoditization has created competitive, pricing and other pressures, such that our pricing models may not be representative of new contracts, adversely affecting the accuracy of our forecasting**. Further, our forecasts are based on a number of assumptions relating to existing and potential contracts with existing and potential clients, including assumptions related to the team members, other resources and time required to perform the services and our clients' ultimate use of the contracted service. **If we make inaccurate assumptions in pricing our contracts, our profitability may be negatively affected. In addition, if the number of our clients that request alternative pricing models continues to increase in line with industry trends, we may be unable to maintain our historical levels of profitability under these evolving alternative pricing models and our financial performance may be adversely affected, or we may not be able to offer pricing that is attractive relative to our competitors**. Some of our clients' may continue to evolve their procurement methodology by increasing the use of alternative methods, such as reverse auctions. **These methods may impact our ability to gain new business and maintain profit margins, and may require us to adapt our sales techniques, which we may be unsuccessful in doing in a timely manner or at all**.

132.    The statements in the preceding paragraphs were materially false and misleading when made because, at the time, Telus was *already* experiencing pressure on pricing and losing market share to competition, forcing Telus to lower its prices and offering pilot programs to combat the price competition, which had a material adverse effect on its margins and profitability. As a result, the 2023 Form 20-F did not accurately portray Telus' then current financial situation or

business prospects, as evidenced by:

a) During CW-2's tenure from March 2021 to February 2024, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

b) According to CW-1 and CW-2, Telus' diversion of inexperienced personnel to AI resulted in more man hours and higher costs and delays spent on projects trying to develop products for which they did not have the relevant background;

c) During CW-2's tenure from March 2021 to February 2024, CW-2 stated that employees were being diverted from high-margin, paid projects, to work on development projects that generated no revenue, significantly decreasing overall revenues for Telus;

d) As CW-1 and CW-2 confirmed, work on AI projects took an extraordinary amount of personnel, as well as extra time, because Telus' did not have engineers with previous sophisticated experience in AI, requiring more people and more time to work on projects that were not done nearly as efficiently as they could have been. The resultant higher costs decreased Telus' margins on its AI initiatives;

e) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects, for which it could not charge full prices, putting downward pressure on margins and on August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that;" and

f) During Telus' August 2, 2024 Earnings Call, Defendant Puritt admitted, for the first time, that "***we just keep losing opportunities because of price***," and that Telus kept being "told in the postmortem [after losing out on sales to competitors] that ***we were just too expensive*** and the competition we're [sic] willing to provide a similar solution."

## XII. February 9, 2024 Earnings Call

133.    On February 9, 2024, Telus held its fiscal fourth quarter 2023 earnings call (the "February 9, 2024 Earnings Call") with analysts to discuss its financial results. During the call, Defendant Puritt falsely claimed that Telus would see demand "across the board," and that "AI is going to be the standout for us going through the entirety of 2024":

> And in terms of service line, again, we think all 4 service lines will see meaningful improvement, particularly in the back half of the year. **And for sure, AI is going to be the standout for us going through the entirety of 2024 and beyond, not just in the back half.**

134.    The above statement was materially false and misleading when made because, in

reality, Telus did not have AI products beyond labor-intensive data annotation and mere pilot projects that were sold at a discount. Thus, Defendants lacked any reasonable basis for their statement because AI would not be a "standout" in 2024 and beyond, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

g) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that; and

i) Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at

a relatively small scale in order to avoid potential catastrophe[.]"

**DEFENDANTS BEGIN TO REVEAL THE TRUTH OVER MULTIPLE DISCLOSURES WHILE CONTINUING TO MISLEAD INVESTORS**

**I.    May 9, 2024 Press Release and Earnings Call**

**A.    Defendants Partially Reveal the Truth in the May 9, 2024 Press Release and Earnings Call**

135.    On May 9, 2024, before market open, Telus partially revealed the truth to investors when it issued a press release, attached to a Form 6-K filed with the SEC, and signed by Defendant Chande (the "May 9, 2024 Press Release"), announcing first quarter 2024 financial results for the period ending March 31, 2024. In the May 9, 2024 Press Release, Telus announced revenues of $657 million, a decrease of $29 million or 4% year-over-year. Telus further announced Adjusted EBITDA of $153 million, and Adjusted EBITDA margins of 23.3%. The May 9, 2024 Press Release quoted Defendant Puritt as stating the financial results were "in line with [] expectations".

136.    Analysts were quick to point out, however, on the earnings call later that day and in their subsequent research reports, that Telus' Adjusted EBITDA of $153 million included a $29 million increase from a one-time acquisition reversal related to the WillowTree acquisition. Excluding this gain from the results, reduced the Adjusted EBITDA margins from 23% to 19%, removing it from the midpoint of annual guidance.

137.    Analyst Stephanie Price of CIBC Research pointed out in a research report that day that "[m]anagement noted that the potential gain was expected and was a factor in setting guidance, *although that was not communicated when guidance was provided*." Price went on to state that, "[f]or margins to improve over the remainder of the year, cost-saving initiatives, mix shifting towards higher-margin revenue, and revenue growth will all need to have a meaningful impact."

138.    On Telus' earnings call later that day (the "May 9, 2024 Earnings Call"), Defendant Puritt partially revealed that Telus was working on "pilot" projects in AI for "many" customers:

[O]ur momentum continues in AI data solutions driven, by the strength of our relationship with Google in particular, while ***we're also working diligently on pilots and opportunities, with many major foundational AI model developers***.

Puritt added that Telus had "several more pilots underway" in the area of AI.

139.    Defendant Puritt's reference to pilot projects gave the first inkling that Telus did not have any fully-developed AI products and raised the question of what Telus was able to charge for such projects (as discounted prices would mean lower margins and negatively affect profitability). However, Puritt did not elaborate on this issue, or how pervasive such pilot projects were (beyond providing one example of a "beta launch").

140.    Additionally, in response to an analyst question about margins, Defendant Chande stated that Telus was seeing pressure on its margins, acknowledging that Telus' AI data solutions services did not produce higher margins, as expected. Rather, Telus' AI produced *lower* margins:

[W]e are seeing pressure on our margins. [] So a bit of the pressure relates to the mix of business we're doing. So we don't provide margin by service line, but we have said in the past that trust and safety is one of our higher margin businesses. ***And AI data solutions, depending on the work, can be a bit below average***. ***So we're working through the adjustment of the mix of our work***. As I mentioned in my remarks, we are seeing some higher cost of delivery.

141.    The May 9, 2024 disclosures were the first admissions that Telus' AI offerings were low margin and would not generate as much profitability as Defendants had led investors to believe.

142.    On this news, the Company's share price on the NYSE fell $1.41 USD or 18.14%, to close at $6.36 USD on May 9, 2024, on unusually heavy trading volume.

**B. Continued False and Misleading Statements on Telus' May 9, 2024 Earnings Call**

143.    Despite the disappointing results and low margins, Telus reaffirmed its full year outlook. On the May 9, 2024 Earnings Call, Defendant Puritt continued to mislead investors by blaming poor results on the macroeconomic environment and claiming "**we anticipate demand**

**starting to recover in the latter part of the year**." In response to an analyst question about client additions and expansions, Defendant Puritt responded that **"[t]he demand we're seeing now, Cassie, is really across all four services lines**."

144.    The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Telus was "seeing" "demand across all four service lines," including AI, when in reality Telus had no AI offerings besides labor-intensive data annotation and "pilot" programs at discounted prices which materially impacted margins, and its claimed AI-related cost efficiencies were not materializing for lack of the requisite, claimed AI capabilities. Thus, Defendants' statements also lacked any reasonable basis. Falsity is evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which

the customer might be an early adopter;

g) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that; and

i) Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe[.]"

## II.   False And Misleading Statements During the May 21, 2024 Investor Conference

145.    During a May 21, 2024 JP Morgran investor conference for Telus, headlined by Defendant Puritt (the "May 21, 2024 Investor Conference"), the Defendants misleadingly sought to downplay the margin pressure Telus experienced and assuage investors that Telus was focused on maintaining margins even if it meant less revenue in the short-term. Puritt falsely stated Telus had "**transform[ed] our own cost[s]…so that we can continue to generate these industry-leading margins and ensure the headroom in our cost structure[**.]"

146.    The above statements were materially false and misleading when made because Telus had no meaningful AI products and the data annotation and pilot projects it was working on were unprofitable due to the manpower it took and the fact Telus had to discount prices on pilot projects. Thus, Telus was not and could not "continue" to generate "industry-leading margins" and Defendants' statements lacked any reasonable basis, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had

significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023 and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

g) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024,  Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies.  Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h) According to CW-1 and CW-2, Telus' diversion of inexperienced personnel to AI resulted in more man hours and higher costs and delays spent on projects trying to develop products for which they did not have the relevant background;

i) During CW-2's tenure from March 2021 to February 2024, CW-2 stated that employees were being diverted from high-margin, paid projects, to work on development projects that generated no revenue, significantly decreasing overall revenues for Telus;

j) As CW-1 and CW-2 confirmed, work on AI projects took an extraordinary amount of personnel, as well as extra time, because Telus' did not have engineers with previous sophisticated experience in AI, requiring more people and more time to work on projects that were not done nearly as efficiently as they could have been.  The resultant higher costs decreased Telus' margins on its AI initiatives;

k) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that."  But with its "pilot," "experimental" and "still nascent" AI programs during the Class

Period, Telus had not yet done that;

l) Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe[;]" and

m) As a result of Telus' inability to develop any significant AI capabilities, it was unable to generate any cost efficiencies from the application of its AI initiatives internally.

147.    Regarding revenues from AI, Puritt again portrayed Telus as in the midst of a "gold rush" for the Company, and in the sweet spot of demand, stating, **"the near-term gold rush for us has been helping the hyperscalers build these large language models**, and we've been privileged to support a number of the large language model builders…. We kind of see this supply demand bifurcation around AI and GenAI, in particular. **And the gold rush today is helping to build these LLMs**."  Puritt added that "**we've built some proprietary tools**" for its clients' AI needs.

148.    The statements in the preceding paragraphs were materially false and misleading when made or omitted to state material facts necessary to make the statements not misleading because they gave the false impression that Telus was a leader in the AI space having already purportedly developed "proprietary" AI tools and was also developing LLMs when, in reality, Telus had no meaningful AI offerings other than the labor-intensive data annotation services and mere pilot programs offered at discounted prices, was simply piggy-backing off other company's AI products and tools and had no "proprietary" products of its own, nor had Telus developed any LLMs, as evidenced by:

a) During CW-1's tenure through late 2022, rather than hire employees with AI experience, to save costs, Telus reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development. Telus further conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI;

b) Corroborating CW-1's account, CW-2 reported that, although WillowTree had no AI products or personnel with experience or capabilities in AI, toward the latter part of 2023

and through at least CW2's tenure to February 2024, Telus diverted numerous WillowTree employees to "AI teams" to try to develop AI capabilities, notwithstanding their lack of AI experience;

c) During CW-2's tenure from March 2021 to February 2024, there was significant consternation at having employees reassigned from their core competencies to internal efforts to develop AI for which such employees did not have the requisite experience;

d) CW-3 also confirmed that during CW-3's tenure from before 2021 to May of 2023, WillowTree employees that worked on AI projects during did not have experience or training in AI and corroborated that engineers were being taken off (non AI-related) billable projects to non-billable work trying to brainstorm ideas related to AI;

e) CW-3 was not aware of any functioning AI product at WillowTree;

f) According to CW-2, there was no concrete AI product to sell at either WillowTree or Telus, only case-by-case basis pitches to customers in hopes of co-developing a product for which the customer might be an early adopter;

g) CW-4 reported that during CW-4's tenure from Summer 2021 to Spring 2024, Telus had no proprietary AI technology, and had not created any LLMs or innovative AI technologies, nor did it have any staff with the expertise or background for developing AI technologies. Instead, Telus used other companies' products to pass off as its own. Thus, as CW-4 stated, customers were not interested in Telus' AI offerings;

h) Defendant Puritt's admissions on May 9, 2024 that Telus had only been selling "pilot" AI projects (for which he admitted at the May 21, 2024 investor conference Telus could not charge full prices), and on the August 2, 2024 Earnings Call that "***when we demonstrate the capability*** set that we have, we can ***then*** look to expand the margin yield derived from that." But with its "pilot," "experimental" and "still nascent" AI programs during the Class Period, Telus had not yet done that; and

i) Defendant Puritt's admission on May 21, 2024 that with respect to the AI pilot projects, Telus was still trying to prove its "credentials and capabilities" and was "experimenting at a relatively small scale in order to avoid potential catastrophe[.]"

### III.    Defendants Partially Reveal the Truth in the August 2, 2024 Press Release and on the August 2, 2024 Earnings Call

149.    On August 2, 2024, before the market opened, Telus issued a press release, attached to Form 6-K filed with the SEC, and signed by Defendant Chande, announcing poor financial results for the second quarter ending June 30, 2024 (the "August 2, 2024 Release"). The August 2, 2024 Release revealed: a $5 million quarter-over-quarter or $15 million year-over-year revenue decrease; a $23 million or 15% quarter over-quarter Adjusted EBITDA decrease; and a 14.6%

quarter-over-quarter reduction in Adjusted EBITDA margin, from 23.3% to 19.9%.

150.    As analysts noted however, these reported results included a one-time acquisition related reversal for WillowTree, such that excluding the reversal, Telus' Q2 2024 Adjusted EBITDA margins were only *15.2%*, not 19.9%.  *See, e.g.*, August 2, 2024 William Baird report.

151.    Defendants explained they were reducing guidance, in large part, because Telus was unable to achieve the cost efficiencies it previously touted to investors, stating:

> These outlook ranges reflect three key assumptions: (1) we no longer assume the magnitude of the broader demand recovery, specifically as it relates to previously expected upside in the second half of the year; (2) we expect our margins to stabilize in the second half aligned with the second quarter of 2024, at the same time, we don't expect to record any material amounts for other income arising from business combination-related provisions in the next two quarters and expect incrementally higher share-based compensation as a result of the WillowTree earnout renegotiation; and (3) ***we have reduced the in-year financial benefit from our ongoing cost efficiency and transformation initiatives to reflect our revised expectations for what can be achieved in 2024***.

152.    On the same date, the Company held an earnings call to discuss Telus' Q2 2024 results (the "August 2, 2024 Earnings Call"). Defendant Puritt began his remarks during the August 2, 2024 Earnings Call by acknowledging that "***our resulting underperformance has put a tremendous dent into our longer-term track record of delivering sustained profitable growth***."

153.    Defendants further revealed that Telus' cost efficiency program thus far had not produced "meaningful" results and was taking much longer than guided:

> While we continue to work diligently on optimizing our global operations with many initiatives already underway, ***we're equally dissatisfied with the pace of our progress in transforming and reducing our cost structure***. In retrospect, ***we may have underestimated the time it would take to see more meaningful outcomes from our actions. These include deploying more automation inside our business and across our global footprint with the sheer scale of our organization, introducing complexity and the need for more time to implement our plans***.

154.    As Defendants explained, this was partially due to the fact Telus had not yet been able to implement AI internally to reduce costs:

We're also **working to** decommission legacy tools and systems and **migrate to a more GenAI-enabled environment** using the same technology we're bringing to our clients like Fuel iX before our own internal use.

155.    Moreover, Puritt disclosed that Telus' transition "towards a more technology-centric and specifically AI fuel business" "**necessitates some cannibalization** of our tenured and higher margin CX work historically in the mid-20s to mid-30s EBITDA margin range **with still nascent and relatively lower margin AI revenue streams**."

156.    Additionally, Telus announced it had significantly reduced its full year 2024 fiscal guidance to: (i) revenue in the range of $2,610 to $2,665 million; (ii) adjusted EBITDA in the range of $465 to $485 million; and (iii) adjusted EBITDA Margin in the range of 17.8% to 18.1%. In explaining the reasoning for reducing guidance, Defendants revealed that Telus had to slash its estimated annual savings for 2024 in half from $60 million to $30 million:

> And third, we have reduced the in-year financial benefits from our ongoing efficiency and transformation initiatives to reflect our revised expectations for what can be achieved in 2024. **Of the $60 million planned in-year savings that we disclosed earlier this year, we now assume half or approximately $30 million can be realized in 2024** with 1/3 already implemented and a reasonable assurance of achieving the other 2/3 by the end of the year.

157.    With respect to pricing, during the August 2, 2024 Earnings Call, Defendant Puritt revealed that despite Defendants' prior statements that Telus was above the competition due to the superior quality of its AI products and would not have to lower its prices, in fact, "**fierce competition on price**" had adversely impacted the Company which had struggled to keep the prices of its AI offerings competitive for several years. Thus, Telus revealed that it lowered prices contrary to its prior public assurances that it did not need to, and would maintain its historic margins, thereby necessitating the downward revision in Telus' financial outlook:

> While earlier in the year, we saw solid signs of the demand recovery on the horizon, including a record in new client bookings in the first quarter, the pace of new client bookings slowed in the second quarter despite continued strength in our sales

funnel. Meanwhile, **fierce competition on price and restricted client spending persisted**. Similar to our peers in now not seeing improvement in the macroeconomic environment, **we too no longer expect the magnitude of recovery previously expected for the second half of this year**. As a result, our financial outlook for the full year 2024 is revised to better reflect the current balance of risks and opportunities.

158.    Later in the call, Puritt revealed that Telus had been repeatedly "told in the postmortem [after losing contracts] that we were just too expensive and the competition we're willing to provide a similar solution" and "more or better for less, as I said before, is the desire out there" so Telus had decided to lower prices at the expense of margins because "we just decided that we can't keep missing out on opportunities."

159.    Also on the August 2, 2024 Earnings Call, an analyst asked Puritt to clarify the drivers of the "pricing pressure you described" to which Defendant Puritt explained that, the Company's AI offerings had put the Company in the "**unendurable position**" of allowing the "**complete eradication of margin yields in order to enjoy the revenue upside,**" and had made the decision to cut prices, which had adversely affected margins, and that the Company is "going to have to take it on the chin a little bit in terms of our historical margin profile."

On the AI front, remember, a lot of **our competitors** are either private companies or companies that **are clearly not targeting the same kind of profitable margin yield as we [are]**, and as a consequence, their focus on price has been considerably less important. They're looking for the land grab and just revenue growth. **And so it put us in this unendurable position of, well, do we allow for this complete eradication of margin yields in order to enjoy the revenue upside? Or do we try and find that elusive balance?** And that's really been the challenge over the last few years and I think as you heard from our comments and reflected in our revised guidance, **we're going to have to take it on the chin a little bit in terms of our historical margin profile**, **so that we can enjoy the upside in revenue** and then rely upon scale and our own eating, our own [gourmet cooking] internally, as I said, in order to create the headwind we need to enjoy the margin yield that we've historically benefited from.

160.    In response to a question regarding the recovery of Telus' margins, Puritt conceded that Telus' AI offerings had not been as profitable as indicated and the Company's transition to AI was facing significant pricing pressures, and adversely impacting margins:

I think I'll invite Tobias to comment on the AI front. But just as a setup, *as I mentioned a moment ago, right now, it's still this land grab period where, again, the price competition is quite fierce. And so we need to once again focus on winning opportunities, getting in the door with these clients. And then when we demonstrate the capability set that we have, we can then look to expand the margin yield derived from that*.

161.    With respect to the cost component of margins, Puritt likewise admitted that Telus' touted AI-related cost efficiency programs were not protecting margins, and that Telus' AI was not delivering costs savings to customers, putting pressure on margins both on the revenue and cost sides:

[O]n the CX front, I think because of the opportunities for technology substitution and enablement, there is this pervasive downward pressure and expectation, well, with more technology in the solution and less labor, you should be able to deliver more cost effectively. And indeed, *whilst we're making progress on that time, it has not been, as I said in my earlier remarks, as quick as we should have been*.

162.    Regarding Telus' much-touted ability to generate internal cost efficiencies from its AI initiatives to improve margins, Puritt indicated Telus would simply have to "rely upon scale and our own, eating our own [gourmet] cooking internally, as I said, … to create … the margin yield that we've historically benefited from," adding that "we're going to have to intentionally lower expectations in the near term … so that we can get back on track for revenue growth and thereafter in the fullness of time as we continue to see *better progression on our cost efficiency efforts that will create the headroom to get our margins back up* to where we want them to be is where we think they could be."

163.    When asked by an analyst about the cost efficiency initiatives taking more time than previously conveyed to yield meaningful results, Defendant Chande acknowledged that, contrary to its previous assurances, Telus was still working through these issues:

**Stephanie Doris Price,** CIBC Capital Markets, Research Division
I just wanted to touch on the cost efficiency initiatives, taking more time to yield meaningful results. Just hoping you could walk through the puts and takes here.

Gopi, I think you also mentioned that average salaries were up due to fierce competition for talent. Just curious if that's AI related or more broad and how that's kind of playing into the cost efficiency initiates here.

**Gopi Chande,** Chief Financial Officer

Stephanie, good to hear from you. So 2 parts to that question. ***One, on our cost efficiency program itself. So there are several components to it, some that have taken flight and are going to continue to support Q2.*** So with regards to some of our facility consolidation, vendor renegotiations, those are being flight. ***The ones that have taken us slightly longer than expected are ones that we're looking to roll globally*** and with some of the nuances that we have in each of the regions, working through the systems and the processes there is ***taking a little longer than expected, but will ultimately be rolled out*** and help support some of the visibility we'll have into our workforce management, which will support in terms of reporting to our clients on absolutism, and it will help us be able to manage attrition. So those are the ones that ***are a bit forward to roll out, but we expect to come through***. To your second question, Stephanie, certainly wage inflation is something like our peers that we are dealing with. And we do think that ultimately, that is addressed in several different wins that we're attacking. One is collaboratively working with our clients, our customers in terms of where we deliver those services. And then secondly, as well, ***moving to provide a more efficient automated service ourselves so that we could reduce the overall cost base*** to absorb some of that deflation. ***So it is all related. Certainly, we're looking at how do we reduce our cost*** and then how do we partner with our customers to reduce overall costs.

164.    On this news, the Company's share price on the NYSE fell from a closing price of $6.48 USD on August 1, 2024, to close at $4.15 USD on August 2, 2024 (a decrease of nearly 36%), on unusually heavy trading volume (more than 8.5 times the prior day's trading volume). The stock price continued to decline on the next trading day, falling $0.83, or 20%, to close at $3.32 on August 5, 2024, again on unusually heavy trading volume, and continued to decline over the subsequent trading days to close at $2.96 USD on August 7, 2024, on similarly heavy volume.

### POST CLASS PERIOD EVENTS

165.    On November 8, 2024, Telus held its fiscal third quarter 2024 earnings call (the "November 8, 2024 Earnings Call"). During that call, in response to a question about what additional levers Telus might have to increase efficiency and whether "structurally," analysts should expect about an 18% margin going forward, Defendant Chande stated that considering "*all*

of our margin levers," "16% to 18% is a good way to look at our operating margins," which translated to an "[A]djusted EBITDA" margin of "probably 14% to 15%." This confirmed that, even utilizing "all" of the margin levers Telus possibly could muster, Telus' baseline margin was just as reported when the truth came out at the end of the Class Period, *i.e.*, a true Adjusted EBITDA margin in the 14-15% range.

166.    During that call, Defendant Chande also reiterated Puritt's admissions on the May 9, 2024 and August 2, 2024 Earnings Calls that margins in Telus' "traditional AI business, meaning our data annotation, [were] lower" than those in Telus' other service lines, and that regarding Telus' newer AI efforts "[i]t is a different [*i.e.*, lower] margin profile on newer nascent work that we're getting around pilots and proof of concepts." New acting CEO and COO Jason Macdonnell also acknowledged that "as far as the generative AI models … it's essential that we bring better capabilities in this front."

167.    On June 12, 2025, Telus Corporation submitted a non-binding indication of interest to the Board of Directors of Telus Digital to acquire all the issued and outstanding subordinate voting shares and multiple voting shares of Telus for a price per share of $3.40. Not even five years ago on February 5, 2021, Telus completed its IPO at $25.00 per share and an initial market capitalization of $8.5 billion, the largest ever for a Canadian company at the time.

## SCIENTER

168.    As alleged herein, the Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations

of the federal securities laws. Indeed, Defendants made many of the alleged false and misleading statements herein directly to market analysts and investors.

**I.    Defendants' End of Class Period Admissions**

> **A.    Defendants' Admission They Were Conducting Pilot Programs Strongly Supports Scienter**

169.    As alleged herein, Defendants admitted at the end of the Class Period that Telus was, at best, running pilot AI programs throughout the Class Period for which they could not charge full price. These high cost and low revenue generating pilot programs negatively impacted the Company's margins for several quarters. However, Defendants were able to hide this underperformance behind the high margin content moderation services provided to Meta. But as Meta spent less and less revenue with Telus throughout the Class Period, Defendants were no longer able to hide their suffering margins and had to admit to investors that Telus' AI products consisted of mainly low margin pilot programs.

170.    For instance, on Telus' May 9, 2024 Earnings Call, Defendant Puritt admitted that Telus was working on pilot projects in AI for customers:

> [O]ur momentum continues in AI data solutions driven, by the strength of our relationship with Google in particular, while ***we're also working diligently on pilots and opportunities, with many major foundational AI model developers***.

171.    Puritt further added that Telus had "***several more pilots underway, as well as over 30 requests for new applications***" in the area of AI. Similarly, on the May 21, 2024 Analyst Day Call, Defendant Puritt admitted that "***we're deploying pilots all over the place***." Defendant Puritt further admitted that Telus could not charge full price for these pilots because Telus still had to prove its credentials, and was only experimenting on a small scale: "***But it's hard to charge full freight for a pilot when you're trying to prove out your credentials and capabilities and you're experimenting at a relatively small scale*** to avoid potential catastrophe…." Likewise, in response

to a question about the nature of Telus' bookings, Puritt reiterated that much of Telus' bookings were "AI-centric" and that such bookings caused "margin pressure" as Telus had to discount such bookings because they were "proof-of-concept pilot" projects:  "***Certainly more AI-centric***, … ***[b]ut it also comes with a bit of margin pressure because, again, as I mentioned earlier, we don't get to charge full freight on the proof-of-concept pilot***."

172.    These admissions, particularly in conjunction with the loss of revenue from Meta, Telus' ***second largest client***, support that Defendants knew that Telus was running low-margin pilot programs throughout the Class Period, cratering both margins and revenues, but nevertheless, in a reckless gamble, made a calculated decision to roll out pilot programs at discounted rates in hopes the situation would right itself.

173.    Defendants knew they were charging those discounted rates (and their consequent adverse impact on revenues and margins) since, *inter alia*, they had to make the decision to charge those discounted rates, they discussed pricing in nearly every earnings call in response to analyst questions, as discussed in Section I.B. *infra*, and Defendant Puritt himself acknowledged the innate logic that "it's hard to charge full freight for a pilot when you're trying to prove out your credentials and capabilities and you're experimenting at a relatively small scale" and "we don't get to charge full freight on the proof-of-concept pilot."

**B.    Defendants Admitted That They Were Harmed by Fierce Price Competition and Their Cost Transformation Initiatives Failed Which Supports an Inference of Scienter**

174.    On the August 2, 2024 Earnings Call, Defendant Puritt admitted that there was "***fierce competition on price***" that, previously unbeknownst to investors, had adversely impacted the Company which had struggled to keep the prices of its AI offerings competitive for several years. This issue had been raised a number of times on earnings calls prior to and during the Class Period, and each time Defendants assured analysts and investors that they did not need to lower

prices and were highly focused on the issue.

175.    Moreover, when an analyst asked Puritt to clarify the drivers of the "pricing pressure," Defendant Puritt admitted that the Company's AI offerings, in particular, had put the Company in the "***unendurable position***" of allowing the "***complete eradication of margin yields in order to enjoy the revenue upside[.]***" Defendant Puritt further admitted that he knew that Telus' competitors were unconstrained in targeting revenue growth, not profitability, which had forced Telus to cut its own prices, depressing margins, and that Telus was "going to have to take it on the chin a little bit" on margins:

> On the AI front, remember, a lot of ***our competitors*** are either private companies or companies that ***are clearly not targeting the same kind of profitable margin yield as we [are]*** and as a consequence, their focus on price has been considerably less important. They're looking for the land grab and just revenue growth. ***And so it put us in this unendurable position of, well, do we allow for this complete eradication of margin yields in order to enjoy the revenue upside? Or do we try and find that elusive balance?*** And that's really been the challenge over the last few years and I think as you heard from our comments and reflected in our revised guidance, ***we're going to have to take it on the chin a little bit in terms of our historical margin profile***, ***so that we can enjoy the upside in revenue*** and then rely upon scale and our own eating, our own [gourmet cooking] internally, as I said, in order to create the headwind we need to enjoy the margin yield that we've historically benefited from.

176.    In response to a question regarding the recovery of Telus' margins, Puritt conceded that Telus' AI offerings had not been as profitable as indicated and the Company's transition to AI was facing significant pricing pressures, and adversely impacting margins, particularly due to Telus' competitors' unconstrained focus on prioritizing market share over profits—despite Puritt previously assuring investors that Telus would not compromise on margins by lowering it prices— and because Telus had not shown any AI capabilities that would justify it charging normal rates for AI offerings that could expand margin yields:

> ***[A]s I mentioned a moment ago, right now, it's still this land grab period where, again, the price competition is quite fierce. And so we need to once again focus***

*on winning opportunities, getting in the door with these clients. And then when we demonstrate the capability set that we have, we can then look to expand the margin yield derived from that*.

177.    With respect to the cost component of margins, Puritt likewise admitted that Telus'

touted cost efficiency programs were not delivering costs savings during its transition to AI, or in

its CX business (including in passing those savings on to customers), as quickly as needed:

> [O]n the CX front, I think because of the opportunities for technology substitution and enablement, there is this pervasive downward pressure and expectation, well, with more technology in the solution and less labor, you should be able to deliver more cost effectively. And indeed, *whilst we're making progress on that time, it has not been, as I said in my earlier remarks, as quick as we should have been*.

178.    In her prepared remarks, Defendant Chande admitted that certain efficiency

transformation initiatives—including those from the touted internal application of Telus' AI

capabilities, which were insignificant—would not all be realized in 2024, as previously claimed.

Chande explained that only *half* of the expected $60 million in savings would be achieved in 2024,

and the remaining to not be achieved until 2025:

> *[W]e have reduced the in-year financial benefits from our ongoing efficiency and transformation initiatives* to reflect our revised expectations for what can be achieved in 2024. *Of the $60 million planned in-year savings that we disclosed earlier this year, we now assume half or approximately $30 million can be realized in 2024* with 1/3 already implemented and a reasonable assurance of achieving the other 2/3 by the end of the year.

179.    When asked by an analyst about the cost efficiency initiatives taking more time

than previously conveyed to yield meaningful results, Defendant Chande admitted that, contrary

to its previous assurances, Telus was still working through these issues:

> *The ones that have taken us slightly longer than expected are ones that we're looking to roll globally and* with some of the nuances that we have in each of the regions, working through the systems and the processes there is *taking a little longer than expected, but will ultimately be rolled out* and help support some of the visibility we'll have into our workforce management, which will support in terms of reporting to our clients on absolutism, and it will help us be able to manage attrition. *So those are the ones that are a bit forward to roll out, but we expect to*

***come through***. To your second question, Stephanie, certainly wage inflation is something like our peers that we are dealing with. And ***we do think that ultimately, that is addressed in several different wins that we're attacking***. One is collaboratively working with our clients, our customers in terms of where we deliver those services. And then secondly, as well, ***moving to provide a more efficient automated service ourselves so that we could reduce the overall cost base*** to absorb some of that deflation. ***So it is all related. Certainly, we're looking at how do we reduce our cost*** and then how do we partner with our customers to reduce overall costs.

180.    These admissions about price competition and that Telus could not achieve its cost transformation initiatives until 2025, many in response to specific, detailed analyst questions and particularly when considered in conjunction with fact that Telus was running, at best, pilot programs in AI throughout the Class Period, support that Defendants knew that Telus' revenues, margins, and profitability were plummeting but nevertheless failed to disclose these facts to investors.

181.    Defendants knew all along that a primary stated basis of the claimed cost reductions—internal efficiencies gained from the application of Telus' purported AI capabilities to its own process ("drinking our own champagne" and "eating our own gourmet cooking")—was nonexistent, since Telus had no such AI capabilities, either to sell to customers or to apply internally.

## II.    Defendants Held Themselves Out as Knowledgeable

182.    As set forth above, Defendants regularly provided detailed updates on, and were asked questions by, analysts and media personnel about revenues and margins, and pricing. In multiple earnings calls throughout the Class Period, revenues, margins and pricing were discussed at length.

183.    Moreover, throughout the Class Period, analysts repeatedly questioned Defendants on Telus' AI offerings and pricing, and whether they were having a negative effect on the Company's business. Defendants' answers suggest that Defendants were aware of all relevant

existing underlying issues with the AI pricing, including those they later admitted at the end of the Class Period, but that Defendants wanted to avoid discussing the undisclosed adverse facts and downplayed their significance until the end of the Class Period.

184.    Defendants did not demur or claim ignorance of the matters. Rather, the Individual Defendants repeatedly provided detailed answers to these questions, indicating their personal knowledge on the subject.

185.    For example, on the February 9, 2023 Earnings Call, in response to an analyst question about what factors contributed to Telus' lower margins, Defendant Kanu responded in detail that the margins were indeed being diluted by incorporating WillowTree margins, as well as client and portfolio mix:

**Jinli Chan,** BofA Securities, Research Division

I just wanted to switch gears and ask a little bit about margins. So you guys are expecting 2020 [sic] margins to be lower. Is that just purely due to WillowTree? Or are there any other factors such as like pricing or labor costs or attrition, utilization offsetting any of that and any way to quantify?

**Mahawa Vanessa Touray [Kanu],** Chief Financial Officer

Kathy, it's Vanessa. I'll take this question. You're absolutely right. The 2023 margin guide does incorporate the WillowTree margins. So that is a little bit dilutive. So that's not the impact that you're seeing. But in terms of any other factors, there's always going to be client and portfolio mix impact. As I mentioned earlier, as we were talking about revenue, we expect certain clients to flex down a little bit and other clients are flex up.  So the weighted balance of that margin profile is reflected in our guide…. But we've taken a more conservative view to our expectations of pricing increases relative to what we did in the past, just given the macro environment. So I think you're seeing a bit of that causation reflected in our margin guidance as well.

186.    Additionally, on the February 9, 2023 Earnings Call, in response to an analyst question about why Telus thinks AI and ChatGPT are opportunities and not threats to its business, Defendant Puritt confidently explained that there will be more business opportunities because

automation creates better user experience and is cost-effective:

**Daniel Rock Perlin,** RBC Capital Markets, Research Division

Jeff, I don't want to steal a lot from next week's event, but I did have a question just around AI and ChatGPT in particular, *as to why you think -- one, it's an opportunity maybe versus a threat for content moderation and your digital CX business*. We are obviously getting a lot more of these questions from investors.

*** *

**Jeffrey D. Puritt,** President, CEO & Director

[B]idirectionally, there's no question that incorporating that more comprehensive, accessible natural language processing capability into our own chatbot community prospectively *is going to create even more opportunity for us to win more business*. And the disintermediation of traditional live agent support that will be a consequence in part of this evolution, I think this is just a natural evolution of that dynamic that's been going on for several years now as automation and process improvement has naturally pushed the humans in the loop further up the food chain because simple, predictable, repeatable interactions can and frankly, should be automated because it's a better user experience, never mind more cost effective. *So we don't see this as a threat at all. We see this as an opportunity to be partnering bidirectionally with them and others similar to them*. And we will indeed talk a lot about it [at] Investor Day next week.

187.    On the May 4, 2023 Earnings Call, in response to an analyst question about the Company's revenue and guidance, Defendant Puritt explained that the Company's guidance was reliable because it was based on Defendants' insights particularly from continuous conversations with clients, touting that "it's a direct consequence of those conversations and sort of a broader look at the macro environment that is the underpinning of our optimism regarding the improved growth rates in the back half of the year." Additionally, on the August 4, 2023 Earnings Call, Puritt claimed that he knew the sales funnel was robust because of the conversations he was personally having with "existing and prospective customers[.]"

188.    The above detailed answers in response to analyst questions about customer insight, margins, and the business opportunities for Telus in AI, among others alleged herein, support a strong inference of Defendants' scienter in making their statements on these issues. Moreover,

Defendants' statements, including extensive (unscripted) discussions throughout multiple calls with analysts and investors, evidence that they were heavily involved in the day-to-day operations of the Company, particularly regarding the subject matter alleged here, with respect to Telus' revenues, margins, AI initiatives, pricing, and cost efficiency initiatives.

189.    Additionally, Defendants repeatedly claimed (leading up to and during the Class Period) that were "supremely confident" in their "strong visibility" into their financial and operational results, not just because they were aware of their own product offerings,  pricing and expenses, but because they were constantly "in discussions with clients in terms of planning their projects and priorities" and as a "direct consequence of" "conversations [Puritt was] personally having with existing and prospective customers."

190.    Defendants' knowledgeable and detailed responses demonstrate they were well aware of, *inter alia*, the levels of customer demand for AI products and services and Defendants' inability to supply them, and the corresponding impact on Telus' revenues and margins, the level of demand from Meta and its corresponding exposure of low margins from AI offerings (including the pilot projects), and the impact of competitors' pricing pressure on customer demand of Telus' products, which had forced Telus to cut its prices.

### III.    Telus' Shift to AI Became a Major Focus of the Company and Supports Scienter

191.    By 2020, Defendants realized, and publicly stated, that AI was the key to Telus' future. Thus, Defendants embarked on strategy to expand Telus' business to offer AI products and services through an aggressive acquisition spree, including the December 31, 2020 acquisition of Lionbridge AI, the July 2, 2021 Telus acquisition of Playment and the January 3, 2023 acquisition of WillowTree.

192.    In 2021, Telus rebranded the Lionbridge AI business as Telus International AI Data Solutions and claimed to be one of only two globally scaled, managed AI training data and data

annotation services providers in the world.

193.    On Telus' February 16, 2023 Analyst Call, Defendant Puritt described AI Data Solutions as "a very topical area that we invested meaningfully in back in 2020 through our acquisition of Lionbridge AI[]" and claimed that Telus has seen "tremendous growth in this portfolio, and we're only just scratching the surface of the full opportunity here with generative AI use cases[.]"

194.    Also during the February 16, 2023, Tobias Dengel, WillowTree's President, confirmed that "ChatGPT is the hot thing right now," and the technology that underpins it is "changing the world."

195.    During the August 4, 2023 Earnings Call, Defendant Puritt stated that Telus was not "merely a backseat passenger in this [AI] disruption," and with these technologies, would "capitalize on the growth in need for AI data annotation and computer vision services, the picks and shovels as I like to call them, to help our clients leverage AI opportunities."

196.    Additionally, Defendant Puritt repeatedly referred to the industry shift to AI as a "gold rush" for which Telus was selling the "picks and shovels."

197.    Telus' swift shift to AI was confirmed by former employees who were employed at Telus' acquired subsidiaries. CW-3 confirmed that prior to the merger, WillowTree's focus was primarily on voice and app development. However, once Telus took over, WillowTree's focus became AI, especially around May 2023. CW-3 stated that Tobias Dengel, WillowTree's CEO, "made a big speech" saying "that the company was now going to pursue AI" and "proclamations were made from on high about what engineers were supposed to do, for example, writing blog posts about AI[.]"

198.    CW-1 and CW-2 corroborated that Telus diverted employees from other projects

to work on pursuing development of AI initiatives.  CW-4 likewise stated that the big push to pivot to AI internally came around March to May 2023, after ChatGPT was publicly introduced, and that the push to redirect engineers to AI development had initiated from Telus, but also WillowTree's C-suite, and there was a quick push for the WillowTree division to "get on this."

199.    Accordingly, Defendants' realization that AI represented the future for the Company and was the key to its success, and the major change in focus to pivot to AI, including diverting large numbers of engineers from high-margin billable work for paying clients, to brainstorming to see if they could come up with some AI product for Telus to offer— notwithstanding that such work was expensive for Telus and non-billable—together with Defendants' constant focus on it in their statements to the market during the Class Period, evidences a strong inference of Defendants' knowledge of the true facts regarding the true state of their AI capabilities during the Class Period, including their inability to harness AI to gain cost efficiencies after a notable dip in margins during the Class Period.

## LOSS CAUSATION

200.    Defendants' wrongful conduct directly and proximately caused Plaintiff and the Class to suffer substantial damages.

201.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Telus Equity Shares and operated as a fraud or deceit on Class Period purchasers of Telus Equity Shares, by misrepresenting Telus' business and prospects and failing to disclose the adverse facts detailed herein. Plaintiff and members of the Class purchased or otherwise acquired Telus Equity Shares throughout the Class Period at prices that were inflated by the fraud described herein. The truth regarding the fraud was revealed to the market in two partial disclosures on May 9, 2024 and

August 2, 2024. When the true facts underlying Defendants' prior misrepresentations and omissions were disclosed to the market and/or the risks concealed by them materialized on each of these dates, the price of Telus Equity Shares declined significantly as the prior inflation came out of the price of such Equity Shares.

202.    As a result of his purchase of Telus Equity Shares during the Class Period at prices inflated by the fraud, and the subsequent decline of the price of those Equity Shares in response to the true facts or the risks concealed by the fraud, Plaintiff and the other members of the Class suffered economic losses, *i.e.*, damages under the federal securities laws. Such declines were a direct result of Defendants' fraudulent misrepresentations being revealed to the market, and/or the materialization of risks that Defendants downplayed or concealed from investors.

203.    On May 9, 2024, before the market opened, Telus announced first quarter 2024 financial results for the period ending March 31, 2024.  Telus announced revenues of $657 million, a decrease of $29 million or 4% year-over-year. Several analysts were quick to point out that Telus' Adjusted EBITDA of $153 million included a $29 million increase from a one-time acquisition reversal related to the WillowTree acquisition. Excluding this gain from the results reduced the Adjusted EBITDA margins from 23% to 19%.

204.    On the May 9, 2024 Earnings Call, Defendants partially revealed the truth that, rather than having substantial AI capabilities as represented during the Class Period, Telus was at best working on "pilot" projects in AI for certain customers and, as a result, Telus was seeing pressure on its margins. The May 9, 2024 corrective disclosures were the first admissions that Telus did not have any meaningful AI products and its AI offerings were low margin and would not generate as much profitability as Defendants had lead investors to believe, thereby correcting Defendants' prior statements that, among others, Telus already had heavy capabilities in AI and

machine learning, a full suite of cognitive AI capabilities, and was equipped to develop and deliver cutting-edge AI solutions, when it reality it only had low margin pilot programs to offer.

205.   In response to Defendants' disclosure, the price of Telus Equity Shares fell significantly, dropping $1.41 USD per share, or 18.14%, thereby partially removing the artificial inflation caused and/or maintained by Defendants' false and misleading statements and causing economic loss to investors who had purchased Telus Equity Shares during the Class Period.

206.   Analysts understood Defendants' disclosures to be correcting their prior misstatements. For example, despite Defendants' prior assurances that they would achieve cost efficiencies that would quickly return margins to Telus' historically high levels, analysts at Baird Equity Research noted that "[w]e remain uncertain about [Telus'] ability to ramp margins back toward the mid-20% range" and there is "concern about [Telus'] ability to ramp revenue/margins in H2 [the second half of 2024]."

207.   Similarly, analysts at CIBC Research noted that margins had not improved as Defendants had indicated and that, "[f]or margins to improve over the remainder of the year, cost-saving initiatives, mix shifting towards higher-margin revenue, and revenue growth will all need to have a meaningful impact," which they had not, despite Defendants' prior assurances.

208.   On August 2, 2024, Defendants revealed that Telus' cost efficiency and transformation initiatives had not had their intended effect, and would not be fully achieved until 2025 at the earliest. Moreover, the Company revealed that Telus' transition "towards a more technology-centric and specifically AI fueled business" had resulted in "cannibalization" of Telus' higher margin work, "lower margin AI revenue streams" (partly because Telus could only offer "pilot" AI projects which it had to discount substantially, and partly because its AI offerings were costly to produce); and that there was "fierce competition on price" on Telus' offerings across-the-

board because the prices Telus was charging for its products were much higher than competitors' prices and Telus' products were not sufficiently different to justify higher prices in the minds of consumers. As a result, Telus had to "focus on winning opportunities, getting in the door with these clients" by lowering prices which in turn, further reduced margins, and would continue to do so for some time.

209.    The August 2, 2024 corrective disclosures revealed for the first time that Telus' AI offerings had "cannibalized" its higher margin offerings and that Telus was losing sales to the competition because its prices were too high. Additionally, Defendants revealed for the first time in their August 2, 2024 corrective disclosures that they were not even close to achieving the cost efficiencies they had previously assured investors they would achieve in 2024, and that they had reduced the estimated savings in 2024 in half, from $60 million to $30 million.

210.    Defendants' disclosures also corrected their prior misleading statements that, *inter alia*, the Company saw "meaningful opportunities being amplified by generated AI adoption" which "will be a tailwind" for Telus, and that Defendant Puritt had not seen any "deterioration, degradation or change of consequence that makes me feel less certain about our ability to anticipate and predict where we think our revenues will be this year."

211.    In response to Defendants' second set of corrective disclosures, the price of Telus Equity Shares fell significantly, dropping $2.33 USD per share, or 35.96%, thereby partially removing the artificial inflation caused and/or maintained by Defendants' false and misleading statements and causing economic loss to investors who purchased Telus Equity Shares during the Class Period.

212.    Analysts understood that these disclosures corrected Defendants' prior misstatements. Analyst Ryan E. Potter of Citi Research wrote that "the magnitude of the lowered

outlook was greater than we expected and the reset in margin expectations was a further negative surprise." Potter explained that "[t]he pricing pressure and lower expected cost efficiency initiative benefits is driving the lowered expected margins that we believe could persist over the medium-term" and that Telus "will need to prove execution over multiple quarters to regain investor confidence."

213.    Analyst Divya S. Goyal of Scotiabank wrote that Telus' second quarter results "came in materially below our and consensus expectations," adding that "we were surprised by the magnitude of guidance revision primarily on the profitability front[.]"

214.    Analyst Tien-tsin Huang of J.P. Morgan wrote that, "TIXT took a nose dive Friday (-36% vs. S&P 500 -2%) after 2Q earnings that included a significant rev/EBITDA/EPS miss, an even greater cut to full-year guidance, and the departure of TIXT's tenured President/CEO Jeff Puritt." Huang further stated that "[w]e believe TIXT's results are reflective of an overly ambitious guidance rather than any material cyclical deterioration", noting that "it will take time for TIXT to rebuild credibility and gain enough proof points to make a call on their AI positioning." Huang further added that despite management's "cost efficiency journey", "headwinds from pricing pressure and weak revenue more than offset benefits…"

215.    Analyst firm William Blair issued a report on August 2, 2024 stating, *inter alia*, that Telus "flagged incremental pricing pressure from private companies and other competitors willing to accept lower-margin work, leaving us skeptical of the margin potential of the business in the future," and "over the next year or more we expect the company to be in rebuild mode as it adapts to … significant pricing pressure from competitors."  This supports that Defendants' August 2, 2024 disclosures corrected their prior Class Period assurances that Telus did not need to and, thus, would not, sacrifice margins for market share and would not, and did not need to cut prices

even despite competition on pricing, because Telus offered a better value proposition to its customers and they were willing to pay for it.

216.    Additionally, the William Blair report highlighted that fact that "[t]he recent cost optimization plan is taking longer than expected" as Telus "now expects to realize one-half of the previously expected $60 million savings in 2024," and that Telus' "margins will be pressured in the near term due to challenges with the recent cost optimization initiatives and pricing pressure from competitive forces."  This supports that Defendants' August 2, 2024 disclosures corrected their prior Class Period assurances that Telus would readily achieve substantial cost reductions and consequent margin improvements from Telus' cost optimization programs, including using Telus' purported AI capabilities internally to increase cost efficiency, and that such programs would see major savings in Q3 and Q4 2023 and $60 million in savings in 2024.

217.    The decline in the price of Telus Equity Shares after the corrective disclosures came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Telus Equity Shares negates any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

218.    The economic loss (*i.e.*, damages) suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Telus Equity Shares and the subsequent significant declines in the value of Telus Equity Shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### CLASS ACTION ALLEGATIONS

219.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Telus International Equity Shares between February 9, 2023 and August 1, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

220.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Telus International's Equity Shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Telus International shares were traded publicly during the Class Period on the NYSE. Record owners and other members of the Class may be identified from records maintained by Telus International or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

221.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

222.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

223.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Telus International; and

c)    to what extent the members of the Class have sustained damages, and the proper measure of damages.

224.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

225.    The market for Telus International's Equity Shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Telus International's Equity Shares traded at artificially inflated prices during the Class Period. On February 13 and 23, 2023, the Company's share price closed at a Class Period high of $22.15 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's Equity Shares relying upon the integrity of the market price of Telus International's Equity Shares and market information relating to Telus International, and have been damaged thereby.

226.    During the Class Period, the artificial inflation of Telus International's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint

causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Telus International's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Telus International and its business, operations, and prospects, thus causing the price of the Company's Equity Shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's Equity Shares at such artificially inflated prices, and each of them has been damaged as a result.

227. At all relevant times, the market for Telus International's Equity Shares was an efficient market for the following reasons, among others:

(a) Telus International shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Telus International filed periodic public reports with the SEC and/or the NYSE;

(c) Telus International regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, publicly available earnings and other calls with market analysts, investor conferences, and other similar reporting services; and/or

(d) Telus International was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

228. As a result of the foregoing, the market for Telus International's Equity Shares promptly digested current information regarding Telus International from all publicly available sources and reflected such information in Telus International's share price. Under these

circumstances, all purchasers of Telus International's Equity Shares during the Class Period

suffered similar injury through their purchase of Telus International's Equity Shares at artificially

inflated prices and a presumption of reliance applies.

229.    A Class-wide presumption of reliance is also appropriate in this action under the

Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the Class's claims are, in large part, grounded on Defendants' material misstatements

and/or omissions. Because this action involves Defendants' failure to disclose material adverse

information regarding the Company's business operations and financial prospects—information

that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to

recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable

investor might have considered them important in making investment decisions. Given the

importance of the Class Period material misstatements and omissions set forth above, that

requirement is satisfied here.

## NO SAFE HARBOR

230.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and

conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when

made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements.

In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward

looking statements pleaded herein, Defendants are liable for those false forward-looking

statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Telus International who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

231.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

232.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Telus International's Equity Shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

233.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Equity Shares in an effort to maintain artificially high market prices for Telus International's Equity Shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

234.    Defendants, individually and in concert, directly and indirectly, by the use, means

or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Telus International's financial well-being and prospects, as specified herein.

235.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Telus International's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Telus International and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's Equity Shares during the Class Period.

236.    Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the

Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

237.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Telus International's financial well-being and prospects from the investing public and supporting the artificially inflated price of its Equity Shares. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.  Each of the speakers of the false and misleading statements alleged herein made such statements or omissions with knowledge or reckless disregard of the undisclosed true facts, and acting on behalf of the Company, and such false and misleading statements are imputed to the Company.

238.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Telus International's Equity Shares was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's Equity Shares were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Equity Shares trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public

statements by Defendants during the Class Period, Plaintiff and the other members of the Class

acquired Telus International's Equity Shares during the Class Period at artificially high prices and

were damaged thereby.

239.    At the time of said misrepresentations and/or omissions, Plaintiff and other

members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and

the other members of the Class and the marketplace known the truth regarding the problems that

Telus International was experiencing, which were not disclosed by Defendants, Plaintiff and other

members of the Class would not have purchased or otherwise acquired their Telus International

Equity Shares, or, if they had acquired such Equity Shares during the Class Period, they would not

have done so at the artificially inflated prices which they paid.

240.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act

and Rule 10b-5 promulgated thereunder.

241.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the

other members of the Class suffered damages in connection with their respective purchases and

sales of the Company's Equity Shares during the Class Period.

## SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

242.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully

set forth herein.

243.    Individual Defendants acted as controlling persons of Telus International within the

meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions and their ownership and contractual rights, participation in, and/or awareness of the

Company's operations and intimate knowledge of the false financial statements filed by the

Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

244.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

245.    As set forth above, Telus International and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's Equity Shares during the Class Period.

<strong>PRAYER FOR RELIEF</strong>

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 30, 2025                                     Respectfully Submitted,

**LEVI & KORSINSKY, LLP**

By: */s/ Shannon L. Hopkins*
    Shannon L. Hopkins (SH-1887)
    Gregory M. Potrepka (GP-1275)
    Andrew E. Lencyk (AL-4329)
    1111 Summer Street, Suite 403
    Stamford, CT 06905
    Telephone: (203) 992-4523
    Facsimile: (212) 363-7171
    shopkins@zlk.com
    gpotrepka@zlk.com
    alencyk@zlk.com

    *Lead Counsel for Lead Plaintiff and the Class*