**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JOSÉ LUIS CERÓN SARRIA, Individually
and on Behalf of All Others Similarly Situated,

                            Plaintiff,

 v.

TELUS INTERNATIONAL (CDA) INC.,
JEFFREY PURITT, VANESSA KANU,
GOPI CHANDE, and MICHAEL RINGMAN,

                            Defendants.

Case No. 1:25-CV-00889-VM

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND.........................................................................................3

      A.    Through Its Four Business Divisions, TI Supplies AI-Related Services to Clients ..........................................................................................................3

      B.    TI Begins to Integrate GenAI into Its Client Offerings, Including Using Pilots ...........................................................................................................6

      C.    TI Begins to Integrate GenAI into Its Own Business to Secure Cost Savings ........................................................................................................7

      D.    TI Announces Disappointing Financial Performance and Plaintiff Sues ...............8

ARGUMENT ...............................................................................................................8

I.     Plaintiff Fails to Plead Any Materially False or Misleading Statements...........................9

      A.    The Complaint Does Not Plead That the AI Offerings Statements Were False or Misleading....................................................................................10

      B.    The Complaint Does Not Plead That the AI Data Statements Were False or Misleading ....................................................................................13

      C.    The Complaint Fails to Plead That the Outlook Statements Were False or Misleading....................................................................................14

      D.    The Complaint Does Not Plead That the Cost Savings Statements Were False or Misleading....................................................................................19

II.    Plaintiff Fails to Plead a Strong Inference of Scienter....................................................20

      A.    The Complaint Does Not Identify Any Motive to Defraud Shareholders............21

      B.    The Complaint Also Does Not Plead Conscious Misbehavior or Recklessness ............................................................................................21

III.   The Complaint Fails to Plead Loss Causation ................................................................25

IV.   Plaintiff Fails to State a Claim Under Section 20(a) of the Exchange Act........................27

CONCLUSION.............................................................................................................27

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Amgen Inc.* v. *Conn. Ret. Plan & Tr. Funds*,
    568 U.S. 455 (2013)..............................................................................................8

*Anschutz Corp.* v. *Merrill Lynch & Co., Inc.*,
    690 F.3d 98 (2d Cir. 2012)..................................................................................8

*In re AppHarvest Sec. Litig.*,
    684 F. Supp. 3d 201 (S.D.N.Y. 2023)................................................................24

*In re AT&T/DirecTV Now Sec. Litig.*,
    480 F. Supp. 3d 507 (S.D.N.Y. 2020)................................................................15

*Athale* v. *SinoTech Energy Ltd.*,
    2015 WL 13145808 (S.D.N.Y. Jan. 23, 2015) ..................................................22

*In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*,
    2009 WL 4823923 (S.D.N.Y. Dec. 14, 2009) ..................................................14

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*,
    506 F. App'x 32 (2d Cir. 2012) ....................................................................8, 18

*Born* v. *Quad/Graphics, Inc.*,
    521 F. Supp. 3d. 469 (S.D.N.Y. 2021)..........................................................25, 26

*C.D.T.S.* v. *UBS AG*,
    2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) ..................................................21

*In re China Mobile Games & Entm't Grp., Ltd. Sec. Litig.*,
    2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ......................................................10

*In re China Organic Sec. Litig.*,
    2013 WL 5434637 (S.D.N.Y. Sept. 30, 2013)...................................................25

*In re Citigroup, Inc. Sec. Litig.*,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004)................................................................11

*City of Coral Springs Police Officers' Ret. Plan* v. *Farfetch Ltd.*,
    565 F. Supp. 3d 478 (S.D.N.Y. 2021)................................................................23

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen. Holdings Corp.*,
    2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) .....................................................21

*Diabat* v. *Credit Suisse Grp. AG*,
2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024)........................................................................20

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. Mar. 30, 2021) ..................................................................3, 25

*East Point Systems, Inc.* v. *Steven Maxim, S2k, Inc.*,
133 F. Supp. 3d 430 (D. Conn. 2015)..................................................................................20

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)............................................................................................9, 21

*Eden Alpha CI LLP* v. *Polished.com Inc.*,
763 F. Supp. 3d 270 (E.D.N.Y. 2025) ..................................................................................10

*In re Francesca's Holdings Corp. Sec. Litig.*,
2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ......................................................................25

*Francisco* v. *Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020)..................................................................................10

*Frankfurt-Tr. Inv. Luxemburg AG* v. *United Techs. Corp.*,
336 F. Supp. 3d 196 (S.D.N.Y. 2018)............................................................................14, 19

*In re IAC/InterActiveCorp Sec. Litig.*,
478 F. Supp. 2d 574 (S.D.N.Y. 2007)..................................................................................13

*Kalnit* v. *Eichler*,
264 F.3d 131 (2d Cir. 2001)................................................................................................21

*Kasilingam* v. *Tilray, Inc.*,
2023 WL 5352294 (S.D.N.Y. Aug. 21, 2023) ......................................................................19

*Kemp* v. *Universal Am. Fin. Corp.*,
2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) ............................................................................20

*Kinra* v. *Chicago Bridge & Iron Co.*,
2018 WL 2371030 (S.D.N.Y. May 24, 2018) ......................................................................22

*In re Lehman Bros. Sec. & Erisa Litig.*,
2013 WL 3989066 (S.D.N.Y. July 31, 2013) ......................................................................15

*Lentell* v. *Merrill Lynch & Co., Inc.*,
396 F.3d 161 (2d Cir. 2005)..........................................................................................25, 27

*Loc. 449 Pension Plan* v. *Skechers U.S.A., Inc.*,
412 F. Supp. 3d 353 (S.D.N.Y. 2019)..................................................................................18

*Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Exp. Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010)........................................................22

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)....................................................9, 11

*Martin* v. *Quartermain*,
    732 F. App'x 37 (2d Cir. 2018) ..............................................................18

*Miller* v. *Lazard, Ltd.*,
    473 F. Supp. 2d 571 (S.D.N.Y. 2007)..................................................8, 23

*Monroe Cnty. Employees' Ret. Sys.* v. *YPF Sociedad Anonima*,
    15 F. Supp. 3d 336 (S.D.N.Y. 2014).......................................................27

*Novak* v. *Kasaks*,
    216 F.3d 300 (2d Cir. 2000).....................................................................22

*In re Omega Healthcare Invs. Inc. Sec. Litig.*,
    563 F. Supp. 3d 259 (S.D.N.Y. 2021).....................................................25

*Paulsen* v. *Stifel, Nicolaus & Co.*,
    2019 WL 2415213 (S.D.N.Y. June 4, 2019) ............................................3

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    437 F. Supp. 3d 329 (S.D.N.Y. 2020).....................................................23

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    89 F.4th 408 (2d Cir. 2023) .....................................................................18

*In re Plug Power, Inc. Sec. Litig.*,
    2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023)..........................................25

*Police & Fire Ret. Sys. City of Detroit* v. *Argo Group Int'l Holdings, Ltd.*,
    2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) ..........................................19

*In re Pretium Res. Inc. Sec. Litig.*,
    256 F. Supp. 3d 459 (S.D.N.Y. 2017).....................................................24

*In re Renewable Energy Grp. Sec. Litig.*,
    2022 WL 14206678 (2d Cir. Oct. 25, 2022).............................................22

*Rothman* v. *Gregor*,
    220 F.3d 81 (2d Cir. 2000)........................................................................3

*Saraf* v. *Ebix, Inc.*,
    632 F. Supp. 3d 389 (S.D.N.Y. 2022).....................................................11

*Saskatchewan Healthcare Emp. Pension Plan* v. *KE Holdings Inc.*,
    718 F. Supp. 3d 344 (S.D.N.Y. 2024) .....................................................................17

*Shetty* v. *Trivago N.V.*,
    796 F. App'x 31 (2d Cir. 2019) ..............................................................................24

*Slayton* v. *Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) ...................................................................................15

*Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*,
    531 F.3d 190 (2d Cir. 2008) ...................................................................................20

*Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ................................................................................................21

*Tyler* v. *Liz Claiborne, Inc.*,
    814 F. Supp. 2d 323 (S.D.N.Y. 2011) ....................................................................24

*In re Veon Ltd. Sec. Litig.*,
    2018 WL 4168958 (S.D.N.Y. Aug. 30, 2018) ........................................................27

*Villare* v. *Abiomed, Inc.*,
    2021 WL 4311749 (S.D.N.Y. Sept. 21, 2021) ........................................................18

*Woolgar* v. *Kingstone Cos., Inc.*,
    477 F. Supp. 3d 193 (S.D.N.Y. 2020) ...................................................................9, 22

## Statutes

Private Securities Litigation Reform Act of 1995 .............................................. *passim*

## Other Authorities

Fed. R. Civ. P. 9(b) ...............................................................................................8, 9, 20

Rule 10b-5 ..............................................................................................................8, 9

Defendants TELUS International (CDA) Inc. d/b/a TELUS Digital ("TI" or the "Company"), Jeffrey Puritt, Vanessa Kanu, Gopi Chande, and Michael Ringman respectfully move to dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF. 24) (the "Complaint") in its entirety and with prejudice.

## PRELIMINARY STATEMENT

TI is a technology services company that sells a variety of artificial intelligence ("AI")-related offerings to its clients, and Plaintiff is a TI shareholder. The crux of Plaintiff's securities fraud claim is that TI and its executives falsely told shareholders that TI had AI capabilities to sell to customers, when it actually had none. But that assertion is entirely unsupported: TI offers many AI-related capabilities, ranging from AI-powered chatbots to AI data annotation services to AI-supported content moderation services. Even the Complaint concedes that TI sells AI-related services, and Plaintiff does not identify *any* AI service or product that TI falsely claimed to have. Not one. Plaintiff's argument to the contrary rests upon confidential witnesses ("CWs") who offer no such facts, and supposed "admissions" that Defendants did not actually make. The Complaint is fatally defective, and fails to identify any fraud whatsoever.

Plaintiff's fraud claims fail for three separate reasons, each of which alone requires dismissal:

*First*, the Complaint fails to plead any false or misleading statements. Plaintiff relies heavily on allegations from low-level former employee CWs (and one CW who did not even work for TI). The CWs purport to reveal information contradicting Defendants' public statements. But no CW identifies an AI capability that TI falsely claimed to have. If anything, the CW allegations about AI capabilities are consistent with Defendants' public disclosures or otherwise raise personal criticisms of TI's management practices that do not support securities fraud. Plaintiff also relies

upon a purported "admission" by CEO Puritt that TI was "only" running "pilot" AI programs, but it was Plaintiff who injected the word "only" and Puritt said no such thing.  Plaintiff fails to plead that any challenged statement was false or misleading.

*Second*, the Complaint fails to plead facts raising a strong inference of fraudulent intent. Plaintiff does not identify any motive or opportunity to commit fraud by any Defendant.  Rather, the Complaint purports to show scienter by identifying internal information that was contrary to public statements.  But none of the CWs identify ***any*** inconsistent internal information that was allegedly known by, or communicated to, the Individual Defendants.  To the contrary, the Complaint barely even mentions the Individual Defendants, much less pleads facts about their knowledge from internal meetings, calls, or reports—as the heightened pleading standards require. These allegations come nowhere close to pleading a strong inference of scienter.

*Third*, the Complaint fails to plead loss causation.  Plaintiff alleges that he suffered losses when TI's stock dropped following TI's first and second quarter 2024 earnings reports.  While both revealed disappointing financial results, neither disclosure revealed that TI had previously misrepresented its AI capabilities.  Plaintiff's alleged stock drop losses, therefore, were not caused by the alleged misstatements.

For these reasons, as developed below, the Complaint should be dismissed.

## FACTUAL BACKGROUND[1]

### A. Through Its Four Business Divisions, TI Supplies AI-Related Services to Clients

TI is a technology services company headquartered in British Columbia, Canada. (¶ 23).[2] The individual defendants are TI's current and former officers: Puritt was TI's CEO (¶ 25); Kanu was TI's CFO until February 9, 2024 (¶ 26), after which Chande replaced her (¶ 27); and Ringman was TI's Chief Information Officer (¶ 28). Plaintiff is a TI shareholder, who purports to represent a putative class of investors who purchased TI stock between February 9, 2023, and August 1, 2024 ("Class Period"). (¶ 219.).

At inception, TI operated call centers, having originated as a single call center that handled customer service inquiries for its parent company, telecom provider TELUS Corporation. (¶ 34; Ex. 13 at 3). In the two decades since, TI's business has grown and transformed with the advent of increased automation, new digital capabilities, and AI-related services. During the Class Period, TI operated four divisions, each of which provides AI-related services to TI clients:

**Customer Experience ("CX")**. CX is the foundation of TI's business and reflects its origins in operating call centers for clients. This division, which accounted for nearly 50% of TI's business, provides customer service support to TI's clients through call centers and digital channels. ¶ 37; Ex. 7 at 42. Digital channels include mediums like chatbots, which are powered

---

[1] The pleaded facts are accepted as true solely for this motion. To the extent that the Complaint quotes, cites, or references a document, it is considered part of the Complaint. *See Rothman* v. *Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *10 n.14 (S.D.N.Y. Mar. 30, 2021). Similarly, a court can take judicial notice of SEC filings. *See Paulsen* v. *Stifel, Nicolaus & Co.*, 2019 WL 2415213, at *3 (S.D.N.Y. June 4, 2019).

[2] References to "Ex." are to exhibits to the attached Declaration of Audra J. Soloway. References to "¶" refer to paragraphs in the Complaint. "Pl. Ltr." refers to Plaintiff's letter dated August 14, 2025 (ECF No. 30). Unless otherwise indicated, all internal citations have been omitted from quotations and all emphases added.

by AI, and deployed by TI to handle customer inquiries for TI clients. Ex. 10 at 11. The Complaint does not challenge statements about the CX business or allege that TI overstated its AI-supported CX capabilities.

**Digital Solutions/IT**. The Digital Solutions/IT division grew from the CX business and helps TI clients build and implement bespoke applications that clients need to serve their customers. (Ex. 7 at 8.) Many of TI's digital solutions are created in its iLabs environment, TI's R&D innovation engine. *Id.* at 11. Some of the technological solutions are powered by AI, which has been a priority focus for iLabs since its inception in 2020. (*Id.* at 12.)[3] TI's AI capabilities were further enhanced by its 2022 acquisition of WillowTree. (¶ 48.) WillowTree is a technology company that specializes in customer-facing applications, and its acquisition enabled TI to provide end-to-end digital services, from *developing* the underlying systems to *delivering* the user-facing applications. (*Id.*; Ex. 7 at 10.) At the start of the Class Period, the Digital Solutions/IT business accounted for less than 25% of the Company's revenue (combined with WillowTree). (Ex. 8 at 56.)

During the Class Period, TI publicly described the offerings of its Digital Solutions/IT business, saying, for example, that TI is able to "design, build and deliver bespoke software engineering and data science services specifically geared for Gen AI application," advise clients as to "process automation for Gen AI workflows," and offer "end-to-end CX innovation" via its "AI-fueled platform," Fuel iX. (¶¶ 100, 117.) The Complaint challenges these statements as false or misleading, but does not identify any AI-related capability that TI wrongly claimed to have.

---

[3]    As one example, in early 2023, TI built an AI-enabled workforce management solution for an American cable company that could predict staffing needs, make work schedules, and track time off. (Ex. 7 at 11.) TI does not build foundational AI products; it provides a service that allows companies to integrate personalized AI capabilities into their operations. *Id.* at 8.

**AI Data/Data Annotation**.  The AI Data division primarily provides data annotation services.  Data annotation entails using humans to label and organize data so that AI programs can learn from it—it is the "lifeblood of AI" and what allows all forms of AI to function accurately. (Ex. 9 at 7.)[4]  The AI Data division does not develop underlying AI systems or products but assists clients in training and maintaining their AI machine learning models, which analyze and identify patterns in data.  (¶ 38; Ex. 9 at 7.)  TI entered the data annotation space with its acquisition of Lionbridge AI in late 2020, and has since expanded to provide this service through a global network of more than 1 million human annotators, making TI one of only two companies capable of delivering these services at scale.  (¶ 38.)

During the Class Period, TI publicly described its data annotation business, saying that TI "secured an exciting infusion of digital talent at scale into our already robust end-to-end digital transformation capabilities," was "seeing good momentum," and was "better positioned than most to help enable this gold rush" in AI.  (¶¶ 82, 89, 119.)  The Complaint challenges these statements as false or misleading, but acknowledges that TI had a significant data annotation business (¶ 38) and does not identify any AI Data capability that TI wrongly claimed to have.

**Trust and Safety Division**.  TI provides content moderation services, which involves monitoring and screening user-generated online materials on clients' platforms to ensure compliance with community guidelines.  (¶ 37.)   TI's content moderation services use a combination of AI solutions and human reviewers.  (Ex. 6 at 6-7.)  The Complaint does not

---

[4]    AI makes predictions and produces outputs from existing, historical data.  Because of this, tagging, labeling, and annotating the underlying data—such as labeling thousands of images as a "cat" or a "dog"—is not a one-time step; the underlying data set must be continually "refreshed," *i.e. trained*, to allow all AI models to continue to produce accurate outputs.  (Ex. 6 at 20.)

challenge statements about the Trust and Safety division or allege that TI overstated its AI content moderation capabilities.

### B.    TI Begins to Integrate GenAI into Its Client Offerings, Including Using Pilots

In early 2023, TI began exploring ways to integrate generative AI ("GenAI"). GenAI is a type of AI that creates new content (such as text, images, audio, and code) by learning patterns from massive data sets (ChatGPT is one example). TI disclosed that it would integrate GenAI, including ChatGPT, into its offerings, especially to improve its CX line. (Ex. 6 at 8.) For example, in February 2023, TI noted that it could "leverage ChatGPT and other generative AI tools to further progress our proprietary intelligent bot platform." *Id.* At an August 2023 conference, TI opined that the increased productivity offered by GenAI would "positively impact[]" TI's offerings, including "data annotation...trust and safety...[and] digital IT services as well." (Ex. 13 at 8.)[5] In late October 2023, TI announced the launch of Fuel iX, a new CX tool powered by GenAI aimed at streamlining the customer support experience and addressing, among other things, common frustrations during customer service interactions. (Ex. 18 at 1-2.)

TI also disclosed that it runs pilot projects to secure new clients and develop new capabilities. A "pilot" is a targeted, limited test of a new service or approach designed to prove it works and find any problems before a client decides to proceed with a full rollout. (Ex. 17 at 8.) TI disclosed that new engagements are "generally followed by a long implementation period in which the services are planned in detail and [TI] demonstrate[s] to a client that [it] can successfully integrate [its] processes and resources with their operations." (Ex. 2 at 11.) Thus, "[b]efore or after entering into a definitive contract with a client, [TI] may run a pilot program that may or may

---

5    For example, one problem with GenAI is "hallucinations" (*i.e.*, the generation of fabricated information), which can be addressed by better training the underlying data—a service that TI provides through its data annotation business. (Ex. 13 at 8-9.)

not be successful." (*Id*.; *see also* Ex. 3 at 9 ("If we are successful, a long implementation and contract negotiation period could follow and, in some cases, a pilot program may also occur, all of which may not be successful."); Ex. 4 at 9 (similar).) TI cannot always charge full price for pilots. (Ex. 17 at 7-8 (May 21, 2024 Tr.).) In late 2022 and into 2023, TI disclosed that it was seeing "elongated sales cycles" and "longer decision timeframes." (Ex. 5 at 14; Ex. 14 at 3.)

### C.    TI Begins to Integrate GenAI into Its Own Business to Secure Cost Savings

While TI was exploring GenAI initiatives, the entire technology sector was grappling with difficult macroeconomic conditions and market instability. Inflation and higher interest rates were leading to recessionary fears and the release of Chat GPT in late 2022 added further disruption as companies across industries had to reassess their strategies. (Ex. 6 at 7-9, 14, 20; Ex. 7 at 21.) These dynamics had an outsized impact on TI's sector and its competitors, and mass layoffs started to occur across technology companies. *Id*. at 7. TI disclosed that its key clients also faced macroeconomic challenges, which led to less spending and reduced demand for TI's services. (Ex. 11 at 3.) TI's third-largest client, in particular, experienced rapid revenue declines, resulting in reduced spending on TI's services. (Ex. 14 at 8.) TI disclosed the challenges to its business, and its efforts to reduce costs, including by reducing hiring and other cost reduction strategies. (Ex. 5 at 11; Ex. 11 at 3-4.)

In early 2023, TI announced that it was exploring the possibility of leveraging GenAI for internal applications (Ex. 6 at 8), and later that year noted that it was "executing upon multiple cost optimization programs across the business," including using GenAI (Ex. 14 at 3). While TI was optimistic about the progress it had made in 2023, it warned that there was "still…a lot more work to do" (Ex. 14 at 15) and noted that it would take time for the company to experience the full benefits of these initiatives, which could take until 2024 to fully accrue. (Ex. 11 at 4.)

### D.    TI Announces Disappointing Financial Performance and Plaintiff Sues

On May 9, 2024, and August 2, 2024, TI disclosed disappointing financial results for the first and second quarters of 2024, respectively, and lowered full-year 2024 guidance.  (¶¶ 135-42, 149-64.)  TI's stock price declined following these announcements (*id.*), and this lawsuit followed.

## ARGUMENT

To state a claim for a violation of Section 10(b) and Rule 10b-5, Plaintiff must allege, as relevant here: (1) a materially false or misleading statement; (2) a strong inference of scienter; and (3) loss causation.  *Amgen Inc.* v. *Conn. Ret. Plan & Tr. Funds*, 568 U.S. 455, 460-61 (2013).  Plaintiff must satisfy the heightened pleading standards under the Private Securities Litigation Reform Act of 1995 (the "PSLRA") and Federal Rule of Civil Procedure 9(b).  *See Anschutz Corp.* v. *Merrill Lynch & Co., Inc.*, 690 F.3d 98, 108 (2d Cir. 2012).  The PSLRA requires that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  *Id.* (citing *Dura Pharm., Inc.* v. *Broudo*, 544 U.S. 336, 345 (2005)).  To comply with Rule 9(b), the Complaint must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quoting *Rombach* v. *Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).  A complaint failing to satisfy these exacting pleading standards must be dismissed.  *See, e.g.*, *Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 39 (2d Cir. 2012).  Fraud must be pleaded with particularity as to each Defendant— "blanket references to the acts of all the defendants without identifying the nature of each defendant's participation in the fraud" are insufficient.  *See Miller* v. *Lazard, Ltd.*, 473 F. Supp. 2d 571, 590 (S.D.N.Y. 2007) (Marrero, J.).

I.      **Plaintiff Fails to Plead Any Materially False or Misleading Statements**

To satisfy Section 10(b) and Rule 10b-5, Plaintiff must plead that Defendants made an "untrue statement of material fact" or "omit[ted]...a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5. Rule 9(b) and the PSLRA require plaintiffs to "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). The Complaint, therefore, must offer well-pleaded facts describing *what* contemporaneous inconsistent information Defendants had, *who* had it, *when* and *where* they learned it, or *how* the information contradicted any challenged statement. *See Woolgar* v. *Kingstone Cos., Inc.*, 477 F. Supp. 3d 193, 217, 220 (S.D.N.Y. 2020). Further, Plaintiffs must plead that every "alleged material misstatement was false *at the time it was made*…[because] without *contemporaneous* falsity, there can be no fraud." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (original emphases).

Applying these rigorous pleading standards, Plaintiff fails to allege any false or misleading statement by Defendants. While Plaintiff sweeps together dozens of statements that mention "AI," the alleged false and misleading statements generally address four topics: (1) AI-supported product and service offerings through TI's Digital/IT Solutions business ("AI Offerings Statements") (Ex. 1 at 1-4); (2) data annotation services offered through TI's AI Data business ("AI Data Statements") (Ex. 1 at 5-6); (3) TI's general optimistic outlook on AI and future projections ("Outlook Statements") (Ex. 1 at 7-19); and (4) TI's cost savings initiative ("Cost Savings Statements") (Ex. 1 at 20-22).[6] None are adequately pleaded to be false or misleading.

---

[6]     For the Court's convenience, a chart listing the challenged statements by category and by ground for dismissal is attached as Exhibit 1 to the Declaration of Audra J. Soloway.

A.    **The Complaint Does Not Plead That the AI Offerings Statements Were False or Misleading**

The AI Offerings Statements discuss TI's AI-related offerings, including initiatives to leverage GenAI through the Digital Solutions/IT business.  For example, Plaintiff challenges statements that TI had "built some proprietary [AI] tools" (¶ 147) and was offering clients "exciting new GenAI-enabled capabilities," including Fuel iX, an "enhanced solution backed by the power of generative AI" (¶¶ 113, 117; *see also* ¶¶ 96, 100, 112, 121.)  Plaintiff contends that these statements are false because TI "did not have any AI capabilities" (Pl. Ltr. at 2) or "only had minimal AI offerings" (¶¶ 98, 101, 103, 110, 114, 116).

The Complaint pleads no specific facts supporting that accusation.  To the contrary, the Complaint concedes that TI offered AI-supported solutions through its Digital/IT Solutions business line, and that Fuel iX is a GenAI-supported product that was actually launched and offered to clients.  (¶¶ 39, 118.)

Plaintiff relies heavily on four CWs, but none supply information supporting Plaintiff's assertion that TI did not actually have AI capabilities.  CW1 did not even work at TI; he worked at TELUS Communications Inc., a wholly owned subsidiary of TI's parent company.  (¶ 30.)  CW1 also left that job *before* the Class Period.  (¶ 30.)  CW1 thus is not positioned to have any relevant or timely information.  *In re China Mobile Games & Entm't Grp., Ltd. Sec. Litig.*, 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) (disregarding allegations of witnesses who worked at a subsidiary, not the defendant company); *Eden Alpha CI LLP* v. *Polished.com Inc.*, 763 F. Supp. 3d 270, 297 (E.D.N.Y. 2025) (CWs' "positions at [affiliate company] do not suggest that they would be in a position to know about [defendants'] practices"); *Francisco* v. *Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) (rejecting CW allegations "where the confidential witnesses left the company before the class period").  In any event, CW1 offers nothing more than conclusory

allegations that, working as a senior analyst for TI's affiliate, he observed a "skills gap" at TI when employees were moved "from non-AI related roles…into roles requiring AI knowledge." (¶ 52.) If anything, CW1 confirms that TI had AI-related offerings, and offers only that some unspecified employees were underqualified for AI-related jobs, which is irrelevant to Plaintiff's fraud claim. *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 375-76 (S.D.N.Y. 2004), *aff'd*, 165 F. App'x 928 (2d Cir. 2006) ("allegations of mismanagement" do not support fraud).

CWs 2, 3, and 4 are a former account representative and two software engineers who worked at WillowTree, which merged into TI's Digital Solutions division. (¶¶ 31-33.) None identifies *any* specific internal information that contradicted public statements about TI's AI-related capabilities. *Lululemon*, 14 F. Supp. 3d at 579 (CW allegations do not show statements were "false when they were made"). The CWs do not, for example, claim knowledge of specific internal reports or data containing information contrary to Defendants' public statements. *Saraf* v. *Ebix, Inc.*, 632 F. Supp. 3d 389, 398 n.5 (S.D.N.Y. 2022) (plaintiff "does not allege that...the confidential witnesses…had access to information" demonstrating falsity of statements). Instead, these CWs largely criticize internal resource allocations and raise human resources issues, none of which support alleged securities fraud. For example, the CWs claim that work was performed by employees lacking AI experience, purportedly resulting in delays and increased costs (*e.g.*, ¶¶ 80, 83, 86, 88, 94, 110). Such complaints are merely the CWs' personal criticisms—none of which supports securities fraud or establishes that TI misrepresented its AI or GenAI offerings. *In re Citigroup*, 330 F. Supp. 2d at 376; *Lululemon*, 14 F. Supp. 3d at 580 ("general allegations" regarding quality control issues "do not render the [defendants'] statements…false or misleading," where the complaint does not "contain the...required specific factual allegations (by CWs or otherwise)").

The remaining CW allegations actually confirm the accuracy of Defendants' statements about AI-related offerings.  For example, CW4 contends that TI was "just using ChatGPT...[and] 'building apps around it'" (¶¶ 99, 118), as "any app company, or any company with in-house developers, could do."  (¶ 60.)  But, apart from the pejorative characterization, this is precisely what TI disclosed.  TI openly discussed that "ChatGPT and similar alternatives" presented "seemingly endless" possibilities for TI to "leverage" GenAI and improve CX operations, such as by improving chatbots.  (*See* Ex. 6 at 8.)  Similarly, CW2 alleges that TI presented "pitches to customers in hopes of co-developing a product for which the customer might be an early adopter" (*E.g.*, ¶¶ 101, 103, 106).  TI disclosed precisely that, describing how it worked alongside clients "as partners rather than just buyers of products or services" in order "to create new solutions or products" tailored to the clients' needs.  (*See* Ex. 7 at 12.)  The CWs thus fail to identify any internal information that is inconsistent with public statements.

Apart from the defective CW allegations, Plaintiff relies on Puritt's so-called "admission" that TI "had ***only*** been selling 'pilot' AI projects" for which it was still trying to prove its "capabilities" and could not charge full price.  (*E.g.*, ¶¶ 80, 83, 88, 94, 110).  But Puritt said no such thing:  the word "only" does not appear in his statement.  What Puritt actually said was that TI is "working diligently on pilots and opportunities with many major foundational AI model developers."  (Ex. 16 at 4.)[7]  Plaintiff cannot rewrite Puritt's statement, and the Court need not "accept allegations that are contradicted or undermined by...written materials properly before the

---

[7]    Puritt's actual statement was:  "our momentum continues in AI Data Solutions, driven by the strength of our relationship with Google in particular, ***while we're also working diligently on pilots and opportunities with many major foundational AI model developers***" and "[o]ur AI capabilities are expanding opportunities with TELUS, charting a path to an additional differentiated service revenue stream. In fact, ***we currently have several more pilots underway***, as well as over 30 requests for new applications."  (Ex. 16 at 4-5.)

court." *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 585 (S.D.N.Y. 2007).  And, Puritt's actual statement is consistent with TI's earlier disclosures that TI may "face a long selling cycle to secure a new client contract" and that "[b]efore or after entering into a definitive [client] contract …[TI] may run a pilot program."  (Ex. 2 at 11; *see also* Ex. 3 at 9 ("We often face a long selling cycle to secure a new client contract or launch a new program for an existing client…If we are successful, a long implementation and contract negotiation period could follow and, in some cases, a pilot program may also occur, all of which may not be successful."); Ex. 4 at 9 (similar).)  Plaintiff can hardly claim fraud when TI's use of pilot programs was transparently disclosed.

## B.    The Complaint Does Not Plead That the AI Data Statements Were False or Misleading

Plaintiff challenges positive statements about the data annotation business, such as that TI was "seeing good momentum and demand this year, in particular, led by [AI data annotation] work we do to support market-leading generative AI foundational model builders" (¶ 119), and that, due to the AI Data business, TI was "better positioned than most to help enable this [AI] gold rush" (¶ 89).  Plaintiff alleges that these AI Data Statements were misleading because they overstated "that TELUS had fully-developed AI products."  (¶ 92; *see also* ¶¶ 83, 147.)

As a threshold issue, this argument makes no sense.  Data annotation is a ***service*** that TI provides to its clients who themselves have AI products; data annotation is not itself an AI ***product***.  The Complaint repeatedly confuses AI services and products.  In any event, the Complaint ***does not*** allege that Defendants overstated TI's data annotation capabilities.  To the contrary, the Complaint concedes that the AI Data business was established following the acquisition of Lionbridge AI (¶ 38)—an AI data annotation company.

Plaintiff attempts to malign the data annotation business by describing its offerings as "manually-intensive data annotation" services.  (¶ 92.)  But TI never represented otherwise,

describing its own business as relying upon a million humans who input information for later use by clients' AI models, such as, for example, providing human inputs to help Google optimize its search and maps functionality.  (Ex. 17 at 6.)[8]

And although the Complaint relies heavily on CWs to allege falsity, none of the four CWs worked in the AI Data business and none purport to have **any** internal information about TI's data annotation services.  The CWs add no allegations to support falsity of this category of statements. *Frankfurt-Tr. Inv. Luxemburg AG* v. *United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (disregarding allegations from former employees who "worked mainly within a single [company] unit" and so had "no insight" on other units) (Marrero, J.).  Likewise, Puritt's purported "admission" that TI offered "only" pilots misstates Puritt's actual statement (*supra* 12), and is also irrelevant to the data annotation business.  *In re Australia & New Zealand Banking Grp. Ltd. Sec. Litig.*, 2009 WL 4823923, at *14 (S.D.N.Y. Dec. 14, 2009) (failure to describe practices in specific business unit at issue in alleged misstatements required dismissal).

In short, Plaintiff fails to allege any facts showing that the AI Data Statements are false or misleading.

### C.    The Complaint Fails to Plead That the Outlook Statements Were False or Misleading

The Outlook Statements—the largest category of alleged misstatements—encompass generally positive statements about TI's outlook on AI, including optimism about TI's AI capabilities (¶¶ 78, 90, 91, 95, 97, 126 ) and the future of AI (¶¶ 81, 93, 100, 102, 107, 108, 109, 111, 120, 133, 143), as well as cautionary disclosures regarding risks that could affect TI's future

---

[8]    Plaintiff also alleges that TI misrepresented that TI itself was developing LLMs (large language models, a form of AI) by stating that TI was "helping to build [] LLMs" through its annotation services.  (¶ 147.)  Nonsense.  TI is a services provider supporting AI clients, and it never purported to be building *its own* LLMs.

performance. ¶¶ 85, 87, 129, 131. These statements are not false for the reasons above: the Complaint does not plead—whether through CWs or so-called "admissions" or otherwise—that any such statements are false. *Supra* 12-14.

Moreover, the Outlook Statements are not actionable for additional reasons. They are forward-looking statements protected by the PSLRA safe harbor, statements of opinion, and puffery:

*First*, the majority of the Outlook Statements are forward-looking and thus protected by the PSLRA safe harbor. 15 U.S.C. § 77z-2(c). These include statements to the effect that AI adoption "will be a tailwind for [TI's] long-term growth and profitability" (¶ 107; Ex. 11 at 5, that "there are meaningful opportunities ahead in digital transformation and generative AI" (¶ 111), and that "AI is going to be the standout for us going through the entirety of 2024 and beyond" (¶ 133), as well as statements of confidence that TI would meet financial projections (¶¶ 93, 143). (*See also* ¶¶ 100, 102, 108, 109, 120.)

The safe harbor protects forward-looking statements unless Plaintiff alleges that Defendants had ***actual knowledge*** that the statements were false. *Slayton* v. *Am. Exp. Co.*, 604 F.3d 758, 762, 766 (2d Cir. 2010). Plaintiff makes no such effort. The Complaint does not even attempt to plead actual knowledge by any Defendant that the Outlook Statements were false, or that any Defendant did not hold this optimism about future prospects and results. None of the CWs purport to have knowledge of any Individual Defendants' knowledge, or even company-wide strategy or exposure to overall business outlook. (Pl. Ltr. at 3 n.6.) *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 526 (S.D.N.Y. 2020) ("[N]one of the CWs on whom Plaintiffs rely had a companywide view of AT&T's business"), *aff'd*, 2022 WL 17587853 (2d Cir. Dec. 13, 2022); *In re Lehman Bros. Sec. & Erisa Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013)

15

(disregarding confidential witnesses who "were loan level underwriters, not managers or corporate officers who could have spoken to the company's practices broadly").

The safe harbor also protects forward-looking statements that are accompanied by meaningful cautionary language, as here. For example, TI's earnings calls warned that "[t]he statements made during this call may be forward-looking in nature…[and] are subject to risks and uncertainties which may cause actual results to differ materially from our current projections," (*see e.g.*, Ex. 14 at 3), and the accompanying presentations incorporated by reference the risk factors described in the Company's Form 20-F (*e.g.*, Ex. 15 at 2). Those risk factors warned that TI's "business and financial results could be adversely affected by a number of global conditions which are outside our control," and that "if we fail to establish our digital brand and successfully market our digital service offerings, our growth prospects, anticipated business volumes and financial performance may be adversely affected." (Ex. 3 at 5-6.) Moreover, TI supplemented its warnings by describing the increasingly difficult market conditions and the reduced spending it was seeing from its largest clients. (*See e.g.*, Ex. 12 at 3-4 ("[This quarter] marked a particularly challenging time for [TI]" brought about by "profitability pressure…[and] aggressive near-term cost cutting behavior by some of our large tech clients in particular."); Ex. 14 at 15 ("In terms of pricing dynamics, it feels to me like it's simply a continuation of the same, i.e., there is a pervasive, persistent pressure around more for less."). In light of this cautionary language, the PSLRA safe harbor protects the forward-looking Outlook Statements.

Plaintiff attempts to convert certain of Defendants' cautionary language into the fraud itself, challenging risk factors from TI's 2022 and 2023 Form 20-F (¶¶ 85, 87, 129, 131). Plaintiff cites warnings that "[c]hanges in technology and client expectations could outpace [TI's] service offerings" (¶ 129), that TI "may not be successful in anticipating or responding to our clients'

expectation" (¶ 85), and that "if we are unable to adapt to the changing pricing and procurement demands of our clients, our business, financial performance, financial condition and cash flows may be adversely affected" (¶ 131), and alleges that these warnings were false because the risks had "already materialized." But Plaintiff does not identify a specific risk that materialized before the issuance of a particular warning. Indeed, the Complaint alleges that TI's financial performance worsened *after* the last of the challenged risk disclosures were issued in February 2024 (¶¶ 135-64). *Saskatchewan Healthcare Emp. Pension Plan* v. *KE Holdings Inc.*, 718 F. Supp. 3d 344, 386 (S.D.N.Y. 2024) (risk that inaccuracies in data "may harm our reputation and negatively affect our business" had not materialized where complaint failed to allege "that the Company or the investing public had discovered inaccuracies at the time of the disclosure"). Moreover, the challenged disclosures did not present risks as "mere hypotheticals" (¶¶ 84, 128)—for example, the 2023 Form 20-F specifically disclosed that TI was "seeing the commoditization of our services" which "has created competitive, pricing and other pressures, particularly given current macroeconomic conditions" and was "adversely affecting the accuracy of our forecasting." (¶ 131; Ex. 4 at 17.) This disclosure concretely disclosed that TI's forecasting accuracy was presently impacted by ongoing challenges, and was not "hypothetical" at all.

*Second*, certain of the Outlook Statements are classic statements of opinion, such as Puritt's statement that "we feel like we've been quite prescient in building out the scope and scale of our technology enabled service line" (¶ 97) and that "we believe that, once again, we have what the doctor is ordering in terms of addressing this opportunity and evolution" (¶ 120). (*See also* ¶¶ 90, 91, 93, 102, 107, 108, 111, 120, 133, 143.) Opinion statements can mislead only if "(1) the speaker does not hold the belief professed; (2) the facts supplied in support of the belief professed are untrue; or (3) the speaker omits information that makes the statement misleading to a reasonable

investor." *Martin* v. *Quartermain*, 732 F. App'x 37, 40 (2d Cir. 2018) (cleaned up).  Plaintiff does

not even attempt to allege any facts demonstrating that the opinions were subjectively disbelieved

or supported by untrue facts or omitted material facts about his inquiry into the opinion.  *Villare*

v. *Abiomed, Inc.*, 2021 WL 4311749, at *20 (S.D.N.Y. Sept. 21, 2021) (dismissing complaint

containing "no specific allegations regarding Defendants' beliefs at the time the alleged statements

were made" and rejecting plaintiff's reliance "on the beliefs and opinions of confidential

witnesses" who did not make the challenged statements); *see also Loc. 449 Pension Plan* v.

*Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 364 (S.D.N.Y. 2019) (statements about continued

growth were not actionable because "[e]xpressions of optimism and projections about the future

are quintessential opinion statements."), *aff'd*, 826 F. App'x 111 (2d Cir. 2020).

*Third*, many of the statements in this category are non-actionable puffery. (¶¶ 78, 81, 90,

91, 95, 97, 100, 102, 108, 109, 111, 120, 126, 133.)  Statements that TI is "a premium provider"

(¶ 91) and has "the AAA trifecta of analytics, artificial intelligence and automation" (¶ 95) are too

vague and imprecise for reasonable investors to rely on, and courts routinely deem similar

statements of corporate optimism as non-actionable puffery.  *See e.g.*, *In re Philip Morris Int'l Inc.*

*Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023) (finding to be non-actionable puffery statements that

described methodology as "rigorous," "extensive," "thorough," "systematic," and "unique");

*Boca Raton Firefighters & Police Pension Fund* v. *Bahash*, 506 F. App'x 32, 34 (2d Cir. 2012)

(finding the company's statements that it had "market lead[ing] software" and it "excelled" to be

"mere commercial puffery").[9]

---

[9]    The AI Data Statements, AI Offerings Statements, and Cost Savings Statements also include
non-actionable puffery, opinions and forward-looking statements.  Indeed, all of the AI Data
Statements (¶¶ 82, 89, 119, 147) and more than half of the AI Offerings Statements (¶¶ 100,
112, 117, 121) are non-actionable puffery because they are "statement[s] of general corporate

D.    **The Complaint Does Not Plead That the Cost Savings Statements Were False or Misleading**

Finally, Plaintiff challenges statements regarding TI's planned cost-saving initiatives, such as that TI had "actioned multiple cost efficiency programs that include...Generative AI initiatives" (¶ 104) and that such initiatives were "in[]progress" (¶ 105).  (*See also* ¶¶ 115, 123.)  The Cost Savings Statements also include projections that the initiatives will result in "improvement in [TI's] adjusted EBITDA margin in the second half [of 2023]," and continuing into 2024, which was reflected in the Company's FY23 and FY24 guidance.  (¶ 105, 123; *see also* ¶¶ 112, 115, 145.)

The Complaint does not plead that any of the Cost Savings Statements were false.  Specifically, Plaintiff does not dispute that TI, in fact, implemented cost-efficiency programs, that automation or GenAI tools were deployed internally to reduce costs, or even that cost savings were realized.  At most, Plaintiff cites CWs who vaguely claim that TI "was unable to generate any cost efficiencies" (*e.g.*, ¶ 106), but none provide particularized allegations to support that contention.  Nor could they.  The CWs were not privy to strategic management decisions or otherwise positioned to report on company-wide cost-saving strategies.  *Frankfurt-Tr.*, 336 F. Supp. at 223 (former employees had "no insight on how other [company] units" operated); *Kasilingam* v. *Tilray, Inc.*, 2023 WL 5352294, at *6 (S.D.N.Y. Aug. 21, 2023) (plaintiff must allege sufficient information to support the "probability that a person in the position occupied by the source would possess the information alleged.").

Many of the Cost Savings Statements are also projections and thus forward-looking on their face—such as the projected $60 million in cost savings that was incorporated in TI's FY2024

---

optimism."  *Police & Fire Ret. Sys. City of Detroit* v. *Argo Group Int'l Holdings, Ltd.*, 2024 WL 5089970, at *11 (S.D.N.Y. Dec. 12, 2024).  All four categories also include non-actionable forward-looking and opinion statements.  (*See* ¶¶ 89, 105, 113-12, 115, 147; *see also infra* at 19-20).  The chart at Ex. 1 identifies the defenses asserted for each challenged statement.

guidance (¶ 105) and Puritt's statement that "we expect to quickly return to our typical 20-plus percent adjusted EBITDA margin" (¶ 115). (*See also* ¶¶ 112, 123, 145.) When a fraud claim rests on "projections about...future performance...Rule 9(b) requires that a complaint allege particular facts demonstrating that the defendant knew or recklessly disregarded that the projections were false at the time that such projections were made." *East Point Systems, Inc.* v. *Steven Maxim, S2k, Inc.*, 133 F. Supp. 3d 430, 435 (D. Conn. 2015) (citing *DiVittorio* v. *Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1248 (2d Cir.1987)). Plaintiff alleges no such facts here. And while Plaintiff identifies a later downward revision of the $60 million projection (¶ 72), projections do not become false just because they are later revised downward or not met. *Kemp* v. *Universal Am. Fin. Corp.*, 2007 WL 86942, at *14 (S.D.N.Y. Jan. 10, 2007) ("The mere fact that the projections ultimately proved erroneous does not state a claim for securities fraud.").[10]

* * * * *

For these reasons, the Complaint fails to allege any false or misleading statements, requiring its dismissal.

## II.    Plaintiff Fails to Plead a Strong Inference of Scienter

The PSLRA and Rule 9(b) require that a securities fraud complaint "state with particularity facts giving rise to a strong inference that the defendant acted with…a mental state embracing intent to deceive, manipulate, or defraud." *Teamsters Loc. 445 Freight Div. Pension Fund* v. *Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008). A "strong" inference "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing

---

[10]    *See also Diabat* v. *Credit Suisse Grp. AG*, 2024 WL 4252502, at *57 (S.D.N.Y. Sept. 19, 2024) ("[I]t is not possible for [defendant's] remarks to be false insofar as the strategy that was in the process of being implemented could not have been known to be 'fundamentally flawed' until it played itself out. 'Such predictions about the future are not rendered fraudulent just because in hindsight they turn out to have been wrong.'...Plaintiff's challenge is just another instance of fraud by hindsight.")

inference of nonfraudulent intent." *Id.* This inquiry is "inherently comparative" and requires the court to consider nonculpable explanations advanced by defendants. *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323-24 (2007). Further, "[s]cienter must be separately pled and individually supportable as to each defendant; scienter is not amenable to group pleading." *C.D.T.S.* v. *UBS AG*, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013).

The required strong inference of fraudulent intent may be established "by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

### A.    The Complaint Does Not Identify Any Motive to Defraud Shareholders

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud," plaintiff must allege that defendants "benefitted in some concrete and personal way from the purported fraud." *Id.* Plaintiff here makes ***no attempt*** to allege motive. Plaintiff does not allege, for example, that Defendants sold TI stock at suspicious times or amounts during the class period or otherwise stood to profit personally from the alleged fraud. Indeed, Plaintiff does not explain ***why*** Defendants would intentionally mislead shareholders about TI's AI capabilities.

### B.    The Complaint Also Does Not Plead Conscious Misbehavior or Recklessness

Because Plaintiff does not plead motive and opportunity, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit* v. *Eichler,* 264 F.3d 131, 142 (2d Cir. 2001). In other words, the "uphill battle to plead a strong inference of scienter becomes that much steeper." *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan* v. *Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021). Moreover, to plead a strong inference of scienter based on circumstantial evidence of conscious misbehavior or recklessness requires Plaintiff to show that Defendants acted with "actual intent" or "a state of mind *approximating*

21

*actual intent*, and *not merely a heightened form of negligence*."  *Athale* v. *SinoTech Energy Ltd.*, 2015 WL 13145808, at *4 (S.D.N.Y. Jan. 23, 2015); *Novak* v. *Kasaks*, 216 F.3d 300, 312 (2d Cir. 2000).  And to the extent that the Complaint challenges forward-looking statements and opinions, Plaintiff may not rely on a recklessness theory; he must plead "actual knowledge" of falsity and that the opinions subjectively were not believed.  *In re Renewable Energy Grp. Sec. Litig.*, 2022 WL 14206678, at *4 (2d Cir. Oct. 25, 2022) ("recklessness-based arguments are categorically insufficient" for forward-looking statements); *Woolgar*, 477 F. Supp. 3d at 224 (opinions are false only where "[d]efendants did not honestly believe" them).

Plaintiff's allegations here are woefully deficient.  Even assuming the Complaint adequately identifies a misstatement (it does not, *supra* Part I), the Complaint does not identify particularized facts showing that Puritt, Kanu, Chande, and Ringman knowingly made false statements with intent to deceive.  Plaintiff does not identify any information actually known by the Individual Defendants that contradicted their public statements when they were made.  Indeed, despite Plaintiff's reliance on the CWs, *none* purport to have interacted directly with any of the Individual Defendants, and *none* offer allegations showing their state of mind.  For instance, the CWs do not claim to have attended *any* internal meeting with the Individual Defendants or to have provided them with internal reports contradicting public statements.  Courts routinely discount allegations from former employees who "were employed in rank-and-file positions…[and] had no contact with the Individual Defendants."  *Loc. No. 38 Int'l Bhd. of Elec. Workers Pension Fund* v. *Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010), *aff'd*, 430 F. App'x 63 (2d Cir. 2011).

Moreover, Plaintiff is required to plead facts supporting a strong inference that is "separately" and "individually supportable" for "each defendant."  *Kinra* v. *Chicago Bridge & Iron Co.*, 2018 WL 2371030, at *6 (S.D.N.Y. May 24, 2018).  For Chande and Ringman, Plaintiff

makes no individualized allegations of scienter whatsoever, which is alone dispositive of the claims against them.  *Miller*, 473 F. Supp. 2d at 590 ("[A] complaint may not rely upon blanket references to the acts of all the defendants without identifying the nature of each defendant's participation in the fraud.").  And for Puritt and Kanu, Plaintiff falls back on four arguments that courts routinely reject as insufficient to plead scienter in this Circuit:

*First*, Plaintiff cites Puritt's so-called "admission" that TI was running "only" pilot AI programs.  (¶¶ 169-72.)  As demonstrated above, Puritt did not say this, and, moreover, Defendants repeatedly explained during the class period that TI tested new client initiatives using pilot programs.  *Supra* at 6-7, 12-13.  If anything, Puritt's transparency about pilot programs undermines any suggestion that he intended to deceive shareholders.  *City of Coral Springs Police Officers' Ret. Plan* v. *Farfetch Ltd.*, 565 F. Supp. 3d 478, 490 (S.D.N.Y. 2021) ("mak[ing] significant disclosures about the exact risk he or she is purportedly trying to hide is inconsistent with" scienter).

*Second*, Plaintiff cites additional so-called "admissions" by Puritt and Kanu at the end of the Class Period to the effect that competition forced price cuts and that TI's cost initiatives were unsuccessful.  (¶¶ 174-80.)  Plaintiff insists that Defendants "knew all along" (¶ 181) that this would occur.  Again, the Complaint does not cite any contemporaneous information available to Defendants during the Class Period that was inconsistent with their statements, whether about the effect of competition or cost-cutting measures.  Plaintiff's contention that Defendants must have known the "consequent adverse impact on revenues and margins" (¶ 173) is impermissible "fraud by hindsight" that cannot support an inference of scienter.  *In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 360 (S.D.N.Y. 2020) (allegations premised on later revelation amount to impermissible "fraud by hindsight"), *aff'd*, 89 F.4th 408 (2d Cir. 2023).

23

*Third*, Plaintiff relies upon the mere fact that Puritt and Kanu discussed revenues, margins, and pricing on investor calls (¶¶ 183-90), which also does not support scienter.  "Courts have repeatedly found" that executives' statements "holding themselves out to the public as knowledgeable about the Company…alone are not sufficient" to plead scienter.  *In re AppHarvest Sec. Litig.*, 684 F. Supp. 3d 201, 243 (S.D.N.Y. 2023).  "Instead, Plaintiff must allege 'what specific contradictory information the makers of the statements had and the connection…between that information and the statements at issue.'" *Id.*; *see also Shetty* v. *Trivago N.V.*, 796 F. App'x 31, 35 (2d Cir. 2019) ("Where plaintiffs contend defendants had access to contrary facts...they must specifically identify the reports or statements containing this information.").  Plaintiff entirely fails to identify such contradictory information.

*Finally*, Plaintiff asserts that TI has a "constant focus on AI" (¶ 199)—an apparent attempt to invoke the core operations doctrine, under which management's knowledge can be presumed for "core operations" of the Company.  The Second Circuit and courts in this district have "expressed doubt as to whether the core operation doctrine has survived" the enactment of the PSLRA, which, contrary to the doctrine, "requires facts supporting the scienter inference to be 'stated with particularity.'"  *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 473-74 (S.D.N.Y. 2017) (collecting cases).  But even if the core operations theory is viable, it fails here.  Plaintiff concedes that TI provides a host of AI-related services through four different business lines, and the Complaint does not identify any misrepresented fact that is sufficiently "core" to TI's operations to presume management's knowledge.  This is not a case, for example, where the company's revenue depends on a single product that does not actually work.  *See Tyler* v. *Liz Claiborne, Inc.*, 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) ("[C]ourts have required that the operation in question constitute nearly all of a company's business before finding scienter based

on the 'core operations doctrine.'"); *In re Plug Power, Inc. Sec. Litig.*, 2023 WL 5577276, at *22

(S.D.N.Y. Aug. 29, 2023) (rejecting core operations doctrine where plaintiff "ha[d] not alleged

that the affected operations truly constituted nearly all of the company's business"). And even if

core operations applies here at all, "at best [it] constitutes supplemental support," *In re Diebold*,

2021 WL 1226627, at *15, and the Complaint is bereft of the required additional support.

## III.    The Complaint Fails to Plead Loss Causation

Under the PSLRA, the "*subject* of the fraudulent statement or omission" must be "the cause

of the actual loss suffered." *Lentell* v. *Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).

Where, as here, the complaint alleges that allegedly false statements were exposed by a purported

corrective disclosure, "a plaintiff must point to a statement that, because it corrected a prior

falsehood, precipitated a change in the security's price causing his loss." *In re China Organic Sec.*

*Litig.*, 2013 WL 5434637, at *7 (S.D.N.Y. Sept. 30, 2013). It is crucial that the alleged corrective

disclosure "reveal to the market...that the prior representations had been false." *In re Omega*

*Healthcare Invs. Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 267 (S.D.N.Y. 2021). Neither of the two

alleged corrective disclosures here revealed the falsity of any challenged statements.

**May 9, 2024**. On May 9, 2024, TI disclosed disappointing financial results for 1Q24, and

the stock price declined. (¶¶ 135-37.) But the "revelation of poor financial results…is simply not

enough" to plead loss causation. *Born* v. *Quad/Graphics, Inc.*, 521 F. Supp. 3d. 469, 494

(S.D.N.Y. 2021); *In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *19

(S.D.N.Y. Mar. 31, 2015) (rejecting alleged corrective disclosure that revealed "disappointing

financials," but did not reveal to the market the "falsity of the prior statements.").

Plaintiff contends that the corrective information is not the results themselves, but rather

other simultaneous disclosures on May 9—namely, that TI was "working on 'pilot' projects in AI

for 'many' customers" and that margins for data annotation work "can be a bit below average."

(¶¶ 139-40.)  But neither of these disclosures reveals the falsity of the challenged statements:  TI had previously disclosed its work on pilot projects (*supra* at 6-7, 12-13, 23), and Plaintiff does not identify any false statement about the margins of data annotation work that this disclosure purportedly corrected.

**August 2, 2024**.  On August 2, 2024, TI announced disappointing second quarter results and a reduction in full-year 2024 guidance.  TI attributed the disappointing results and guidance reduction to a host of factors.  Plaintiff attempts to create a link to the pleaded fraud, but there is no such causal link:

*First*, Plaintiff cites TI's statement that it had underestimated the time it would take to cut costs internally, including by deploying GenAI for internal use.  (¶¶ 152-63.)  Plaintiff alleges that this disclosure revealed the falsity of the Cost Savings Statements.  But TI did not say that it had not actually implemented GenAI for internal cost-cutting, only that benefits would take longer to achieve.  Plaintiff's precise argument was rejected in *Born*, where the company experienced delays in realizing results from a previously announced transformation plan, and the court found that the delayed improvement in financial performance did not plead loss causation. 521 F. Supp. 3d. at 494.  So too here.

*Second*, Plaintiff points to TI's August 2 disclosures about the fiercely competitive environment, pressure on prices, and the shift in product mix from higher to lower margin businesses.  (¶¶ 208-10.)  This news—while no doubt disappointing to investors—did not reveal that any of the challenged statements were false.  Plaintiff attempts to fashion a connection by claiming that Defendants had previously promised not to "yield" to pricing pressures or otherwise promised high margins from AI offerings.  (Pl. Ltr. at 3).  TI made no such promises.  To the contrary, TI warned about the competitive environment and the uncertainty of its forecasts.  *Supra*

at 7, 16-17.  At most, the disappointing financial results were the "materialization of a known risk," which cannot satisfy loss causation.  *Monroe Cnty. Employees' Ret. Sys.* v. *YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 358 (S.D.N.Y. 2014).

The alleged corrective disclosures did not reveal the falsity of any alleged misstatement, which is fatal to Plaintiff's claim.  *Lentell*, 396 F.3d at 175 n.4 ("[t]hese allegations do not amount to a corrective disclosure, however, because they do not reveal to the market the falsity of the prior" statements).

## IV.    Plaintiff Fails to State a Claim Under Section 20(a) of the Exchange Act

Plaintiff fails to state a Section 20(a) claim because he pleads no primary violation of Section 10(b), and he fails to allege any Individual Defendant's "culpable participation" in the alleged fraud (as explained *supra* at 20-25).  *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *22 (S.D.N.Y. Aug. 30, 2018).

## CONCLUSION

Defendants' motion to dismiss should be granted.  Plaintiff had the opportunity to amend following the submission of pre-motion letters, and chose not to amend (ECF No. 30); as such, dismissal should be with prejudice.

Dated: October 23, 2025
New York, New York

Respectfully submitted,

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

*/s/ Audra J. Soloway*
Audra J. Soloway
Emily M. Miller
1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000
asoloway@paulweiss.com
emiller@paulweiss.com

*Counsel for TELUS International (CDA) Inc., Jeffrey
Puritt, Vanessa Kanu, Gopi Chande, and Michael
Ringman*

28

## **WORD COUNT CERTIFICATION**

I hereby certify that the foregoing document complies with the word count limit set forth in Local Civil Rule 7.1. I relied on the word count of the word-processing system used to prepare the document.  The total number of words in this document, exclusive of the caption, table of contents, table of authorities, and signature block, is 8,708 words.

*/s/ Audra J. Soloway*
Audra J. Soloway