**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSÉ LUIS CERÓN SARRIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TELUS INTERNATIONAL (CDA) INC., JEFFREY PURITT, VANESSA KANU, GOPI CHANDE and MICHAEL RINGMAN<br><br>Defendants | Case No. 1:25-CV-00889-VM |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND.................................................................................................... 2

    I.    Telus' Claimed Pivot to AI was a Façade............................................................... 2

    II.    The AI Sham Collapses Telus' Margins and Cost-Saving Promises................................. 4

    III.    The Truth Emerges and Telus' Stock Price Plummets ........................................................ 5

ARGUMENT ............................................................................................................................ 5

    I.    THE COMPLAINT ADEQUATELY ALLEGES MATERIAL MISREPRESENTATIONS .................................................................................. 6

        A.    Misrepresentations Concerning AI Capabilities ................................................. 6

        B.    Misrepresentations Concerning AI-Based Cost Efficiency Initiatives ......................... 12

        C.    Misrepresentations Concerning Price Competition ......................................... 14

        D.    Defendants' Statements Are Not Forward-Looking or Protected by The Safe Harbor. 15

        E.    Defendants' Statements Are Not Inactionable Statements of Opinion or Puffery ........ 18

    II.    THE COMPLAINT ADEQUATELY ALLEGES SCIENTER ....................................... 20

        A.    Defendants' Admissions That Telus Only Had Pilot Programs Strongly Supports Scienter ............................................................................................................ 21

        B.    Defendants Admitted They Were Harmed By Price Competition and Their Cost Transformation Initiatives Materially Underperformed Due to Telus' Lack of AI Capabilities ..................................................................................................... 22

        C.    Defendants Held Themselves Out as Knowledgeable ...................................... 23

        D.    Telus' Major Shift to, and Focus on, AI Supports Scienter............................................ 25

    III.    THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION......................... 25

        A.    May 9, 2024 Corrective Disclosure ................................................................. 26

        B.    August 2, 2024 Corrective Disclosure .............................................................. 27

    IV.    THE CONTROL PERSON CLAIMS SHOULD BE SUSTAINED ............................... 28

CONCLUSION....................................................................................................................... 28

## TABLE OF AUTHORITIES

**Cases**

*Abramson v. Newlink Genetics Corp.*,
   965 F.3d 165 (2d Cir. 2020) ................................................................................... 18, 19

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*,
   19 F.4th 14 (2d Cir. 2021) ....................................................................................... 6, 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)......................................................................................................... 5

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
   506 F. App'x 32 (2d Cir. 2012) ..................................................................................... 20

*Born v. Quad/Graphics, Inc.*,
   521 F.Supp.3d 469 (S.D.N.Y. 2021) ............................................................................. 27

*Boston Ret. Sys. v. Alexion Pharms., Inc.*,
   556 F.Supp.3d 100 (D. Conn. 2021)............................................................................... 26

*Carmignac Gestion, S.A. v. Perrigo Co. PLC*,
   2019 WL 3451523 (D.N.J. July 31, 2019)..................................................................... 15

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
   750 F.3d 227 (2d Cir. 2014) ......................................................................................... 26

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
   565 F.Supp.3d 478 (S.D.N.Y. 2021) ............................................................................. 22

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
   450 F.Supp.3d 379 (S.D.N.Y. 2020) ............................................................................. 10

*City of Pontiac Gen. Emps.' Retirement Sys. v. Lockheed Martin Corp.*,
   875 F.Supp.2d 359 (S.D.N.Y. 2012) ............................................................................. 21

*City of Providence v. Aeropostale, Inc.*,
   2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013)................................................................ 16

*Diabat v. Credit Suisse Grp. AG*,
   2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024)......................................................... 13, 16

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)......................................................................................................... 6

*E. Point Sys., Inc. v. Steven Maxim, S2k, Inc.*,
   133 F.Supp.3d 430 (D. Conn. 2015)............................................................................... 24

*Eden Alpha CI LLP v. Polished.com Inc.*,
763 F.Supp.3d 270 (E.D.N.Y. 2025) ................................................................................ 12

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) ................................................................ 10, 20, 21, 23

*Farrar v. Workhorse Grp., Inc.*,
2021 WL 5768479 (C.D. Cal. Dec. 2, 2021) ................................................................ 14

*Francisco v. Abengoa, S.A.*,
481 F.Supp.3d 179 (S.D.N.Y. 2020) ................................................................ 10

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F.Supp.3d 526 (S.D.N.Y. 2017) ................................................................ 19

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F.Supp.2d 171 (S.D.N.Y. 2010) ................................................................ 25

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ................................................................ 13

*Helo v. Sema4 Holdings Corp.*,
2025 WL 1733387 (D. Conn. June 23, 2025) ................................................................ 8

*In re Alstom SA Sec. Litig.*,
406 F.Supp.2d 433 (S.D.N.Y. 2005) (Marrero, J.) ................................................................ 24

*In re Aphria, Inc. Sec. Litig.*,
2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020) ................................................................ 20

*In re AppHarvest Sec. Litig.*,
684 F.Supp.3d 201 (S.D.N.Y. 2023) ................................................................ 25

*In re Arqit Quantum Inc. Sec. Litig.*,
774 F.Supp.3d 505 (E.D.N.Y. 2025) ................................................................ 8, 13

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ................................................................ 22

*In re China Mobile Games & Ent. Grp., Ltd. Sec. Litig.*,
2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ................................................................ 12

*In re Facebook, Inc.*, *IPO Sec. and Derivative Litig.*
986 F.Supp.2d 487 (S.D.N.Y. 2013) ................................................................ 15, 17

*In re GigaCloud Tech. Inc. Sec. Litig.*,
2025 WL 307378 (S.D.N.Y. Jan. 27, 2025) ................................................................ 11, 12

iv

*In re Hut 8 Corp. Sec. Litig.*,
    2025 WL 2636150 (S.D.N.Y. Sept. 12, 2025)................................................ 28

*In re Nielsen Holdings PLC Sec. Litig.*,
    510 F.Supp.3d 217 (S.D.N.Y. 2021) ............................................................. 23

*In re Philip Morris Int'l Inc. Sec. Litig.*,
    89 F.4th 408 (2d Cir. 2023) .......................................................................... 20

*In re Plug Power, Inc. Sec. Litig.*,
    2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023).............................................. 25

*In re Regeneron Pharms., Inc. Sec. Litig.*,
    2005 WL 225288 (S.D.N.Y. Feb. 1, 2005).................................................... 15

*In re Romeo Power Inc. Sec. Litig.*,
    2022 WL 1806303 (S.D.N.Y. June 2, 2022) ................................................ 24

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) .............................................. 16

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2018 WL 616788912 (S.D.N.Y. Nov. 26, 2018)........................................... 19

*In re STMicroelectronics N.V. Sec. Litig.*,
    2025 WL 2644241 (S.D.N.Y. Sept. 15, 2025)............................................... 24

*In re Synchrony Fin. Sec. Litig.*,
    2022 WL 427499 (D. Conn. Feb. 11, 2022) ........................................... 22, 25

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016) .................................................................. passim

*Karimi v. Deutsche Bank Aktiengesellschaft*,
    607 F.Supp.3d 381 (S.D.N.Y. 2022) ........................................................... 7, 9

*Kemp v. Universal Am. Fin. Corp.*,
    2007 WL 86942 (S.D.N.Y. Jan. 10, 2007) ................................................... 16

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991). ......................................................................... 6

*Lapin v. Goldman Sachs Group, Inc.*,
    506 F.Supp.2d 221 (S.D.N.Y. 2006) ........................................................... 7, 9

*Lentell v. Merrill Lynch & Co., Inc.*,
    396 F.3d 161 (2d. Cir 2005) ......................................................................... 27

*Meyer v. Jinkosolar Holdings Co.*,
   761 F.3d 245 (2d Cir. 2014) ................................................................................... 6

*Noto v. 22nd Century Grp., Inc.*,
   35 F.4th 95 (2d Cir. 2022) ..................................................................................... 6

*Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*,
   2019 WL 2360942 (S.D.N.Y. Mar. 4, 2019) ....................................................... 17

*Police & Fire Ret. Sys. City of Detroit v. Argo Group Int'l Holdings, Ltd.*,
   2024 WL 5089970 (S.D.N.Y. Dec. 12, 2024) ..................................................... 20

*Puddu v. 6D Global Techs., Inc.*,
   742 F. App'x 553 (2d Cir. 2018) .......................................................................... 20

*S. Ferry LP # 2 v. Killinger*,
   687 F.Supp.2d 1248 (W.D. Wash. 2009) ............................................................. 24

*Saraf v. Ebix, Inc.*,
   632 F.Supp.3d 38 (S.D.N.Y. 2022) ...................................................................... 12

*Saskatchewan Healthcare Emp. Pension Plan v. KE Holdings Inc.*,
   718 F. Supp. 3d 344 (S.D.N.Y. 2024) ............................................................ 15, 17

*Securities and Exchange Commision v. StratoComm Corp.*,
   652 F.App'x 35 (2d Cir. 2016) ............................................................................... 8

*Set Capital LLC v. Credit Suisse Group AG*,
   996 F.3d 64 (2d Cir. 2021) ................................................................................... 23

*Sheman v. Abengoa*, S.A.,
   156 F.4th 152 (2d Cir. 2025) ................................................................................ 10

*Stadium Capital LLC v. Co-Diagnostics, Inc.*,
   2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ..................................................... 21, 24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) .............................................................................................. 20

*Tyler* v. *Liz Claiborne, Inc.*,
   814 F.Supp.2d 323 (S.D.N.Y. 2011) .................................................................... 25

*Wang v. Cloopen Grp. Holding Ltd.*,
   661 F.Supp.3d 208 (S.D.N.Y. 2023) ............................................................... 19, 25

*Yannes v. SCWorx Corp.*,
   2021 WL 2555437 (S.D.N.Y. June 21, 2021) ............................................. 16, 24, 25

**Statutes**

15 U.S.C. §78u-5(c)(1)(B) ...................................................................................................... 16

Court-appointed Lead Plaintiff Mohammed Mohiuddin ("Lead Plaintiff" or "Plaintiff"), respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws ("Motion") (ECF 35) and Memorandum of Law in support thereof ("DB") (ECF 36).

## PRELIMINARY STATEMENT

Faced with the commoditization of its legacy call-center customer experience ("CX") business, Defendant TELUS International ("Telus," "TI," or the "Company") sought to reinvent itself as a high-tech leader in the AI "gold rush[.]" Through a series of acquisitions—including Lionbridge AI, Playment, and WillowTree—Defendants constructed a façade of innovation, telling investors that Telus possessed "proprietary," "cutting-edge," and "end-to-end" AI capabilities that would boost its margin profile.

Throughout the Class Period, Defendants propped up Telus' stock price with three core deceptions. First, they touted a "proprietary" "cognitive AI suite" that did not exist. Second, they claimed Telus was "drinking [its] own champagne" by using these AI capabilities internally to generate massive cost efficiencies ($40 to $60 million). Third, they assured the market that these "unique, differentiated" capabilities "distinguish[ed]" Telus from competitors and insulated it from price wars, allowing it to command premium pricing while competitors raced to the bottom.

In reality, Telus' AI transformation was smoke and mirrors. As confirmed by former employees ("Confidential Witnesses" or "CWs"), Telus possessed virtually no genuine AI technology or talent. Instead, the Company relied on extraordinarily headcount-intensive manual data annotation, and low margin "pilot" AI projects using other companies' products presented under its own logo. Because there was no "champagne" to drink, the internal cost efficiencies were also a fiction because Telus did not have the AI capabilities to achieve them. Furthermore, far from

being insulated from competition, Telus was secretly slashing prices to stem the loss of customers who viewed its offerings as overpriced and undifferentiated.

The truth emerged in two corrective disclosures that devastated shareholder value. On May 9, 2024, Defendants effectively admitted their "comprehensive" AI suite consisted merely of "pilots," acknowledging severe margin pressure from low margin AI initiatives that caused shares to fall over 18%. The full picture was revealed on August 2, 2024, when Defendants conceded that Telus was nowhere close to its cost-efficiency targets, that its "nascent" AI work was actually "cannibaliz[ing]" higher-margin revenue, and that it had been forced to cut prices because it kept "losing opportunities because of price."  Telus shares plummeted another 36%.

Defendants' Motion avoids the well-pled allegations in the Complaint in favor of a revisionist history based on extrinsic documents. The Motion should be denied.

## FACTUAL BACKGROUND[1]

### I.    Telus' Claimed Pivot to AI was a Façade

Historically, Telus' business focused on high-margin CX call centers and content moderation. ¶¶2, 37. With the market shift to AI and the rise of ChatGPT, Defendants initiated a dramatic pivot, rebranding Telus as an AI leader selling the "picks and shovels" for the AI "gold rush." ¶¶43, 47, 89, 191-98.

To enter the AI market, Telus acquired the "data annotation" business from Lionbridge in 2020 and computer vision "data annotation" capabilities from Playment in 2021, forming Telus' "AI Data Solutions" division. ¶¶38, 44-47. To further build the illusion of an AI market leader, on October 27, 2022, Telus announced the acquisition of WillowTree, a digital product provider,

---

[1] Citations to "¶__" are to paragraphs in the Amended Class Action Complaint ("AC" or "Complaint") (ECF 24). Capitalized terms have the same meaning as in the AC. References to "DB__" are to pages of Defendants' Memorandum. Unless otherwise indicated, internal citations are omitted and emphasis is added.

portraying it as adding to Telus' own purported substantial AI capabilities to operate "at scale." ¶¶48, 81-82. In reality, Telus' "AI Data Solutions" division was merely a rebrand of Lionbridge's legacy, low-margin, and extraordinarily headcount-intensive manual data annotation business. ¶¶38, 50, 63.

Yet, throughout the Class Period, Defendants repeatedly assured investors that Telus possessed "heavy capabilities in AI," including a "proprietary" "cognitive AI suite" of offerings and "cutting-edge," "next-generation" and "end-to-end" AI solutions and services that "support the full lifecycle of its clients' AI-led transformation journeys," and that would allow Telus to profit from the AI "gold rush." ¶¶7, 78-79, 89-90, 95-96, 102, 112, 117, 121, 126.  This was pure fiction. As detailed by the CWs with direct knowledge of Telus' technical and sales operations, far from having "heavy capabilities in AI," Telus had no AI talent or offerings beyond labor-intensive data annotation and pilot projects.

**No AI Talent:** Telus lacked the personnel and budget to develop AI offerings, beyond mere data annotation. ¶¶49-52. CW-1, a senior analyst who trained and worked with Telus technical personnel, confirmed a "major skills gap," stating that budget constraints forced Telus to reassign non-AI staff—including from *call centers*—onto "AI teams." ¶¶51-54. CW-3 and CW-4, both software engineers, confirmed those working on AI had *no AI background or training*. ¶¶52, 56. CW-2, an Account Director who sold the Company's offerings, stated that, during the Class Period, Telus had no personnel with AI experience and, in late 2023 into 2024, was diverting WillowTree employees from billable, non-AI work to nonbillable internal projects to brainstorm ideas for AI-related offerings. ¶¶51, 55, 58-59, 63. To maintain an "outward appearance" of AI competence, CW-1 reported that Defendants conferred misleading "AI" titles on non-credentialed employees. ¶¶51-54.

3

**No AI Offerings:** Consequently, Telus had no proprietary AI offerings. CW-3 stated CW-3 was not aware of any functioning AI offering, and CW-4 reviewed Telus' "Proprietary" "cognitive AI Suite" slide and confirmed that "none of this is developed by TI or WillowTree" but was merely a collection of *other* companies' products or services that Telus presented under its logo. ¶¶56, 96, 99. CW-4 specified Telus' "Fuel iX" platform was just a "meaningless, marketing label" for a "ChatGPT wrapper" that Telus "just put[] their logo on[.]" ¶¶99, 118.

With no AI offerings, Telus' only option was pitching "pilot" projects. ¶59. CW-2 confirmed there was "no concrete AI product to sell...only case-by-case basis pitches to customers to possibly co-develop something the customer might be interested in." ¶59. According to CW-2, there was "significant consternation" from engineers pulled from billable projects to work on non-billable "AI teams," hurting revenues and margins. ¶¶55, 58.

## II.    The AI Sham Collapses Telus' Margins and Cost-Saving Promises

Defendants' deception extended to two critical areas: Telus' claimed internal cost efficiencies, and its pricing power and related margins.

**The False Cost-Savings Promise**: Defendants repeatedly claimed Telus was employing its purported AI capabilities internally to achieve cost efficiencies and boost margins, a phenomenon Puritt repeatedly referred to as "drinking our own champagne" or "eating our own gourmet cooking," ¶¶67-70, 104-05, 115, 123, 145. Defendants claimed these internal efficiencies would result in "$40 million" of cost savings in 2023 and "$60 million" in 2024. ¶¶69, 72, 156. This was impossible because, as CWs confirmed, Telus had no internal AI capabilities to deploy; its "AI teams" of inexperienced, diverted employees were still "brainstorming" and not implementing cost-saving technology. ¶¶55-56, 58, 71, 73.

**The False "Premium" Price and Margin Claims**: Defendants also claimed Telus was a "premium provider" of AI and other solutions and, thus, insulated from price competition because

4

of its "unique value proposition," enabling it to achieve high margins. ¶¶74-75, 90-91, 108. In reality, as Puritt later admitted, Telus had to cut prices because "we just keep losing opportunities because of price" and was repeatedly "told ... we were just too expensive"—depressing margins. ¶¶75, 158-59. Moreover, Telus' AI pivot was a margin-destroying albatross, as its legacy "data annotation" work was extraordinarily headcount-intensive and costly, as CW-1 and CW-2 confirmed. ¶63. Further, Telus could not "charge full freight" for its "pilot" projects (¶¶61-62, 171) and such "nascent and relatively lower margin AI revenue streams" were "cannibaliz[ing]" Telus' "tenured and higher margin CX work." ¶¶11, 155. These factors caused Telus' margins to "take it on the chin," and drastically lower prices by the end of the Class Period ¶¶14, 76, 159.

### III.    The Truth Emerges and Telus' Stock Price Plummets

On May 9, 2024, Defendants revealed that, contrary to Defendants' prior statements, Telus only had "pilot" offerings and, as a result, Chande confessed the AI business produced "below average" margins, not the tens of millions in cost savings Defendants promised. ¶¶138-41. Telus' stock price plummeted 18.14%. ¶142. On August 2, 2024, Defendants admitted the AI initiatives were "still nascent," "lower margin," and had been "cannibaliz[ing]" the profitable legacy CX business, forcing Telus to slash 2024 cost savings estimates in half to $30 million. ¶¶72, 155-56, 178. Defendants also admitted Telus had been hit hard by "fierce competition on price[,]" having repeatedly lost opportunities for being "just too expensive" (¶¶157-58), all putting Telus in an "unendurable position" of seeing the "complete eradication of margin yields." ¶¶159, 162, 175. Telus' stock collapsed another 36% (¶164) and Puritt was replaced. ¶25.

### ARGUMENT

On Rule 12(b)(6) motions, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard is met "when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[D]ismissal is appropriate only where [plaintiffs] can prove no set of facts consistent with the complaint that would entitle them to relief." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co. Ltd.*, 19 F.4th 145, 150 (2d Cir. 2021).

To state a §10(b) claim requires: (1) a material misrepresentation or omission (*i.e.*, falsity); (2) scienter; (3) a connected purchase or sale of a security; (4) reliance; and (5) causation and injury. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Defendants challenge falsity, scienter, and loss causation.[2]

## I.    THE COMPLAINT ADEQUATELY ALLEGES MATERIAL MISREPRESENTATIONS

The securities laws obligate speakers to be "accurate and complete." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 n.49 (2d Cir. 2022). "[O]nce a company speaks[,]… there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). While Defendants seek to recast most of Telus' statements as forward-looking statements of "outlook" (DB14-18), the alleged misstatements concern present facts, relating to three general categories: (1) AI capabilities, (2) AI-based cost-efficiency initiatives, and (3) price competition.

### A.  Misrepresentations Concerning AI Capabilities

Throughout the Class Period, Defendants consistently overstated Telus' AI capabilities. For example, Defendants claimed Telus had a "proprietary" "full suite of cognitive AI capabilities"; had "heavy capabilities in AI"; and its portfolio included "the AAA trifecta of

---

[2] Defendants submit 18 exhibits without requesting judicial notice (except for Exhibits 2-4, DB3 n.1), including documents not referenced in the Complaint (*e.g.*, Exs. 5, 9-10, 13, 15). Defendants cite their exhibits extensively, while citing sparsely to the Complaint, to create a counter-narrative. While the Court may take judicial notice of Defendants' excerpted SEC filings (Exs. 2-4), it cannot accept their contents (or the contents of other exhibits submitted for which they did not request judicial notice) for their truth, or draw inferences therefrom in their favor on this motion. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991).

analytics, artificial intelligence and automation". ¶¶95-96. These statements were false and misleading when made because, as CW-4 stated, there was "**nothing 'proprietary'**" about Telus' purported AI offerings, which were merely a collection of *other* companies' products or services that Telus presented under its logo. ¶¶52, 56-57, 59, 99. Defendants implicitly *concede* this by suggesting it was "disclosed" that Telus was "just using ChatGPT…[and] 'building apps around it[.]'" DB12. But that is not what Defendants said. What they said, on a completely different call, was that "[t]he possibilities presented by ChatGPT … are seemingly endless." *Id.* That statement has nothing to do with their false claims of having a "proprietary" suite of "heavy" "cognitive AI capabilities," does not convey that Telus had no AI capabilities and was passing off a ChatGPT wrapper as is own "proprietary" products, and was not "conveyed to the public with a degree of intensity and credibility" the same as Defendants' false statements. *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F.Supp.3d 381, 396 (S.D.N.Y. 2022) ("vague disclaimers" insufficient); *Lapin v. Goldman Sachs Group, Inc.*, 506 F.Supp.2d 221, 238 (S.D.N.Y. 2006) (truth-on-the-market defense is "intensely fact-specific and is rarely an appropriate basis for dismiss[al]").

Defendants also repeatedly claimed Telus "designs, builds, and delivers next-generation solutions, including AI" which "support the full lifecycle of its clients' AI-led transformation journeys" (¶¶78-79, 117, 126); was "equipped to develop and deliver cutting-edge AI solutions" (¶102); had "meaningful [AI] capability at scale" having "secured an…infusion of digital talent at scale" (¶¶81-82); Telus' AI capabilities made it "better positioned than most" competitors to "enable this gold rush"; and that "other than Accenture, no one else has what [Telus] ha[s] in this space." ¶¶89-90. These, and other similar misstatements (*e.g.,* ¶¶91, 97, 100, 108-09, 111-13, 120-21, 133, 147), conveyed the false impression that Telus had a suite of fully-developed, commercially-viable cognitive AI offerings, when (besides *other* companies' solutions) Telus had

7

merely its legacy data annotation services, and "pilot" programs that Puritt and Chande later admitted were "still nascent," "experimenting at a relatively small scale to avoid potential catastrophe," and at the "proof-of-concept" stage—for which Defendants could not charge "full freight." ¶¶98, 138-39, 155, 166, 171. All CWs confirmed Telus had no staff educated, trained or experienced in AI and simply reassigned employees from billable projects to "brainstorm ideas" for AI products. ¶¶51-61. CW-2 confirmed Telus had no concrete AI offerings during the Class Period and made "case-by-case" pitches hoping to co-develop products with the customers, CW3 reported Telus had no functional AI products, and CW-4 stated Telus had no proprietary AI products or services. *Id.*

Courts have found similar statements false and misleading where, as here, defendants portray their products as commercially viable when they are not. *See SEC v. StratoComm Corp.*, 652 F.App'x 35, 37 (2d Cir. 2016) (misrepresenting telecommunications system as commercially-viable); *Helo v. Sema4 Holdings Corp.*, 2025 WL 1733387, at *6 (D. Conn. June 23, 2025) (misleading statements about product's capabilities); *In re Arqit Quantum Inc. Sec. Litig.*, 774 F.Supp.3d 505, 536 (E.D.N.Y. 2025) (misrepresentations overstating Arqit's technology's capabilities).

Defendants' brief ignores virtually all their misrepresentations about Telus' AI capabilities and misleadingly presents the few snippets they do address. For example, Defendants omit from their reference to "exciting new GenAI-enabled capabilities" (DB10) that what Puritt actually said was Telus was providing "the very capabilities that we've *perfected over the last many years*, … in particular … our … exciting new GenAI-enabled capabilities." ¶113. This was false because, *inter alia*, Telus had no GenAI-related capabilities of its own and certainly had not "perfected [them] over the last many years." Similarly, ¶39, which Defendants cite as showing Plaintiff

"concedes" "TI offered AI-supported solutions through its Digital/IT Solutions business line" (DB10), does not even mention AI. *See Lapin*, 506 F.Supp.2d at 240 (rejecting defendants' effort to "misconstrue[] Plaintiff's allegations"). Likewise, Defendants' description of Fuel iX as a "GenAI-*supported* product" (DB10) is not contrary to the Complaint, which describes Fuel iX as a ChatGPT wrapper. ¶118.

Moreover, Defendants' contention that Plaintiff misquotes Puritt as saying Telus "only" had pilot AI projects during the Class Period, is wrong. The word "only" was never attributed to Puritt. What Plaintiff alleges is that Puritt admitted Telus had no commercially viable, proprietary AI offering beyond pilots (which Defendants do not dispute). Indeed, other than referencing data annotation work, the only other AI initiatives Puritt mentioned in Telus' May 9, 2024 Earnings Call were "pilots" Telus was "working…on" for "many" customers. ¶¶138-40. On May 21, 2024, Puritt blamed margin shortfalls on Telus running "AI-centric" "proof-of-concept pilot[s]" "all over the place" for which it could not charge "full freight" because Telus was still "experimenting at a relatively small scale," which Chande confirmed on November 8, 2024. ¶¶165-166, 170-71. Similarly, Defendants' invocation of a boilerplate phrase buried in documents (including documents *predating the Class Period*) that "in some cases," "[b]efore or after entering into a … contract [for *any* product]…, [we] *may* run a pilot program" (DB13), is completely untethered from Telus' AI initiatives and does nothing to inform investors that Telus' highly-touted AI capabilities were merely pilots that had to be heavily discounted. *See Karimi*, 607 F.Supp.3d at 396; *Lapin*, 506 F.Supp.2d at 238.

Next, Defendants argue that Plaintiff confuses AI services and products. DB13-14. But it is Defendants who are confused. The Complaint alleges Telus had *neither* (*e.g.*, ¶55 (no "AI products or services"); ¶61 (no AI "offerings"); ¶103 (no AI "solutions"). Further, Plaintiff does

9

not allege Telus had no data annotation services or that Defendants falsely represented they were not labor-intensive, as Defendants contend. Rather, Plaintiff alleges that Telus was unable "to develop and implement actual AI products or services" but merely had data annotation and pilot projects. *E.g.*, ¶¶3, 9, 50, 63, 98. Defendants' examples (DB13) are not to the contrary. None of the alleged misstatements they cite say anything about data annotation and Defendants cannot simply insert the words "AI data annotation" in brackets to change the context of their misstatements. *E.g.*, ¶119 (falsely claiming Telus was "seeing good…demand," particularly for its "market-leading generative AI"); ¶147 (noting "the near-term gold rush for us" from AI and that "we've built some proprietary tools" for its clients' AI needs).

Finally, Defendants argue that the Court should not rely on Plaintiff's CWs because they were not employed at Telus during the entire Class Period, were too low-level to have personal knowledge about the facts alleged, and/or their accounts are "personal criticisms." DB10-12, 14. CW allegations are reliable where they "support the probability that a person in the position occupied by the source would possess the information alleged." *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015). Contrary to Defendants' argument, CWs need not have been employed at Telus throughout the Class Period or at the exact time of the alleged misstatement to have relevant knowledge of falsity. *Id.* at 307; *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F.Supp.3d 379, 411 (S.D.N.Y. 2020) ("no bright-line rule prohibiting courts from considering allegations that predate the Class Period. To the contrary, courts in this Circuit frequently consider such allegations in denying motions to dismiss.").[3]

---

[3] Defendants' lone authority, *Francisco v. Abengoa, S.A.*, 481 F.Supp.3d 179 (S.D.N.Y. 2020), was *vacated, sub nom. Sheman v. Abengoa*, S.A., 156 F.4th 152 (2d Cir. 2025).

In *In re GigaCloud Tech. Inc. Sec. Litig.*, 2025 WL 307378, at *7-8 (S.D.N.Y. Jan. 27, 2025), the court rejected similar arguments that CW statements were mere "musings" lacking "credible knowledge about the Company's use of AI" and too "generic," because, as here, the CWs "'held positions that suggest they would have knowledge' about GigaCloud's use of AI" such as being part of the company's software development team. As in *GigaCloud*, CWs 2, 3 and 4 all worked in Telus' WillowTree division during the Class Period where Telus focused its AI development, and were in roles where they witnessed, firsthand, Telus' futile attempted AI pivot, diversion of inexperienced resources to AI efforts, status of its AI capabilities, and the background and experience of engineers. CW-2 was an Account Director who sold WillowTree/Telus' products and services, including AI, to clients, and participated in weekly and monthly calls with senior management regarding the status of such products. ¶31. Thus, CW-2 knew what Telus' AI offerings were. CW-3 was a Senior Software Engineer who developed apps and software programs and, thus, knew about WillowTree/Telus' AI capabilities and its pivot to AI. ¶32. CW-4 was a Software Engineer who was personally diverted to train WillowTree employees in AI and participated in daily status meetings regarding the Company's AI efforts. ¶33. Thus, CW-4 knew Telus' employees' capabilities and the status of Telus' AI capabilities. Moreover, CW-4 personally reviewed Telus' claims of having a "proprietary" "cognitive AI suite" of offerings and affirmed they were untrue. ¶¶96-99. CW-1 was employed by Telus' parent company until the end of 2022, just one month before the Class Period start, as a senior analyst focused on customer experience and automation initiatives. ¶30. In this role, CW-1 regularly coached, trained,

11

interacted and collaborated with Telus employees, and thus knew their capabilities. *Id.*[4] Thus, the CW allegations sufficiently support Plaintiff's allegations. *GigaCloud*, 2025 WL 307378, at *7-8.

### B. Misrepresentations Concerning AI-Based Cost Efficiency Initiatives

Defendants also repeatedly claimed they were deploying Telus' "AI-enabled and automation capability inside [Telus]" (¶¶112, 123); Telus had already "actioned" "cost efficiency programs" including "accelerating automation and Generative AI initiatives within our internal processes" (¶104, 115); and Telus' updated guidance included "an improvement in our adjusted EBITDA margin" "primarily attributed to our in-progress cost efficiency program as we … implement further automation and Gen AI solutions internally." ¶105. Puritt referred to this as "drink[ing] our own champagne" or "eat[ing] our own gourmet cooking." *E.g.*, ¶¶67, 123.

Puritt and Kanu promised investors that "certain of the actions already completed" would save Telus "approximately $40 million" in 2023, with a "full benefit" of $60 million in 2024, and boost margins back to approximately 23%. ¶¶67-69, 72. *See also* ¶115 ("we have now successfully actioned meaningful cost savings" and "efficiency" "by deploying generative AI solutions within our own operations[,]" and "[d]ue to the strong progress and execution of these … efforts … we expect to quickly return to our typical 20% plus adjusted EBITDA margin"); ¶145 (similar).

These statements gave investors the false impression that Telus was already successfully "deploying AI-enabled and automation capability inside [Telus]" and driving down costs to boost closely-watched margins back to previous levels when, in fact, Telus had no AI capabilities beyond

---

[4] Accordingly, Defendants' cases for the proposition that the CWs were not in a position to know or have access to the information alleged are inapplicable. *Eden Alpha CI LLP v. Polished.com Inc.*, 763 F.Supp.3d 270 (E.D.N.Y. 2025) (warehouse workers opining companywide publicly reported inventory numbers false); *Saraf v. Ebix, Inc.*, 632 F.Supp.3d 389 (S.D.N.Y. 2022) (employee at Georgia headquarters "lacked 'visibility'" into India operations); *In re China Mobile Games & Ent. Grp., Ltd. Sec. Litig.*, 2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) (CW worked for the defendants' subsidiary, while here, CW-1 worked for TI's *parent* and was charged with *training TI personnel*).

labor-intensive data annotation and pilot programs, and lacked AI expertise to utilize AI to drive down internal costs. ¶¶106, 116, 124, 146. Thus, contrary to Defendants' statements, Telus was not deploying AI inside the Company or experiencing related cost savings and resulting margin improvements. *Arqit*, 774 F.Supp.3d at 536 (misrepresentation of product's capabilities actionable); *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *1, 5 (N.D. Ill. Aug. 11, 2021) (claim that cost-cutting strategy was "in line to exceed expectations" actionable where investors misled about savings).[5]

Defendants' arguments are unavailing. *First*, Plaintiff does not allege Telus had *no* cost reductions. DB19-20. It purportedly did implement headcount reductions. Rather, Plaintiff alleges Telus had no AI offerings of its own or expertise to apply GenAI internally to generate the significant savings it promised investors. This is consistent with CW accounts that Telus' personnel lacked AI training or experience to develop AI products and Telus lacked AI capabilities during the Class Period. Indeed, Telus' lack of AI capabilities to generate cost savings is borne out not just by Defendants' failure to achieve the claimed cost savings, but by the fact Telus missed its $60 million estimate by a mile (cutting its estimate in half to $30m),[6] and Defendants' subsequent admissions that Telus had not yet implemented the measures that purportedly would generate such savings (*e.g.*, initiatives were "a bit forward to roll out, but we expect to come through[,]" "will ultimately be rolled out," "we're looking at how to we reduce our cost"). ¶¶61, 71, 153-54, 156, 161-63, 177-81. *See Arqit*, 774 F.Supp.3d at 536; *Hedick*, 2021 WL 3566602, at

---

[5] Unlike in *Diabat v. Credit Suisse Grp. AG*, 2024 WL 4252502 (S.D.N.Y. Sept. 19, 2024) (DB20), here, Defendants did not make generic statements about Telus' cost-savings initiatives, but provided specific details about the source, basis, timeline and expected savings amount of those initiatives.

[6] In its August 2, 2024 announcement, Telus acknowledged only 1/3 of the $30 million ($10 million) had been "implemented" (consisting of facility reductions, vendor renegotiations, and headcount reductions). ¶¶156, 163.

\*5 (defendants misled investors synergies were capable of generating substantial savings); *Farrar v. Workhorse Grp., Inc.*, 2021 WL 5768479, at \*3-5 (C.D. Cal. Dec. 2, 2021) (claims company was viable contender to achieve contract actionable where it did not have realistic ability to achieve it).

*Second*, Defendants' attack on CWs, again, ignores that they were perfectly positioned to observe Telus', and its personnel's, AI capabilities. *See* §I.A. *supra*.

*Third*, as set forth below, Defendants' argument that their statements are inactionable forward-looking projections ignores that (i) they conveyed representations of present fact that Telus was capable of generating meaningful AI-based cost efficiencies internally, (ii) Telus did not have such capabilities, and (iii) Defendants knew or recklessly disregarded that they did not have such capabilities and it was impossible to achieve them by the stated timeframe. *See* §§I.D. and II.A.-C. *infra*.

### C. Misrepresentations Concerning Price Competition

Defendants also assured investors that Telus could command high prices for its offerings—including AI offerings—because they provided better value than competitors. *See* ¶108 (Puritt responding to analyst question about price competition that "because of our unique differentiated AI" and other capabilities "delivering a superior client experience," "we'll continue to be able to distinguish ourselves from the competition" on the "value for money" proposition, *i.e.*, without cutting prices); ¶93 (claiming Telus was "supremely confident" in its revenue visibility and hadn't "seen a deterioration, degradation or change of consequence"); ¶¶87, 129, 131 (stating that "*if*" Telus was unable to adapt to customer pricing demands or overcome competitors' price undercutting, its financial performance "*may*" be adversely effected, but that "*we believe our services to be of higher quality*"); ¶¶84-85 (similar). These statements were false and misleading when made because, as Puritt later admitted, throughout the Class Period, customers repeatedly

14

told Telus "we were just too expensive," causing Telus to continually lose sales due to "fierce competition on price[.]" Thus, at the end of the Class Period, Defendants belatedly revealed Telus had been cutting its prices. ¶¶75-76, 157-60, 174-76. *See Carmignac Gestion, S.A. v. Perrigo Co. PLC*, 2019 WL 3451523, at *11 (D.N.J. July 31, 2019) (statements claiming company was "insulated from the current pricing drama" actionable); *In re Facebook, Inc.*, 986 F.Supp.2d 487, 515-16 (S.D.N.Y. 2013) (risk warnings misleading if event had already occurred).[7]

### D. Defendants' Statements Are Not Forward-Looking or Protected by The Safe Harbor

Defendants contend certain misstatements are protected by the PSLRA's "safe harbor" for forward-looking statements. DB15, 19.[8] However, Defendants ignore that such statements made claims about Telus' AI capabilities in the ***past-tense*** or ***present-tense***. *E.g.*, ¶102 (Telus "***is equipped*** to develop and deliver cutting-edge AI solutions"); ¶113 (touting "the very capabilities that ***we've perfected over the last many years***, including, in particular, ***more recently*** our exciting new GenAI-enabled capabilities").[9] Such representations about Telus' *then-existing* AI capabilities are not forward-looking and thus not protected by the safe harbor. *In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005) (misrepresentations of historical and present facts on effectiveness of developing product not forward-looking).

Moreover, the safe harbor does not protect the past-tense or present-tense aspects of statements that are "mixed" with forward-looking aspects. *See In re Vivendi, S.A. Sec. Litig.*, 838

---

[7] Unlike *Saskatchewan Healthcare Emp. Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344 (S.D.N.Y. 2024) (DB17), here Plaintiff has alleged Defendants knew the undisclosed facts had already occurred, *e.g.*, ¶¶158-60 (Puritt admitting he was told Telus kept losing contracts on pricing and therefore had to cut prices).

[8] The statements challenged as forward-looking are ¶¶85, 87, 89, 93, 100, 102, 105, 107-109, 111-113, 115, 120, 123, 129, 131, 133, 143, 145, 147. DB 15, 19; Ex. 1. Defendants do not challenge ¶96 as puffery, opinion, or forward-looking.

[9] *See also* ¶¶89, 100, 120, 147.

F.3d 223, 246 (2d Cir. 2016); *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, at *13 (S.D.N.Y. Mar. 25, 2013). Defendants contend several paragraphs with such "mixed" statements are exclusively forward-looking (DB15, 19), ignoring the past-tense or present-tense elements thereof.[10] For example, Defendants represented that "**we see** meaningful opportunities **being amplified** by generated AI adoption…" (¶107) and "Telus "**is** uniquely positioned and credentialed" in AI (¶111).[11] The forward-looking component of those statements "incorporate a present fact" about Telus' *existing* AI capabilities, which Defendants knew did not extend beyond pilots or include proprietary offerings. *Aeropostale*, 2013 WL 1197755, at *13; *see also In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *10 (S.D.N.Y. Apr. 22, 2016). Moreover, Plaintiff adequately alleges Defendants made the statements with "actual knowledge" of their falsity. 15 U.S.C. §78u-5(c)(1)(B); *see* §II.A.-C. *infra*.[12]

Defendants' reliance on boilerplate cautionary language from earnings calls and Telus' 2022 and 2023 Form 20-Fs (DB16-17) also fails. Such generic and hypothetical disclaimers,

---

[10] *See, e.g.*, ¶¶93, 105, 107-109, 111-112, 115, 123, 133, 143, 145. Even the claim in ¶133 that "AI is going to be the standout for us going through the entirely of 2024" implicitly represents that Telus then had significant AI capabilities.

[11] Defendants also attempt to characterize several paragraphs (¶¶105, 112, 115, 123, 145) as containing purely forward-looking "projections" of cost savings. Not so. Paragraphs with statements like "**we have now successfully actioned** meaningful cost savings" (¶115) and "**we have undertaken** a fairly comprehensive optimization effort" (¶123) are not purely "projections." The statements in the remaining paragraphs implied that the cost efficiency projections accurately reflected efficiencies from Telus' purported "proprietary" AI capabilities that Defendants knew did not exist. ¶¶71, 116, 177-81. *See Aeropostale*, 2013 WL 1197755, at *13; *Salix*, 2016 WL 1629341, at *10.

[12] Defendants' "incantation of fraud-by-hindsight" is unpersuasive because Plaintiff adequately alleges that Defendants "failed to take into account information that was available" at the time of the misstatements. *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *7 (S.D.N.Y. June 21, 2021). Contrary to Defendants' assertion (DB20), Plaintiff's scienter allegations are in stark contrast to the lack of "contrary information" in *Kemp v. Universal Am. Fin. Corp.*, 2007 WL 86942, at *14 (S.D.N.Y. Jan. 10, 2007), and the absence of a "single allegation" of defendant's knowledge in *Diabat*, 2024 WL 4252502, at *57.

16

including that "risks and uncertainties…may cause actual results to differ" (Ex. 14 at 3), and Telus "may not be successful" in responding to clients' needs (¶85), are inadequate as they do not address the specific risks. *See In re Vivendi Universal, S.A. Sec. Litig.*, 381 F.Supp.2d 158, 183 (S.D.N.Y. 2003) (similar "actual results may differ" warning "does not come close" to sufficient cautionary language). Defendants also contend they disclosed general "profitability pressure" (DB16), but omit from their quoted language that they stressed it was "***near-term and temporary***" (Ex. 12 at 3) and that, despite overall market pressure, the "TI AI service line" was experiencing the "biggest bump," which Defendants expected "to continue" (Ex. 14 at 15). Thus, in full context—including Defendants' claims that they could withstand pricing pressure because they beat competitors on value—Defendants' statements provide nothing close to a disclosure that Telus kept losing business because customers repeatedly told Defendants "we were just too expensive," or had no differentiated AI capabilities to offer. ¶158.

Moreover, Plaintiff alleges that Defendants' Form 20-F risk factors[13] were themselves misleading because the "risks had already materialized." *Facebook*, 986 F.Supp.2d at 515-516; *Plumbers & Pipefitters Nat'l Pension Fund v. Tableau Software, Inc.*, 2019 WL 2360942, at *4 (S.D.N.Y. Mar. 4, 2019) (similar).[14] Contrary to Defendants' contention, the word "may" in the cited risk factor "our pricing models ***may not be*** representative of new contracts" (¶131), renders it hypothetical, and is false because it omits Telus was already experiencing pricing pressure, losing market share, and cutting prices in response. *See* ¶132.

---

[13] *See, e.g.*, ¶¶85, 87, 129, 131.

[14] Unlike *Saskatchewan*, 718 F.Supp.3d at 386, here, CWs stated that, during their tenures, the risks referenced in the 2022 and 2023 Form 20-Fs that Telus' offerings "may" become uncompetitive and its profitability "may" deteriorate had already materialized. *See* ¶¶86, 88, 130, 132.

17

### E. Defendants' Statements Are Not Inactionable Statements of Opinion or Puffery

Defendants characterize several statements as inactionable opinions (DB17-19).[15] However, of the 24 paragraphs Defendants apparently contend (between their brief and Ex. 1) contain opinion statements, they identify the opinion portion within only two such paragraphs. DB17-18. Because Defendants force Plaintiff and the Court to guess which statements are challenged, Defendants' argument should be rejected. Moreover, 11 of the purportedly "classic" opinion paragraphs (DB17) are not opinions because the misleading statements do not include any of the traditional prefatory language associated with opinions, *e.g.*, "believe," "estimat[e]," or "think," nor do they otherwise suggest that they were intended as opinions.[16] *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176-77 (2d Cir. 2020).

Other paragraphs, that Defendants contend are purely opinions, are actionable because they are based on false embedded representations—namely that Telus' AI capabilities went beyond pilots and included proprietary offerings, and generated significant cost savings. ¶¶90, 102 (describing Telus' AI capabilities as supporting Telus' holding "a position of scale [a]s 1 of only 2 providers with more than 10% overall share;" claiming Telus was "equipped to develop and deliver cutting-edge AI solutions"); ¶115 (claiming that due to "meaningful cost savings…we expect to quickly return to our typical 20% plus adjusted EBITDA margin"); ¶121 ("we really do have something quite unique, differentiated because of the AI experience and expertise and because of the comprehensive nature of the offering").[17] *Abramson*, 965 F.3d at 175-76 (opinions actionable where they "impl[y] facts or the absence of contrary facts"); *Wang v. Cloopen Grp.*

---

[15] Defendants' brief cites 18 total paragraphs as containing "opinions" (DB17-19). Defendants' Ex. 1 chart purports to cite 24 paragraphs: ¶¶81-82, 89-91, 93, 95, 97, 100, 102, 105, 107-109, 111-113, 115, 119-121, 133, 143, 147.

[16] *See, e.g.*, ¶¶81-82, 89, 95, 100, 105, 109, 112-113, 119, 133.

[17] *See also* ¶¶93, 107, 111, 143, 147.

*Holding Ltd.*, 661 F.Supp.3d 208, 229 (S.D.N.Y. 2023) (statements about beliefs and expectations of business actionable where material information withheld); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *11–12 (S.D.N.Y. Nov. 26, 2018) (qualitative statements about **present** state of affairs actionable).

Moreover, even seeming "opinion" statements can, depending on context, be actionably misleading, as here. *See Abramson*, 965 F.3d at 175-77; ¶97 (Puritt responding to analyst question about "new technologies around AI," that "we've been quite prescient in building out the scope and scale of our technology-enabled service line"—when Telus had not built out its AI offerings for scale); ¶120 (Puritt reassuring analyst that Telus would "turn[] things around" "particularly … in the AI space," and "leverage[]our capability set, particularly … in the AI space" because "we have what the doctor is ordering in terms of addressing this [AI] opportunity"—when Telus had no significant AI capability).

Further, opinion statements are actionable where, as here, they are made with actual knowledge of their falsity and/or "omit[ed] material facts about [each] speaker's … knowledge of facts that would support the stated opinion." *Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F.Supp.3d 526, 547 (S.D.N.Y. 2017); *see* §II.A-C. *infra*.

Lastly, Defendants contend that certain statements are inactionable puffery because they are "too vague and imprecise." DB18.[18] However, Defendants impermissibly present the statements "in isolation" rather than in context. Considered in context, the alleged misstatements contain objectively verifiable facts and, thus, are not puffery. *Signet*, 2018 WL 6167889, at *11– 12. For example, Defendants' statements that Telus was "deploying AI…to drive down our own

---

[18] *See, e.g.*, ¶¶78, 81-82, 89-91, 95, 97, 100, 102, 107-109, 111-113, 117, 119, 120-121, 123, 126, 133, 145, 147.

19

cost[s]" (¶123) and describing AI offerings as "next-generation" (¶78), "robust end-to-end digital transformation capabilities" (¶82), "unique differentiated" (¶108), and "comprehensive" (¶121)— some directly in response to analyst questions about Telus' then-existing AI capabilities—falsely portrayed differentiated and cost-reducing AI capabilities when Telus had, at most, AI pilots and no proprietary AI technology or significant cost efficiencies. ¶¶49-61, 99, 116, 174-81; *see In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *8-9 (S.D.N.Y. Sept. 30, 2020) (statements about "world class" and "established and successful" asset not puffery because defendants knew the asset was underdeveloped); *Signet*, 2018 WL 6167889, at *11–12 (statements about "strong," "robust," and "very healthy" asset not puffery because many were made in response to direct analyst questions).[19]

## II.   THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

Scienter is pled by allegations of conscious misbehavior or recklessness, *or* motive and opportunity to defraud. *See Puddu v. 6D Global Techs., Inc.*, 742 F.App'x 553, 556 (2d Cir. 2018). Defendants are reckless if they "knew facts or had access to information suggesting that their public statements were not accurate[.]" *Blanford*, 794 F.3d at 306. Courts must consider "*all* of the facts alleged … collectively" to determine if an inference of scienter is, like here, "cogent and at least as compelling" as the competing inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007). Ties go "to the plaintiff" and motive is not required to plead scienter.

---

[19] Taken in context, Defendants' statements are in stark contrast to the general statements of "competitive advantages" and "highly efficient operation" in *Police & Fire Ret. Sys. City of Detroit v. Argo Group Int'l Holdings, Ltd.*, 2024 WL 5089970, at *11 (S.D.N.Y. Dec. 12, 2024), or the "generic" and "indefinite" statements about "integrity and credibility" in *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F.App'x 32, 37 (2d Cir. 2012) (DB18-19 & n.9). Moreover, contrary to the statements in *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 417 (2d Cir. 2023), whether Telus was designing and delivering "unique" and "comprehensive" AI capabilities (¶¶108, 121) is verifiable.

*City of Pontiac Gen. Emps.' Retirement Sys. v. Lockheed Martin Corp.*, 875 F.Supp.2d 359, 371 (S.D.N.Y. 2012) (motive and opportunity is "an alternative test."). As discussed below, contrary to Defendants' assertion (DB22-23), the AC alleges facts supporting each Defendant's scienter.

### A. Defendants' Admissions That Telus Only Had Pilot Programs Strongly Supports Scienter

At the end of the Class Period, on calls held by Puritt and Chande, Defendants finally admitted that Telus' touted AI offerings merely consisted of low margin "pilot" projects. Indeed, Defendants blamed Telus' low margins on the facts that "we're deploying pilots all over the place … [b]ut it's hard to charge full freight for a pilot"; Telus' "AI-centric" bookings had caused "margin pressure because … we don't get to charge full freight on the proof-of-concept pilot"; Telus' "nascent" AI initiatives had "cannibalized" higher margin offerings; and "*when* we demonstrate [our AI] capability … we can *then* look to expand the margin yield." ¶¶155, 157-60, 171-80, 209. Thus, Defendants admittedly knew they were selling mere "pilot" AI offerings and had not yet demonstrated their AI capabilities.

Moreover, Defendants knew they were charging discounted rates for pilots because they made the decision to charge those discounted rates (¶158), discussed pricing in nearly every earnings call (¶¶90-91, 108, 174-180), and Puritt himself acknowledged the innate logic that "it's hard to charge full freight for a pilot." ¶173. *See In re Vivendi Universal, S.A. Sec. Litig.*, 765 F.Supp.2d 512, 553-554 (S.D.N.Y. 2011) (scienter where admissions of liquidity crisis supported inference it did not arise overnight); *see also Blanford*, 794 F.3d at 306-07 (scienter pled where defendants "knew facts or had access to information suggesting that their public statements were not accurate"); *Stadium Capital LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *6 (S.D.N.Y. Feb. 5, 2024) (finding "we" in "we are … able to monitor" included all executives on call where admission was made).

21

Defendants' admissions of "nascent" and "pilot" AI offerings are corroborated by CW accounts. Even if the CWs did not directly interact with the Individual Defendants, they uniformly corroborate that, during the Class Period, Telus had no significant or proprietary AI capabilities, or even the staff to develop them. ¶¶51-58, 60-61. *See In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. Nov. 18, 2019) (finding scienter and that the "notion that [CWs] cannot be believed because none had direct contact with any individual Defendant is contrary to law."). Thus, all Defendants lacked a good faith basis for their claims about Telus' AI capabilities.

Defendants rely on a single, boilerplate reference to *possibly* employing pilots for *any* new program, as somehow showing their "transparency" and undercutting scienter. DB23. As discussed in §I.A. *supra*, this argument fails because the disclosures did not address Telus' AI initiatives or inform investors that Telus ***only*** had pilots. *See In re Synchrony Fin. Sec. Litig.*, 2022 WL 427499, at *7-10 (D. Conn. Feb. 11, 2022) (rejecting risk disclaimers as undermining scienter).[20]

## B. Defendants Admitted They Were Harmed By Price Competition and Their Cost Transformation Initiatives Materially Underperformed Due to Telus' Lack of AI Capabilities

At the end of the Class Period, Defendants admitted that competitors' continued focus on market share over margins had forced Telus to cut prices during the Class Period to such a degree that it "put us in this unendurable position" of allowing the "complete eradication of margin yields." ¶¶159-60, 174-76. More specifically, Puritt admitted that Telus had to cut prices because, *throughout the Class Period*, Telus "just ke[pt] losing opportunities because of price" and had repeatedly kept being "told in the postmortem [after losing out on sales to competitors] that we

---

[20] Unlike the "significant disclosures about the exact risk" in *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F.Supp.3d 478, 490 (S.D.N.Y. 2021), Defendants' disclosures here were minimizing, hypothetical, and wholly unrelated to the pilots at issue.

were just too expensive" so "we just decided that we can't keep missing out on opportunities." ¶¶75-76, 158; *see Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 78 (2d Cir. 2021) (defendants' responsive action supported scienter). Indeed, Telus' "unendurable" position with "complete eradication" of margins "did not develop overnight." *Vivendi*, 765 F.Supp.2d at 553-54.

Further, as discussed above, because Defendants admittedly knew Telus did not have the claimed AI capabilities, they also knew they could not gain the AI-based internal cost efficiencies they touted, and admitted at the end of the Class Period that they only hoped to implement such measures in the future. *E.g.*, ¶¶161-63, 177-81. The foregoing were facts Defendants knew during the Class Period, not ones that just materialized at the end of the Class Period (and thus not "fraud-by-hindsight"). *Blanford*, 794 F.3d at 306-07; *Vivendi*, 765 F.Supp.2d at 553-54.

## C. Defendants Held Themselves Out as Knowledgeable

Throughout the Class Period, Defendants provided detailed updates and answers to analyst questions about Telus' AI capabilities, pricing, cost reduction, and margins, indicating personal knowledge thereof. ¶¶182-90. *See In re Nielsen Holdings PLC Sec. Litig.,* 510 F.Supp.3d 217, 237 (S.D.N.Y. 2021) (frequent discussion of topic demonstrates scienter).

For example, Defendants consistently affirmed Telus' market and price competitiveness because of its "unique" and "differentiated" AI offerings (¶¶89-90, 100, 102, 108, 111-13, 119-21, 174); and provided detailed updates and answers to analyst questions on Telus' AI offerings, pricing, cost efficiency programs (referencing specific programs), as well as their effects on Telus' overall margins and business. *See, e.g.*, ¶97 (Puritt claiming "we've been quite prescient in building out the scope and scale of our technology"); ¶105 (Kanu describing improved margins due to implementing "further automation and Gen AI solutions internally"); ¶108 (Puritt responding to analyst question about price competition that because of our "unique differentiated

23

AI" and other capabilities "we'll continue to be able to distinguish ourselves from the competition"); ¶121 (Puritt claiming that "almost everybody" was talking to Telus about AI); *see also* ¶¶104, 115, 123, 133, 143, 145, 185-86. *Compare In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at *5 (S.D.N.Y. June 2, 2022) (detailed knowledge and involvement in relevant issues supported scienter) *and S. Ferry LP # 2 v. Killinger*, 687 F.Supp.2d 1248, 1258-60 (W.D. Wash. 2009) (intimate knowledge of issues, direct responses to analyst questions, and admissions demonstrated actual knowledge) *with E. Point Sys., Inc. v. Steven Maxim, S2k, Inc.*, 133 F.Supp.3d 430, 436-37 (D. Conn. 2015) (no allegations projections were "inconsistent with information available to Plaintiffs").

Defendants also touted their visibility into and personal involvement in Telus' day-to-day operations, claiming they were "supremely confident" in their "strong visibility" into Telus' financial and operational results. ¶¶93, 189; *see In re STMicroelectronics N.V. Sec. Litig.*, 2025 WL 2644241, at *3 (S.D.N.Y. Sept. 15, 2025) (visibility statements supported scienter). Defendants explained their confidence resulted from constant "discussions with clients in terms of planning their projects and priorities" and as a "direct consequence" of "conversations [Puritt was] personally having with existing and prospective customers." ¶¶187, 189. *See Romeo Power*, 2022 WL 1806303, at *5; *Yannes*, 2021 WL 2555437, at *5 (defendant's personal involvement in operations supported scienter); *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 456, 459-60 (S.D.N.Y. 2005) (Marrero, J.) (allegations of officers' direct involvement in day-to-day operations and familiarity with relevant issues supported scienter).[21]

---

[21] Defendants' demand for specific reports to show Defendants' knowledge (DB24) is unnecessary especially where, as here, Defendants admit actual knowledge of the subject of the misstatements. *Stadium Capital*, 2024 WL 456745, at *6 (specific reports not required where defendants admit actual knowledge). Moreover, *In re AppHarvest Sec. Litig.*, 684 F.Supp.3d 201, 243 (S.D.N.Y.

### D. Telus' Major Shift to, and Focus on, AI Supports Scienter

Prior to and during the Class Period, Defendants shifted Telus' entire focus from its legacy CX business to, and staked its future on, the burgeoning AI market. ¶¶191-96. Defendants regularly indicated that Telus' expanding AI capabilities were critical to its growth and margins, and Puritt emphasized Telus' purported pivotal role in the AI "gold rush for years to come" ¶¶89, 147. CWs also confirmed Telus' intense internal focus on AI. For example, CW-3 recalled that Tobias Dengel, WillowTree's CEO, "made a big speech" saying "the company was now going to pursue AI." ¶¶197-98. All CWs recounted that Telus diverted numerous employees from high-margin billable work to developing AI initiatives, which became a top Company-wide priority. ¶¶51-58, 60-61, 198. Defendants' external and internal prioritization of AI initiatives, along with their claimed laser-focus on margins, supports scienter. *See Yannes*, 2021 WL 2555437, at *5 (importance of subject matter to company "at the very least" supports scienter); *Wang*, 661 F. Supp.3d at 237 (similar); *Synchrony*, 2022 WL 427499, at *8 (similar).[22]

## III. THE COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

Loss causation allegations are assessed under the Rule 8 notice pleading standard, requiring only "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 346-47. A corrective disclosure need not be a "mirror image" of the alleged misstatement. *Freudenberg v. E*Trade Fin. Corp.*, 712 F.Supp.2d 171, 202 (S.D.N.Y. 2010). Partial corrective disclosures are permissible. *Id.* Loss causation is ordinarily an issue for the trier

---

2023) (DB24), found that defendants holding themselves out as knowledgeable "undoubtedly weigh[s] in favor of a finding of scienter."

[22] These cases demonstrate that, contrary to Defendants' assertion, courts in this Circuit find that the importance of the subject matter at issue can support scienter, a point Defendants concede (DB25), even when the operation does not constitute "nearly all" of a company's business (DB24-25, citing *Tyler* v. *Liz Claiborne, Inc.*, 814 F.Supp.2d 323 (S.D.N.Y. 2011); *In re Plug Power, Inc. Sec. Litig.*, 2023 WL 5577276 (S.D.N.Y. Aug. 29, 2023)).

of fact. *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233-34 (2d Cir. 2014).

### A.  May 9, 2024 Corrective Disclosure

On May 9, 2024, Defendants revealed Telus missed revenue and earnings targets, attributing the misses to Telus "working [] on" "pilot" projects in AI for "many" customers, resulting in margin pressure and revenue decline. ¶¶138-41, 203-04. This disclosure was the first inkling to investors that Telus lacked fully-developed AI offerings and could not generate significant profitability therefrom. *Id.* In response, the price of Telus Equity Shares fell 18.14%. ¶205.

Defendants' disclosures partially corrected their prior misstatements, among others, that Telus had heavy capabilities in AI, a full suite of cognitive AI capabilities, and was equipped to deliver cutting-edge AI solutions. *See* §I.A., *supra*. Defendants' disclosure of poor margins also corrected prior misrepresentations that Telus had already "actioned" AI-based initiatives internally leading to major cost reductions and boosting margins. *See* §I.B., *supra*. Analysts understood Defendants' disclosures as correcting their prior misstatements, highlighting that margins had not improved as expected, contrary to Defendants' AI capability misstatements. Indeed, a CIBC Research report later that day noted lower-than-expected margins, due to the failed cost initiatives and low-margin AI revenue drag: "[f]or margins to improve over the remainder of the year, ***cost saving initiatives,*** mix shifting towards higher-margin revenue, and revenue growth will all need to have a meaningful impact." ¶207; *see also* ¶206. *Boston Ret. Sys. v. Alexion Pharms., Inc.*, 556 F.Supp.3d 100, 141 (D. Conn. 2021) ("contemporaneous analyst commentary" supports loss causation).

Thus, contrary to Defendants' suggestion (DB25), Plaintiff's loss causation allegations do not rely simply on poor financial results. Rather, Plaintiff connects Telus' stated ***reasons*** for the

26

poor earnings, including poor margins, to a correction of prior misstatements regarding AI capabilities resulting in internal cost savings to lower margins, as supported by analyst understandings. *See Abramson*, 965 F.3d at 179-80 (loss causation pled where corrective disclosure reflects subject of misstatement).[23] Moreover, as discussed above, Defendants' truth-on-the-market defense—that Telus mentioned in passing it sometimes "may" run a pilot program for *any* of its offerings—was insufficient to inform investors that Telus *only* had pilot projects for AI.

### B.  August 2, 2024 Corrective Disclosure

On August 2, 2024, Defendants revealed for the first time that (i) Telus was not close to achieving the claimed $60 million AI-based cost efficiencies in 2024 because it was still "working to…migrate to a more GenAI-enabled environment" and "deploy[] more automation;" (ii) contrary to Defendants' touting of Telus' AI offerings, they were "nascent" and low-margin AI pilots, which "cannibalized" Telus' higher margin offerings; and (iii) Telus had cut prices to boost revenues in response to customer feedback that "we were just too expensive." ¶¶151-64, 174-81, 208-10.[24] Defendants' disclosures corrected their prior misstatements that, *e.g.*, Telus had a "proprietary," "heavy," "cutting-edge," "full suite of cognitive AI capabilities" to profit from the AI "gold rush" (s*ee* §I.A., *supra*), had already "actioned" AI-based initiatives internally leading to major cost reductions and boosting margins (*see* §I.B., *supra*), and could charge higher prices

---

[23] Unlike the one-word stock downgrades (*e.g.*, neutral, accumulate) alleged to be correctives in *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 175 (2d. Cir 2005), the detailed May and August 2024 disclosures, here, clearly demonstrate the falsity of prior statements.

[24] *Born v. Quad/Graphics, Inc.*, 521 F.Supp.3d 469 (S.D.N.Y. 2021), is inapplicable. There, Quad/Graphics merely revealed it would "accelerate" its transformation (without any indication it had known it was proceeding too slowly). Here, Plaintiff alleges Telus revealed that all along it could only muster AI "pilots" and thus did not have the claimed underlying capability to support the strategic shift to achieve AI-generated internal cost efficiencies.

because it offered better "value for money" and had not seen a degradation in revenue (*see* §I.C., *supra*).

Upon the news, Telus' equity shares dropped 35.96%. ¶211. Analysts' surprise confirms these disclosures corrected Defendants' prior misrepresentations. ¶¶212-16 (*e.g.*, "it will take time for TIXT to **rebuild credibility** and **gain enough proof points to make a call on their AI positioning**").

Defendants, again, seek protection from their generic "warn[ings]" about the competitive environment and "uncertainty," which is insufficient because it did not convey to investors any of the information provided during the May or August 2024 corrective disclosures. §I.D., *supra*. Because the salient facts were not discussed in their risk disclosures, this argument fails.[25]

## IV.    THE CONTROL PERSON CLAIMS SHOULD BE SUSTAINED

Defendants' arguments concerning §20(a) are derivative of their §10(b) arguments. Because the AC adequately alleges §10(b) claims against the Individual Defendants, it also states §20(a) claims. *See Altimeo*, 19 F.4th at 152.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied. If the Court grants any part of Defendants' motion, Plaintiff respectfully requests leave to amend. *In re Hut 8 Corp. Sec. Litig.*, 2025 WL 2636150, at *25 (S.D.N.Y. Sept. 12, 2025) (Marrero, J.).

Dated: December 10, 2025                Respectfully Submitted,

                                        **LEVI & KORSINSKY, LLP**

                                        By: */s/ Shannon L. Hopkins*
                                            Shannon L. Hopkins (SH-1887)
                                            Gregory M. Potrepka (GP-1275)
                                            Andrew E. Lencyk (AL-4329)

---

[25] Defendants are wrong that materialization of a concealed risk cannot satisfy loss causation. *Vivendi*, 838 F.3d at 261-62.

1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
alencyk@zlk.com

*Lead Counsel for Lead Plaintiff and the Class*

## CERTIFICATION OF WORD COUNT

I, Shannon L. Hopkins, hereby certify pursuant to Local Civil Rule 7.1(c) that Plaintiff's

Memorandum of Law in Opposition to Defendants' Motions to Dismiss contains 8,736 words, in

compliance with the limit of 8,750 words.

Dated: December 10, 2025

/s/ Shannon L. Hopkins
SHANNON L. HOPKINS

*Lead Counsel for Lead Plaintiff and the Class*