USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/11/2026

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSÉ LUIS CERÓN SARRIA, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>- against -<br><br>TELUS INTERNATIONAL (CDA) INC., JEFFREY PURITT, VANESSA KANU, GOPI CHANDE, and MICHAEL RINGMAN,<br><br>Defendants. | **25 CV 889 (VM)**<br><br>**DECISION AND ORDER** |

**VICTOR MARRERO, United States District Judge.**

In this putative class action, Lead Plaintiff Mohommed Mohiuddin ("Lead Plaintiff" or "Plaintiff"), individually and on behalf of all others similarly situated, alleges violations of 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder. Plaintiff brings one claim pursuant to Section 10(b) and Rule 10b-5 against Defendants TELUS International (CDA) Inc. ("TI"), Jeffrey Puritt ("Puritt"), Vanessa Kanu ("Kanu"), Gopi Chande ("Chande"), and Michael Ringman ("Ringman," and together with TI, Puritt, Kanu, and Chande, the "Defendants"). Plaintiff asserts a second claim pursuant to Section 20(a) against Puritt, Kanu, Chande, and Ringman (together, the "Individual

Defendants"). Defendants now move to dismiss the Amended Class Action Complaint (see "Amended Complaint" or "AC," Dkt. No. 24) pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (See "Motion to Dismiss" or "Motion," Dkt. No. 35.) For the reasons set forth below, the Defendants' Motion to Dismiss is GRANTED.

## I. BACKGROUND[1]

### A. FACTUAL BACKGROUND

TI is a publicly traded technology company that provides services and related offerings to clients, including customer experience management ("CX") services, trust and safety products, digital solutions, and artificial intelligence ("AI") data solutions. (See AC ¶ 11.) The Individual Defendants are current or former TI executives. Puritt served as TI's president and chief executive officer from 2016 until his retirement, effective September 2024. (See id. ¶ 25.) Kanu served as TI's chief financial officer from September 7, 2020, until February 9, 2024, when TI announced that Kanu would be leaving TI effective March 31, 2024. (See id. ¶ 26.) Chande replaced Kanu in March 2024, after previously serving in other capacities at TI's parent corporation. (See id. ¶ 27.) Ringman has served as TI's chief information officer

[1] Derived from the Amended Complaint unless otherwise noted. (See AC.)

since May 2012. (See id. ¶ 28.) Lead Plaintiff Mohommed Mohiuddin purchased TI shares during the period between February 9, 2023, and August 1, 2024 (the "Class Period"). (See id. at 1; id. ¶ 22.)

Although TI's CX and trust and safety offerings were historically its "high-margin products," before the Class Period began, the industry began to shift toward automation and AI-based solutions. (See id. ¶¶ 2, 43.) Accordingly, TI recognized that in order to grow and retain existing customers, it needed to enter the AI market and offer AI capabilities to clients. (See id. ¶ 43.) In December 2020, executing on this plan, TI acquired Lionbridge Technologies, Inc., a provider of a proprietary annotation solution used in the development of AI algorithms to power machine learning. (See id. ¶ 44.) To further expand its AI offerings, TI acquired two additional digital product and services providers: Playment in July 2021 and WT Blocker Corp., commercially known as WillowTree ("WillowTree"), in October 2022. (See id. ¶¶ 31, 38, 43-45, 48.)

Following those acquisitions, TI experienced financial decline, and the price of TI's stock on the New York Stock Exchange decreased from a close of $21.73 on February 9, 2023, to a close of $4.15 on August 2, 2024, the day after the end

of the Class Period. (See id. ¶ 17.) Relevant to this action, Defendants issued partially corrective disclosures on May 9, 2024, and August 2, 2024, revealing disappointing financial figures for the first and second quarters of 2024 and lowering TI's full-year 2024 guidance. (See id. ¶¶ 135, 149.) After the May 9, 2024, corrective disclosure, TI's stock price fell $1.41, or 18.14%, to close at $6.36. (See id. ¶ 142.) After the August 2, 2024, press release, TI's stock price fell $2.33, or 36%, to close at $4.15. (See id. ¶ 164.)

Beginning on February 9, 2023, and throughout the Class Period, Plaintiff alleges that Defendants made materially false and/or misleading statements to the market regarding: (1) TI's AI capabilities and growth; (2) TI's margins, including loss of revenue and margin pressure due to competition and pricing; and (3) the impact of TI's cost-cutting initiatives. (See id. ¶ 77.)

In the Amended Complaint, Plaintiff relies in part on four confidential witnesses ("CW") to support the allegations that those statements were either false or materially misleading. (See id. ¶¶ 30-33.) CW-1 worked as a senior analyst at Telus Communications Inc., an affiliate of TI, until the end of 2022. (See id. ¶ 30.) CW-1 contributed to automation and AI initiatives, trained and coached other

employees, observed software development, interacted with TI programmers and coders, and helped support pre-launch testing efforts for new features and offerings. (See id.)

CW-2 worked as an account director for business development at WillowTree from 2021 until January 2023 and, after TI acquired WillowTree, worked in that same capacity until February 2024. (See id. ¶ 31.) CW-2 sold services to existing clients, looked for new customers, and participated in calls with WillowTree and TI senior management. (See id.)

CW-3 worked as a senior software engineer at WillowTree from 2021 to May 2023 – serving in the same capacity after TI acquired WillowTree. (See id. ¶ 32.) CW-3 developed apps and wrote software programs. (See id.)

CW-4 worked as a software engineer at WillowTree from 2021 to 2024 – also serving in the same capacity after TI acquired WillowTree. (See id. ¶ 33.) CW-4 dealt with customer contracts, was a part of WillowTree's hiring team prior to its acquisition, trained WillowTree employees in AI, and participated in company meetings. (See id.)

The Court provides a streamlined summary of Plaintiff's factual assertions, which rely largely upon statements made

by the CWs, alleged in support of Plaintiff's claims as stated in the Amended Complaint:[2]

- TI's employees and the reassignment of personnel: Rather than hire employees with AI experience, to save costs TI reassigned the personnel it had, even though they had no background or experience in AI, to try to develop ideas for AI offerings and support AI product development (id. ¶ 80); TI conferred titles on personnel that made it appear they had significant AI experience when such personnel had no training or background in AI (id.); TI diverted numerous employees to "AI teams" to try to develop AI capabilities, notwithstanding the employees' lack of AI experience (id.); there was consternation within TI's WillowTree division at having employees reassigned from their core competencies (id.); TI diverted engineers from billable projects to non-billable work trying to brainstorm ideas related to AI (id.); the diversions from high-margin, paid projects to developmental projects decreased revenue (id. ¶ 106); work on AI projects was inefficient and took an extraordinary amount of personnel because TI did not have engineers with previous sophisticated experience in AI, resulting in higher costs and decreased margins (id. ¶ 86).

- Nature of TI's AI capabilities, services, and offerings: CW-3 was not aware of any functioning AI product at WillowTree (id.); outside of TI's data annotation services, TI had no proprietary AI technology or software to sell and had not created any large language models or "innovative" technologies (id. ¶¶ 49, 80); TI used other companies' products – including OpenAI's ChatGPT and Google's Gemini - and built user interface applications around them (id. ¶¶ 60, 80); TI pitched "pilot projects" to clients, offering to co-develop AI products and charge reduced rates, but customers "were not interested" in those

[2] The same factual assertions appear throughout the Amended Complaint to support different alleged false or materially misleading statements. The Court cites only one example.

offerings (id. ¶¶ 59, 103); TI billed Fuel iX as a generative AI-backed solution that provided clients "a comprehensive suite of services" but the offering was "little more than a product[] that other companies had built," "a meaningless . . . marketing label" that "did not constitute any substantive product or innovation," and was merely ChatGPT packaged under a user interface displaying TI's name (id. ¶¶ 117-18); Fuel iX did not generate any revenue (id. ¶ 118).

- Cost-efficiency programs: TI stated it was implementing cost-saving measures, including by capitalizing on the same AI solutions it was purportedly offering to customers, but TI was unable to develop "any significant AI capabilities" and thus did not "generate any cost efficiencies from the application of its AI initiatives internally" (id. ¶¶ 67, 106).

- May 2024 disclosures: Puritt stated that TI had been deploying "pilots" and that it was "hard to charge full freight for a pilot when you're trying to prove out your credentials and capabilities and you're experimenting at a relatively small scale in order to avoid potential catastrophe" (id. ¶¶ 139, 171).

- August 2024 disclosures: Puritt stated that "when we demonstrate the capability set that we have, we can then look to expand the margin yield derived from that" despite TI's Class Period AI programs being "pilot," "experimental," and "nascent" (id. ¶¶ 62, 160, 176); Puritt stated that "TI just keep[s] losing opportunities because of price," and that TI kept being "told in the postmortem . . . that we were just too expensive and the competition [was] willing to provide a similar solution" (id. ¶ 158); Puritt stated that TI "expect[ed] to start seeing meaningful revenue contributions from Fuel iX in 2025" (id. ¶ 118).

B. ALLEGEDLY FALSE OR MATERIALLY MISLEADING STATEMENTS

Plaintiff alleges that the following statements are false or materially misleading:[3]

- Statement No. 1 – February 9, 2023, press release filed on Form 6-K, signed by Kanu;[4] May 9, 2024, press release filed on Form 6-K, signed by Chande;[5] April 10, 2023, press release posted on TI's website:[6] "[TI] (NYSE and TSX: TIXT), a leading digital customer experience innovator that **designs, builds, and delivers next-generation solutions, including AI** and content moderation, for global and disruptive brands[.]" (Id. ¶¶ 78-79.)

- Statement No. 2 – February 9, 2023, earnings call, Puritt: TI's content moderators were **"[w]orking alongside AI technology, where TI has meaningful capability at scale to bring to bear."** (Id. ¶ 81.)

- Statement No. 3 – February 9, 2023, earnings call, Puritt: **"[W]e've also secured an exciting infusion of digital talent at scale into our already robust end-to-end digital transformation capabilities**, including premium content moderation services, **AI data solutions** and IT lifecycle services." (Id. ¶ 82.)

- Statement No. 4 – February 9, 2023, Form 20-F, signed by Puritt: "Although we are focused on maintaining and enhancing the range of our offerings, **we may not be successful in anticipating or responding to our clients' expectations and the integration of our technology solutions into our offerings may not achieve the intended enhancements or cost reductions in our operations. New services**

[3] All emphases in original. (See AC.)

[4] Kanu signed additional press releases containing the same language on May 4, 2023, July 13, 2023, August 4, 2023, November 3, 2023, and February 9, 2024. (See id. ¶ 79.)

[5] Chande signed an additional press release containing the same language on August 2, 2024. (See id.)

[6] Additional press releases containing the same language were posted on TI's website on May 10, 2023, June 1, 2023, and October 30, 2023. (See id.)

**and technologies offered by our competitors may make our service offerings uncompetitive, which may reduce our clients' interest in our offerings and our ability to attract new clients. Our failure to innovate, maintain technological advantages or respond effectively and timely to changes in technology could have a material adverse effect on our business, financial performance, financial condition and cash flows."** (Id. ¶¶ 84-85.)

- Statement No. 5 - February 9, 2023, Form 20-F, signed by Puritt: **"If we are unable to accurately forecast our pricing models or optimize the mix of products and services we provide to meet changing client demands, or if we are unable to adapt to changing pricing and procurement demands of our clients, our business, financial performance, financial condition and cash flows may be adversely affected. . . . If we make inaccurate assumptions in pricing our contracts, our profitability may be negatively affected. In addition, if the number of our clients that request alternative pricing models continues to increase in line with industry trends, we may be unable to maintain our historical levels of profitability under these evolving alternative pricing models and our financial performance may be adversely affected, or we may not be able to offer pricing that is attractive relative to our competitors.** Some of our clients' [sic] may continue to evolve their procurement methodology by increasing the use of alternative methods, such as reverse auctions. **These methods may impact our ability to gain new business and maintain profit margins, and may require us to adapt our sales techniques, which we may be unsuccessful in doing in a timely manner or at all."** (Id. ¶ 87.)

- Statement No. 6 - February 16, 2023, call with analysts and investors, Puritt: **"As a result of our Lionbridge AI acquisition back in December 2020, we have AI enablement competencies of consequence, and we are better positioned than most to help enable this gold rush for years to come. It's like we're selling the picks and shovels."** (Id. ¶ 89.)

- Statement No. 7 - February 16, 2023, call with analysts and investors, Puritt: **"TI has purposefully put together the combination of new economy services of AI and content moderation that I think go together, just like peanut butter and jelly.** Despite significant technology advancements, harmful content is still making its way to consumers. We feel brands should be doing more. **We have a unique value proposition here, and we're not alone in that view. . . . Other than Accenture, no one else has what we have in this space.** As you can see from the image taken [] on the screen here, this is a space that seemingly everyone wants to get into, but I suspect many don't realize just how difficult it is to do well at scale and on a sustained basis. . . . **TI holds a position of scale [a]s 1 of only 2 providers with more than 10% overall share.** And trust and safety isn't just content moderation for social platforms." (Id. ¶ 90.)

- Statement No. 8 - February 16, 2023, call with analysts and investors, Ringman: Regarding whether ChatGPT was a threat or an opportunity for TI, **"we are a premium provider. We are not here to solve the simple tasks[.]"** (Id. ¶ 91.)

- Statement No. 9 - February 16, 2023, call with analysts and investors, Puritt: "**I haven't seen a deterioration, degradation or change of consequence that makes me feel less certain about our ability to anticipate and predict where we think our revenues will be this year."** (Id. ¶ 93.)

- Statement No. 10 - February 16, 2023, call with analysts and investors, Beth Howen ("Howen"): TI's portfolio includes **"the AAA trifecta of analytics, artificial intelligence and automation,"** which TI combines **"to support some of the world's largest and most disruptive brands**[.] . . . **TI leveraged our heavy capabilities in AI and machine learning to develop a workforce management solution."** (Id. ¶ 95.)

- Statement No. 11 - February 16, 2023, call with analysts and investors, Ringman: **"This slide [displaying TI's 'cognitive AI suite'] represents our full suite of cognitive AI capabilities. We have invested in building a wide gamut of services from voice and text to images."** (Id. ¶ 96.)

- Statement No. 12 - February 16, 2023, call with analysts and investors, Puritt: **"[W]e feel like we've been quite prescient in building out the scope and scale of our technology-enabled service line so that we have something relevant to say and sell to all of these businesses."** (Id. ¶ 97.)

- Statement No. 13 – May 4, 2023, earnings call, Puritt: **"[TI] is well positioned to benefit from the continued proliferation of AI through [its] meaningful and ongoing investments in this space** and to support the emerging ecosystem, including multiple fee clients **with the development of core generative AI data sets** [an] area experiencing extraordinary growth. . . . As part of our generic AI software engineering services, we're advising clients contemplating the use of Gen AI-based technology, and **we're able to design, build and deliver bespoke software engineering and data science services specifically geared for Gen AI applications [and] process automation for Gen AI workflows."** (Id. ¶ 100.)

- Statement No. 14 – May 12, 2023, annual general meeting, Puritt: TI was **"at the beginning of [its] next chapter of growth with disruptive tech like generative AI,"** and was **"equipped to develop and deliver cutting-edge AI solutions**[.] . . . Looking longer term, we believe we're at the beginning of our next chapter of growth **with disruptive tech like generative AI[.]"** (Id. ¶ 102.)

- Statement No. 15 – July 13, 2023, guidance update call, Puritt: "[W]e've actioned **multiple cost efficiency programs that include** both team member reduction along with **accelerating automation and Generative AI initiatives within our internal processes and platform."** (Id. ¶ 104.)

- Statement No. 16 – July 13, 2023, guidance update call, Kanu: TI's updated guidance "implies **an improvement in our adjusted EBITDA margin in the second half, which is primarily attributed to our in-progress cost efficiency program as we** both rightsize our team to match demand and **implement further automation and Gen AI solutions internally."** (Id. ¶ 105.)

- Statement No. 17 – July 13, 2023, guidance update call, Kanu: **"[W]e see meaningful opportunities being amplified by generated AI adoption"** which **"will be a tailwind"** for TI. (Id. ¶ 107.)

- Statement No. 18 – July 13, 2023, guidance update call, Puritt: **"[W]e anticipate that because of our unique differentiated AI and part enable [sic] capabilities that are really focused on delivering a superior client experience, but we think there's value for money to be recognized in that we'll continue to be able to distinguish ourselves from the competition[.]"** (Id. ¶ 108.)

- Statement No. 19 – July 13, 2023, guidance update call, Puritt: "[T]here really is a counter cyclicality to the relationship TI enjoys [with Telus Corporation and] the opportunities to continue to enable Telus [Corporation] in its own digital transformation journey **now more than ever using our AI capabilities and then thereafter to take those referenceable instances on the road, so to speak, continue to be a real source of optimism and confidence, frankly, for the continued future success of TI."** (Id. ¶ 109.)

- Statement No. 20 – August 4, 2023, earnings call, Puritt: "I want to reiterate my belief that TI's long-term investment thesis is very much intact and **our competitive positioning remains strong.** Indeed **there are meaningful opportunities ahead in digital transformation and generative AI, in particular . . . areas where [TI] is uniquely positioned and credentialed to design, build, and deliver differentiated, responsible, and market-leading solutions for our clients. . . .** [C]onversations

**. . . with existing and prospective customers continue to indicate a desire to procure from us the very capabilities that we've perfected over the last many years, including, in particular, more recently our exciting new GenAI-enabled capabilities."** (Id. ¶¶ 111, 113.)

- Statement No. 21 – August 4, 2023, earnings call, Puritt: **"We see generative AI as a net positive development for our business, thanks to our existing capabilities and the benefits we stand to realize by deploying generative AI solutions within our own operations and on behalf of our clients. To this end, [TI] has a comprehensive suite of data-driven end-to-end generative AI solutions that integrate the best of GenAI capabilities and human expertise to transform digitally-led customer experiences across the entire customer journey."** (Id. ¶ 112.)

- Statement No. 22 – August 4, 2023, earnings call, Puritt: **"[W]e have now successfully actioned meaningful cost savings"** and **"efficiency,"** including the **"benefits we stand to realize by deploying generative AI solutions within our own operations. Due to the strong progress and execution of these and other remediation efforts . . . we expect to quickly return to our typical 20% plus adjusted EBITDA margin for the balance of the year."** (Id. ¶ 115.)

- Statement No. 23 – October 30, 2023, press release: As a "a leading digital customer experience (CX) innovator **that designs, builds and delivers next-generation solutions, including artificial intelligence (AI),"** TI was announcing the launch of Fuel iX, an **"enhanced solution backed by the power of generative AI (GenAI) to deliver end-to-end CX innovation and AI-fueled intelligent experiences (iX)."** With Fuel iX, TI was providing customers **"a comprehensive suite of services, combin[ing] digital consulting, data services and analytics, web and mobile application development, and an AI-fueled platform."** (Id. ¶ 117.)

- Statement No. 24 – November 3, 2023, earnings call, Puritt: TI was "**seeing good momentum and demand this year, in particular, led by the work we do to support market-leading generative AI foundational model builders[.] . . . I think one of the sources of turning things around is really leveraging our capability set, particularly, as I referred to earlier, in the AI space.** I think, obviously, content moderation in particular has seen an interesting evolution as many of our clients, particularly in the social media space, look to rely more and more on AI-enabled capabilities as a first line of identification and defense, and less and less so on human digital engagement where possible. And so, we hope, we believe that once again, **we have what the doctor is ordering in terms of addressing this opportunity and evolution.**" (Id. ¶¶ 119-20.)

- Statement No. 25 – November 3, 2023, earnings call, Puritt: "So, almost everybody is talking to us about AI. . . . But I think **we really do have something quite unique, differentiated because of the AI experience and expertise and because of the comprehensive nature of the offering, where we can engage in a conversation in terms of a consulting advisory basis to really explore, together with our customers, the art of the possible and how their environment might lend itself favorably to GenAI implementation and adoption** to help both their own internal team members exploit that capability, as well as to better serve their customers." (Id. ¶ 121.)

- Statement No. 26 – November 3, 2023, earnings call, Puritt: "And so, as you heard Vanessa detail in her prepared remarks earlier, **we have undertaken a fairly comprehensive optimization effort** that's not just right-sizing labor to demand, **but also looking to, as you've heard me say often in these calls, drink our own champagne, eat our own gourmet cooking, where we're deploying AI-enabled and automation capability inside TI to drive down our own cost to serve to create that headroom we need**

**so we can continue to enjoy our targeted margins."** (Id. ¶ 123.)

- Statement No. 27 – February 9, 2024, Form 20-F, signed by Puritt: **"We design, build and deliver next-generation solutions, including AI** and content moderation, to enhance the CX for global and disruptive brands. **The Company's services support the full lifecycle of its clients' AI-led transformation journeys[.]"** (Id. ¶ 126.)

- Statement No. 28 – February 9, 2024, Form 20-F, signed by Puritt: **"Changes in technology and client expectations could outpace our service offerings and the development of our internal tools and processes, which could have a material adverse effect on our business, growth, financial performance, financial condition and cash flows. . . . Although we are focused on maintaining and enhancing the range of our offerings, we may not be successful in anticipating or responding to our clients' expectations and the integration of our technology solutions into our offerings may not achieve the intended enhancements or cost reductions in our operations. New services and technologies offered by our competitors may make our service offerings uncompetitive, which may reduce our clients' interest in our offerings and our ability to attract new clients. This may increasingly become a challenge for us with respect to revenue derived from our customer experience (CX) business, which may be negatively impacted by the introduction of AI capabilities into our marketplace. Our failure to innovate, maintain technological advantages or respond effectively and timely to changes in technology could have a material adverse effect on our business, financial performance, financial condition and cash flows."** (Id. ¶ 129.)

- Statement No. 29 – February 9, 2024, Form 20-F, signed by Puritt: **"If we are unable to accurately forecast our pricing models or optimize the mix of products and services we provide to meet changing client demands, or if we are unable to adapt to the changing pricing and procurement demands of our**

**clients, our business, financial performance, financial condition and cash flows may be adversely affected. . . . [W]e are seeing the commoditization of our services in the market place, where our competitors are offering services similar to ours at a lower cost. While we believe our services to be of higher quality, this commoditization has created competitive, pricing and other pressures, such that our pricing models may not be representative of new contracts, adversely affecting the accuracy of our forecasting. . . . If we make inaccurate assumptions in pricing our contracts, our profitability may be negatively affected. In addition, if the number of our clients that request alternative pricing models continues to increase in line with industry trends, we may be unable to maintain our historical levels of profitability under these evolving alternative pricing models and our financial performance may be adversely affected, or we may not be able to offer pricing that is attractive relative to our competitors.** Some of our clients' may continue to evolve their procurement methodology by increasing the use of alternative methods, such as reverse auctions. **These methods may impact our ability to gain new business and maintain profit margins, and may require us to adapt our sales techniques, which we may be unsuccessful in doing in a timely manner or at all."** (Id. ¶ 131.)

- Statement No. 30 – February 9, 2024, earnings call, Puritt: "And in terms of service line, again, we think all 4 service lines will see meaningful improvement, particularly in the back half of the year. **And for sure, AI is going to be the standout for us going through the entirety of 2024 and beyond, not just in the back half."** (Id. ¶ 133.)

- Statement No. 31 – May 9, 2024, earnings call, Puritt: **"[W]e anticipate demand starting to recover in the latter part of the year."** Regarding client additions and expansions, **"[t]he demand we're seeing now . . . is really across all four services lines."** (Id. ¶ 143.)

- Statement No. 32 – May 21, 2024, investor conference, Puritt: TI had **"transform[ed] our own cost[s] . . . so that we can continue to generate these industry-leading margins and ensure the headroom in our cost structure[.]"** (Id. ¶ 145.)

- Statement No. 33 – May 21, 2024, investor conference, Puritt: **"[T]he near-term gold rush for us has been helping the hyperscalers build these large language models,** and we've been privileged to support a number of the large language model builders. . . . We kind of see this supply demand bifurcation around AI and GenAI, in particular. **And the gold rush today is helping to build these LLMs. . . . [W]e've built some proprietary tools"** for clients' AI needs. (Id. ¶ 147.)

C. PROCEDURAL HISTORY

Plaintiff brings one claim against all Defendants pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, alleging that Defendants knowingly and materially misrepresented the operational and financial success, profitability, status and prospects of TI to investors. (See id. ¶¶ 1, 231-41.) Plaintiff brings a second claim against the Individual Defendants, alleging that they acted as controlling persons of TI and are therefore liable under Section 20(a) of the Exchange Act. (See id. ¶¶ 242-45.)

On October 23, 2025, Defendants filed their Motion to Dismiss (see Motion), supported by a memorandum of law (see "MTD," Dkt. No. 36) and the declaration of Audra J. Soloway (see "Soloway Decl.," Dkt. No. 37). On December 10, 2025, Plaintiff filed an opposition. (See "Opp'n," Dkt. No. 38.) On

January 1, 2026, Defendants filed a reply (see "Reply," Dkt. No. 39), along with a second declaration (see "Reply Decl.," Dkt. No. 40).

## II. LEGAL STANDARD

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. See Holmes v. Grubman, 568 F.3d 329, 335 (2d Cir. 2009).

When a claim sounds in fraud, such as claims brought under Section 10(b) and Rule 10b-5, the heightened pleading requirement of Rule 9(b) applies. First, "the circumstances constituting fraud . . . shall be stated with particularity." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (citation omitted) (alteration in original). Rule 9(b) requires that a

complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Id. (internal quotations omitted). Second, the Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that a complaint (1) "'specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, . . . state with particularity all facts on which that belief is formed,'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99 (2d Cir. 2007) (quoting 15 U.S.C. § 78u 4(b)(1)), and (2) "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,'" id. (quoting 15 U.S.C. § 78u-4(b)(2)). Accordingly, the heightened pleading standards of Rule 9(b) and the PSLRA require that plaintiffs "do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004).

Finally, "[i]n considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint,

documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." United States ex rel. Foreman v. AECOM, 19 F.4th 85, 106 (2d Cir. 2021) (internal quotations omitted). "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." Id. (internal quotations omitted) (alteration in original).[7]

## III. DISCUSSION

Defendants move to dismiss the Section 10(b) claim on the basis that Plaintiff fails to sufficiently plead falsity, scienter, or loss causation. (See MTD at 9-27.) Defendants further argue that because Plaintiff fails to plead a primary Section 10(b) violation, the Section 20(a) claim necessarily fails. (See id. at 27.)

[7] Defendants submitted 19 exhibits in support of their Motion to Dismiss, including transcripts or other statement source materials. (See Soloway Decl.; Reply Decl.) To the extent those documents are either "incorporated by reference in the complaint" or "integral to the complaint," Foreman, 19 F.4th at 106, the Court will consider those exhibits when they are useful in providing the full language that Plaintiff excerpts in the Amended Complaint. To the extent the documents provided by Defendants as exhibits are wholly independent from any documents referenced or quoted in the Amended Complaint, the Court will not consider those exhibits at this stage. Id.

A. SECTION 10(b)

Under Section 10(b) and Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b); see also 15 U.S.C. § 78j(b). To state a claim under Section 10(b) and Rule 10b-5 for fraudulent misrepresentations, a plaintiff must plausibly allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." GAMCO Invs., Inc. v. Vivendi Universal, S.A., 838 F.3d 214, 217 (2d Cir. 2016) (quoting Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 267 (2014)).

1. Actionable Statements

The Court begins by assessing whether the statements made by Defendants during the Class Period are actionable. Defendants contend that the statements at issue are: (1) protected by the PSLRA safe harbor; (2) statements of opinion; (3) puffery; and/or (4) otherwise not false or materially

misleading. The Court addresses each argument in turn, finding that the alleged statements are non-actionable and therefore cannot sustain Plaintiff's claims.

a) Safe Harbor

Defendants argue that certain alleged statements are forward-looking and thus cannot serve as the basis for Plaintiff's securities fraud claims. (See MTD at 14-17.) "The PSLRA creates a statutory 'safe harbor' for certain statements." City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp., 450 F. Supp. 3d 379, 396 (S.D.N.Y. 2020). Under the safe-harbor provision, "a defendant is not liable if (1) 'the forward-looking statement is identified and accompanied by meaningful cautionary language,' (2) the forward-looking statement 'is immaterial,' or (3) 'the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'" In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 245 (2d Cir. 2016) (quoting Slayton v. American Express Co., 604 F.3d 758, 766 (2d Cir. 2010)). "[A] forward-looking statement is protected under the safe harbor if any of the three prongs applies." Id. at 245-46 (internal quotations and citation omitted).

The Second Circuit has held that "[a] statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements." Vivendi, 838 F.3d at 246. "Mixed present and future statements are not entitled to the safe harbor with respect to the part of the statement that refers to the present." In re Supercom Inc. Sec. Litig., No. 15-CV-9650, 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018).

Additionally, "[t]o avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." Slayton, 604 F.3d at 772. To overcome the existence of such language, plaintiffs may "show[], for example, that the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss." Halperin v. eBanker USA.com, 295 F.3d 352, 359 (2d Cir. 2002). "[T]he court must keep in mind that a complaint fails to state a claim of securities fraud if no reasonable investor could have been misled about the nature of the risk when he invested." Id.

The Court finds that Statement Nos. 4, 5, 28, 29, and 31 – in whole or in part – are forward-looking statements

protected by the safe harbor provision. At the outset, Statement Nos. 4, 5, 28, and 29 are statements pulled from TI's Form 20-F "Risk Factors" section and are merely disclosures of TI's business and operational risks. (See AC ¶¶ 84, 85, 87, 129, 131.) Plaintiff argues that the risk disclosures were false or materially misleading because TI was "already losing market share to the competition" and thus the risks warned about "had already materialized" – rendering TI's portrayal of its current financial situation inaccurate. (Id. ¶¶ 85, 86, 88, 131, 132.) Plaintiff supports this contention, in part, by pointing to TI's later August 2, 2024, earnings call in which Puritt stated that TI "keep[s] losing opportunities because of price" and kept being "told in the postmortem . . . that we were just too expensive." (Id. ¶¶ 86, 88, 130, 132.)

The Court finds Plaintiff's arguments unavailing. First, even if TI was "losing opportunities" or had not yet "demonstrate[d] [its] capability set" at the time that the statements were made, those circumstances would not render TI's risk disclosures false or materially misleading. The statements are not merely accompanied by meaningful cautionary language but instead *constitute* that cautionary language. As Defendants argue, finding those statements

actionable would convert the "cautionary language into the fraud itself." (MTD at 16.)

Furthermore, counter to Plaintiff's contention that TI's disclosures were "presented as mere hypotheticals," TI specifically stated that it "face[d] intense competition from companies" (Soloway Decl. Ex. 3 at 5), that the "commoditization [of its services] ha[d] created competitive, pricing and other pressures" (id. at Ex. 4 at 17), and that those and other factors were "adversely affecting the accuracy of [TI's] forecasting" (id.). Nothing Puritt disclosed on later earnings calls, or any of the other allegations Plaintiff asserts, makes TI's earlier risk disclosures false or materially misleading at the time they were made.

Finally, Statement No. 31 - "we anticipate demand starting to recover in the latter part of the year" (id. ¶ 143) - "fall[s] squarely within the definition of 'a statement containing a projection of . . . income (including income loss), earnings (including earnings loss) per share, . . . or other financial items' and 'a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management.'" Gray v. Wesco Aircraft Holdings, Inc., 454 F.

Supp. 3d 366, 386 (S.D.N.Y. 2020) (quoting 15 U.S.C. § 78u-5(i)(1)(A) & (C)); see also Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc., 665 F. Supp. 3d 522, 531, 538 (S.D.N.Y. 2023) (finding statements concerning demand projections – for example, a statement that "guidance reflects our expectation of continued strong demand" – are forward-looking and fall within the safe harbor). Accordingly, this statement is protected by the safe harbor and is thus non-actionable.

b) Opinion

Defendants next contend that certain alleged statements are non-actionable statements of opinion. (See MTD at 17-18.) "[S]ubjective statements of opinion are generally not actionable as fraud." Afr. v. Jianpu Tech. Inc., No. 21-CV-1419, 2022 WL 4537973, at *5 (S.D.N.Y. Sept. 28, 2022). "Statements of opinion are actionable if (1) the speaker did not hold the belief she professed, (2) the supporting fact[s] she supplied were untrue, or (3) the speaker omit[ted] information whose omission makes the statement misleading to a reasonable investor." In Re Shanda Games Ltd. Sec. Litig., 128 F.4th 26, 43 (2d Cir. 2025) (cleaned up). "In other words, when a statement of opinion implies facts or the absence of contrary facts, and the speaker knows or reasonably should

know of different material facts that were omitted, liability under Rule 10b-5 may follow." Abramson v. Newlink Genetics Corp., 965 F.3d 165, 175 (2d Cir. 2020).

"Statements of opinion often include qualifying language (like 'I believe' or 'I think') that conveys a lack of certainty about the thing being expressed, marks the statement as reflecting the speaker's impression or point of view rather than an objective truth, and makes it easier to identify the statement as one of opinion rather than fact." New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo, 122 F.4th 28, 41 (2d Cir. 2024). "But not all statements of opinion include such qualifying language," and thus, "[t]he core inquiry . . . is whether the omitted facts would conflict with what a reasonable investor would take from the statement itself." In re AppHarvest Sec. Litig., 684 F. Supp. 3d 201, 254 (S.D.N.Y. 2023) (internal quotations and citation omitted).

The Court finds that Statement Nos. 6, 7, 12, 13, 17, 18, 24, and 30 – in whole or in part - fall into this category and are thus non-actionable. For example, statements such as "we have AI enablement competencies of consequence, and we are better positioned than most" (AC ¶ 89), "[w]e have a unique value proposition" (id. ¶ 90), "[TI] is well positioned

to benefit from the continued proliferation of AI" (id. ¶ 100), "we see meaningful opportunities being amplified by generated AI adoption" (id. ¶ 107), and "AI is going to be the standout for us" (id. ¶ 133), express "inherently subjective" assessments rather than facts "ascertain[able] with certainty." In Re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th 408, 418 (2d Cir. 2023) (internal quotations and citation omitted).

Moreover, many of those statements include qualifying language (see, e.g., Statement Nos. 18, 24, AC ¶¶ 108, 120) or, alternatively, if lacking such language, are nevertheless statements of opinion given "the nature of the information conveyed." DeCarlo, 122 F.4th at 41. The representation that TI has "a unique value proposition" (AC ¶ 90), for example, merely expresses a "belief, a view, or a sentiment" that the Court finds would not be misleading to a reasonable investor. In re Lottery.com, Inc. Sec. Litig., 765 F. Supp. 3d 303, 335 (S.D.N.Y. 2025) (internal quotations and citation omitted).

Plaintiff contends that the statements are nevertheless actionable because they are based on false embedded representations. (See Opp'n at 18.) However, the Court is not persuaded by this argument. As will be explained further below, any representations embedded within those statements

relating to TI's offerings, services, or cost-saving efforts were not false or materially misleading. Accordingly, the Court finds that the statements listed above – in whole or in part - meet the definition of non-actionable statements of opinion.

c) Puffery

Defendants also argue that various statements contained in the Amended Complaint cannot support a securities claim because they are puffery or statements of corporate optimism. (See MTD at 18.) Puffery encompasses "statements [that] are too general to cause a reasonable investor to rely upon them," ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 206 (2d Cir. 2009), and thus "cannot have misled a reasonable investor," San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 811 (2d Cir. 1996).

"[G]eneral statements about reputation, integrity, and compliance with ethical norms are inactionable puffery[.]" Singh v. Cigna Corp., 918 F.3d 57, 63 (2d Cir. 2019) (internal quotations and citation omitted). So too are "[v]ague positive statements regarding a corporate entity's risk-management strategy, asset quality, and business practices[.]" Sherman v. Abengoa, S.A., 156 F.4th 152, 164

(2d Cir. 2025) (citation omitted); see also In re Vale S.A. Sec. Litig., No. 15-CV-9539, 2017 WL 1102666, at *22 (S.D.N.Y. Mar. 23, 2017) (finding that statements regarding what defendant "is 'seeking' to do, what it is 'committed' to doing, what it is 'focused on,' what it is 'aiming' to do, and what its 'priorities' are" were non-actionable). Even "misguided optimism is not a cause of action, and does not support an inference of fraud" because the Second Circuit has "rejected the legitimacy of alleging fraud by hindsight." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (internal quotations and citation omitted).

Nevertheless, statements of optimism and puffery can be actionable if they are "determinate [and] verifiable," In Re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th at 418, "contradict facts that are known to a defendant," In re Virtus Inv. Partners, Inc. Sec. Litig., 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016), or amount to "misrepresentations of existing facts that were made even though the speaker knew that the contrary was true," Galestan v. OneMain Holdings, Inc., 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) (internal quotations and citation omitted). A plaintiff must be able to point to an "objective, black-and-white-standard by which to verify"

whether the challenged statement is untrue. In Re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th at 418.

Here, the Court finds that Statement Nos. 2, 8, 10, 20, 24, and 25 – in whole or in part - cannot support Plaintiff's securities claim because they constitute non-actionable puffery. For example, language that TI "has meaningful capability at scale" (AC ¶ 81), is a "premium provider" (id. ¶ 90), has "heavy capabilities" (id. ¶ 95), is "uniquely positioned" (id. ¶ 111), has "something quite unique, differentiated" (id. ¶ 121), or has "comprehensive" offerings (id.) is simply "too general" for a "reasonable investor to rely upon" or reflects "general expressions of corporate optimism that are too indefinite to be actionable under the securities laws." Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc., 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) (internal quotations and citation omitted).

Once again, the Court is not persuaded by Plaintiff's argument that, "[c]onsidered in context, the alleged misstatements contain objectively verifiable facts and, thus, are not puffery." (Opp'n at 19-20.) Reviewing that context, many of the statements lack verifiable facts. And as the Court addresses below, Plaintiff fails to sufficiently allege that any verifiable facts contained in those statements were

actually false. See Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004); In Re Philip Morris Int'l Inc. Sec. Litig., 89 F.4th at 418. Further, "[u]p to a point, companies must be permitted to operate with a hopeful outlook," and its leaders "can be expected to be confident about their stewardship and the prospects of the business that they manage." Rombach, 355 F.3d at 174. As such, the Court is convinced that the statements listed above – in whole or in part - are non-actionable for this reason.

d) Falsity and Materiality

Finally, Defendants argue that various statements – even if they are not protected by the safe harbor provision or are not statements of opinion or puffery – are otherwise non-actionable because they are not materially false or misleading. (See MTD at 9-20.) "The test for whether a statement is materially misleading under Section 10(b) . . . is whether the defendants' representations, taken together and in context, would have misled a reasonable investor." City of Hialeah Emps.' Ret. Sys. v. Peloton Interactive, Inc., 153 F.4th 288, 295 (2d Cir. 2025) (internal quotations and citation omitted). "The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together

and in context." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 366 (2d Cir. 2010). Accordingly, plaintiffs "may not cherry pick certain public statements for [their] complaint and divorce them from the universe of disclosed information to plausibly allege fraud." In re Synchrony Fin. Sec. Litig., 988 F.3d 157, 171 (2d Cir. 2021).

An omission is actionable if the omitted information was subject to "an affirmative legal disclosure obligation" or the omitted information was "necessary to prevent existing disclosures from being misleading." Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715-16 (2d Cir. 2011). "[Section] 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 44 (2011). Essential is the "presence of a prior statement that otherwise is or will become materially misleading" because of the omission. DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A., 413 F. Supp. 3d 187, 206 (S.D.N.Y. 2019).

Additionally, "[a] violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false *at the time it was made*." In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014) (emphasis in original); see also Novak v.

Kasaks, 216 F.3d 300, 309 (2d Cir. 2000) ("[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.").

To sustain an action, misrepresentations or omissions must also be material. A plaintiff must allege facts showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (internal quotations and citation omitted). "It is not sufficient to allege that the investor might have considered the misrepresentation or omission important," Ganino v. Citizens Utils. Co., 228 F.3d 154, 162, and Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose any and all material information," Matrixx, 563 U.S. at 44 (internal quotations and citation omitted). "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." Caiola v. Citibank, N.A., New York, 295 F.3d 312,

329 (2d Cir. 2002) (internal quotations and citation omitted).

The Court categorizes the alleged misstatements concerning present facts into four general categories: (1) TI's talent and personnel; (2) TI's financial or business outlook; (3) TI's AI capabilities, services, and offerings; and (4) TI's cost-cutting initiatives. Put simply, the factual allegations contained within the Amended Complaint do not sufficiently support Plaintiff's contention that Defendants' statements were materially false or misleading at the time they were made.[8]

(i) TI's Talent and Personnel

First, despite the emphasis Plaintiff places on TI's internal employee reassignments and the inexperience of its personnel, the alleged misrepresentations that fall directly into this category are scarce and – when placed into context – are not misrepresentations at all. For example, in Statement No. 3, Puritt represented in an earnings call that TI had "secured an exciting infusion of digital talent at scale into

[8] The Court finds that *all* remaining statements, even if not referred to as an example in the following analysis, are non-actionable because they are not materially false or misleading. The Court noted above that some statements are non-actionable "in whole or in part" because they are protected by the safe harbor or are statements of opinion or puffery. (See Sections A.1.(a)-(c).) Any remaining portions of those statements are non-actionable because they are likewise not false or materially misleading.

[its] already robust end-to-end digital transformation capabilities, including premium content moderation services, AI data solutions and IT lifecycle services." (AC ¶ 82.) Plaintiff argues that Puritt's statement was false or materially misleading when made because it implied that TI "had hired 'talent' with AI experience when, in reality, [TI] used its existing employees who had no AI experience." (Id. ¶ 83.) But that statement is embedded among others in which Puritt discusses TI's naming of the new president of WillowTree, which TI had recently acquired, and talks about how WillowTree would further elevate TI's services and offerings. (See Soloway Decl. Ex. 6 at 5.) In this context, the Court does not read securing an "infusion of digital talent" as implying that TI had hired a new army of AI professionals. Plaintiff pleads elsewhere in the Amended Complaint that TI "sought to enhance its 'next generation' *digital* service offerings primarily through acquisitions," including its acquisition of WillowTree. (AC ¶ 39 (emphasis added).) Thus, through WillowTree, as Puritt represented, TI had "secured an exciting infusion of *digital* talent." (Id. ¶ 82 (emphasis added).) Plaintiff may not divorce a cherry-picked statement "from the universe of disclosed information

to plausibly allege fraud." In re Synchrony Fin. Sec. Litig., 988 F.3d at 171.

(ii) TI's Financial or Business Outlook

Next, Plaintiff alleges that statements concerning TI's financial or business outlook were false or materially misleading at the time they were made because TI was already experiencing margin pressure. While some of those statements are protected by the safe harbor, which the Court addresses above, others, when "taken together and [considered] in context," do not meet the false or materially misleading standard. In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 366 (citation omitted).

For example, in Statement No. 9, Puritt stated in a call with analysts and investors that he had not "seen a deterioration, degradation or change of consequence" that made him feel "less certain about TI's ability to anticipate and predict" revenue. (AC ¶ 93.) Plaintiff contends that Puritt knew TI was "seeing lower revenues from selling pilot projects at discounted prices, and [was] forced to cut prices on other products." (Id. ¶ 94.) But immediately after Puritt's statement, he asked Kanu to further elaborate on how TI was "building [its] guide." (Soloway Decl. Ex. 7 at 29.) Kanu stated that "where [TI has] seen softness, whether it's

happened now, where [TI] think[s] [its] going to happen, [TI has] built that in. . . . [T]hat's how we've been able to get in front" of softness. (Id. at 29, 30.) Puritt did not state that he had not seen any "deterioration, degradation or change of consequence" but rather that he had not seen one that changed TI's ability to anticipate or predict revenue. (Id.) Kanu further explained that TI had actively built the "softness" it was seeing into its guide. (Id.)

Plaintiff also asserts that certain disclosures by Defendants in May and August 2024 support the contention that Defendants' earlier statements concerning TI's financial or business outlook were false or materially misleading at the time they were made. For example, in May 2024, Puritt stated that it was "hard to charge full freight for a pilot" and later told investors in August 2024 that "TI just keep[s] losing opportunities because of price" and was being "told in the postmortem . . . that we were just too expensive and the competition [was] willing to provide a similar solution." (AC ¶¶ 158, 171.) But TI often discussed the competitive environment and pricing pressures it faced throughout the Class Period. For example, in July 2023, Puritt told investors that the pricing environment was continuing "to get more and more competitive" and that it was "becoming more and more of

that Sophie's Choice challenge of just how much of a tradeoff on margin yield through price reductions are we willing to tolerate in order to preserve revenue and revenue growth." (Soloway Decl. Ex. 11 at 11; see also Ex. 12 at 15 ("There is no question that these are levels of price sensitivity that we certainly haven't experienced in the past."); Ex. 14 at 15 ("[T]here is a pervasive, persistent pressure around more for less.").) Accordingly, when the relevant representations are taken together, Plaintiff does not offer sufficient support that the alleged statements were false or materially misleading.

(iii) TI's AI Products, Services, and Capabilities

The bulk of the statements Plaintiff alleges are actionable relate to TI's AI capabilities, services, and offerings. For example, Plaintiff points to language such as "[TI] designs, builds, and delivers next-generation solutions, including AI" (Statement No. 1, AC ¶¶ 78-79), statements concerning TI's "full suite of cognitive AI capabilities" (Statement No. 11, id. ¶ 96), and representations that TI had an "enhanced solution backed by the power of generative AI" (Statement No. 23, id. ¶ 117). Plaintiff relies largely on the same factual allegations in support of the argument that each statement is false or

materially misleading. Therefore, the Court will address each category of factual support.

First, Plaintiff contends that TI did not have the AI capabilities or offerings that it represented it had because TI did not have personnel "with the expertise or background for developing AI technologies" and merely diverted engineers and other employees from billable work to "AI teams." (Id. ¶¶ 5, 60.) But the CWs' accounts of inexperience offer nothing more than conclusory allegations about how the lack of AI training or education directly led to a failure to produce AI products and impacted TI's margins. As Defendants argue, those assertions are more akin to complaints of mismanagement, which the Second Circuit has found do not support a claim for securities fraud. See, e.g., Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 115 (2d Cir. 1982) (finding that Section 10(b) was not designed to regulate corporate mismanagement). Plaintiff points to no specific information, reports, or metrics about how personnel decisions impacted margins or impeded development of TI's offerings. And vague allegations – including, for example, that based on "conversations with others," a "skills gap" led to revenue losses at TI – do not suffice. (AC ¶ 52.)

Furthermore, even accepting Plaintiff's premise as true – *i.e.*, TI did not have the AI capabilities it professed to have because its staff lacked the relevant AI background – that proposition would apply only to a specific division of TI. Plaintiff's factual allegations are based on statements made by four CWs. CW-1 was employed by an affiliate of TI and left at the end of 2022, before the Class Period began. (See id. ¶ 30.) Given those circumstances, the Court cannot see how CW-1 had relevant insight concerning the impact of TI's staffing and personnel beginning in 2023. The three other CWs worked for WillowTree and, post TI's acquisition of WillowTree, served in the same capacity under the TI umbrella. (See id. ¶¶ 31-33.) Their allegations center largely around that division specifically: "[TI] began diverting numerous *WillowTree* engineers"; "*WillowTree* employees that worked on AI projects during CW-3's tenure did not have experience or training in AI"; the appearance that "WillowTree/Telus was involved in AI" was "'superficial,' and was not what *WillowTree* was doing at the time." (Id. ¶ 56 (emphases added).) Even if, as Plaintiff argues, TI "focused its AI development" at WillowTree, those allegations, the Court finds, are not sufficient to support Plaintiff's contention

that TI's statements about company-wide AI efforts or capabilities were false or materially misleading.

Second, Plaintiff pleads various factual allegations based upon the CWs' accounts directly related to the nature of TI's AI products, services, and capabilities. For example, Plaintiff contends that outside of TI's data annotation services, TI had no proprietary AI technology or software to sell and had not created any large language models or innovative technologies. (Id. ¶¶ 49, 80.) Plaintiff alleges that TI merely used other companies' products – including OpenAI's ChatGPT and Google's Gemini - and built user interface applications around them. (Id. ¶¶ 60, 80.) Plaintiff further asserts that TI pitched "pilot projects" to clients, offering to co-develop AI products and charge reduced rates, but customers "were not interested" in those offerings. (Id. ¶¶ 59, 103.)

Based on those factual allegations, Plaintiff argues that certain statements – including, for example, Puritt's representation that TI was "well positioned to benefit from the continued proliferation of AI through [its] meaningful and ongoing investments in this space" (Statement No. 13, id. ¶ 100) – were false or materially misleading. Plaintiff's Amended Complaint is replete with allegations that some of

TI's AI offerings were not "fully developed," "concrete," or "significant" and that TI had no "offerings other than the labor-intensive data annotation services and mere pilot programs." (Id. ¶¶ 80, 90, 92, 148.) But those qualifiers do not change the core fact that TI did, in fact, have AI capabilities, and Plaintiff fails to point to any specific AI product or service that TI falsely or misleadingly claimed it had.

To start, TI's data annotation services and pilot programs cannot be discounted,[9] and their existence alone supports the notion that TI was "put[ting] together the combination of new economy services of AI and content moderation" (Statement No. 2, id. ¶ 81) and that TI was making "ongoing investments in this space" (Statement No. 13, id. ¶ 100). Further still, Plaintiff's own characterization of CW-2 – "an Account Director who sold WillowTree/Telus' products and services, including AI, to clients" (Opp'n at 11) - discredits the claim that TI lacked AI offerings or capabilities.

[9] Plaintiff concedes in the Amended Complaint that TI's data annotation services and its pilot programs were AI products. (See, e.g., AC ¶ 118 (setting forth that TI "had no *AI products* beyond data annotation and pilot projects" (emphasis added).)

Moreover, Plaintiff concedes that TI *did* offer additional AI solutions, beyond data annotation and pilot programs. For example, Plaintiff alleges that TI launched Fuel iX, which TI explained was an "enhanced solution backed by the power of generative AI" to provide a "comprehensive suite of services." (Id. ¶ 117.) Plaintiff contends that TI's description of Fuel iX was false or materially misleading because Fuel iX was merely ChatGPT packaged under a user interface and "a meaningless . . . marketing label." (Id. ¶¶ 117-18.) But that allegation does not render any of the challenged statements false or materially misleading. TI never represented that it was building or possessed proprietary generative AI *models*. Rather, TI stated outright that it had "proprietary *tools*" and a "proprietary *platform*." (Id. ¶¶ 96, 147 (emphasis added).) TI further represented that it was "helping the hyperscalers build . . . large language models" and stated that Fuel iX was a solution "enhanced" and "backed" by generative AI. (Id. ¶¶ 117, 147 (emphasis added).) Plaintiff fails to show how Fuel iX was not, as TI announced, "a comprehensive suite of services, combin[ing] digital consulting, data services and analytics, web and mobile application development, and an AI-fueled platform." (Id. ¶ 117.)

Finally, Plaintiff asserts that the May and August 2024 disclosures support the contention that Defendants' earlier statements about TI's AI capabilities were materially false or misleading at the time they were made. For example, in May 2024, Puritt stated that TI was "trying to prove out [its] credentials and capabilities and [was] experimenting at a relatively small scale in order to avoid potential catastrophe." (Id. ¶¶ 139, 171.) In August 2024, Puritt stated that "when we demonstrate the capability set that we have, we can then look to expand the margin yield derived from that" but further explained that TI's AI revenue streams were "still nascent." (Id. ¶¶ 62, 160.)

The representations that TI was "trying to prove out" its credentials and capabilities, needed to "demonstrate" its capability set to "then" expand margins, or was facing competition on pricing do not render any of the alleged statements made earlier in the Class Period false or materially misleading. For example, in earnings calls, Puritt stated that TI possessed "meaningful capability at scale" (Statement No. 2, id. ¶ 81) and was "able to design, build and deliver bespoke software engineering and data science services specifically geared for Gen AI applications" (Statement No. 13, id. ¶ 100). Needing to "prove out" AI

capabilities does not support the contention that TI lacked those AI capabilities. Nor does the fact that AI revenue streams were "still nascent" support the assertion that TI did not simultaneously have meaningful capabilities in the AI space. As Puritt stated elsewhere in the August earnings call, the AI revenue streams were "lower-margin," but TI hoped the margin "trade-off [would] be resolved as [TI's] GenAI-focused offerings continue[d] to achieve better scale." (Dkt. No. 29, Ex. 6 at 21.) Having AI capabilities and earning revenue from them are separate points, and the lack of the latter does not render statements concerning the former false or materially misleading. The same is true for *having* AI capabilities at scale and *achieving customer uptake* of AI offerings at scale.

Accordingly, the Court is persuaded that TI possessed sufficient AI solutions, capabilities, and offerings – from Fuel iX to its "legacy AI data annotation services" and its "pilots" - to render the statements concerning TI's AI capabilities non-actionable. (AC ¶¶ 9, 62, 117.) "[T]he proper inquiry requires an examination of defendants' representations, taken together and in context." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 366 (internal quotations and citation omitted). The Court cannot find that the remaining alleged statements – from representations that

TI could "support the full lifecycle of its clients' AI-led transformation journeys" (Statement No. 27, id. ¶ 126) to language that it had "services specifically geared for Gen AI applications" (Statement No. 13, id. ¶ 100) or possessed AI capabilities that were a "real source of optimism" (Statement No. 19, id. ¶ 109) - were objectively false or misleading to an ordinary investor. In re AppHarvest Sec. Litig., 684 F. Supp. 3d at 236 (finding that courts apply an "objective" test and must "look to the understanding of the 'ordinary investor'" (citation omitted)).

(iv) Impact of TI's Cost-Cutting Initiatives

Finally, Plaintiff alleges that several statements relating to TI's "cost-cutting" efforts were false or materially misleading. For example, Plaintiff points to guidance that Puritt provided to investors in which he stated that TI had "actioned multiple cost efficiency programs" that included "accelerating automation and Generative AI initiatives within [TI's] internal processes and platform" (Statement No. 15, id. ¶ 104) and additional earnings call statements in which Puritt represented TI had "successfully actioned meaningful cost savings" and that "[d]ue to the strong progress," TI expected "to quickly return to [its] typical 20% plus adjusted EBITDA margin" (Statement No. 22,

id. ¶ 115). (See also Statement No. 26, id. ¶ 123 ("[TI has] undertaken a fairly comprehensive optimization effort . . . [to] drink our own champagne, eat our own gourmet cooking, where we're deploying AI-enabled and automation capability inside TI to drive down our own cost.").)

Plaintiff argues that those statements "gave investors the false impression that [TI] was already successfully" implementing its AI capabilities into its own internal processes "when, in fact, [TI] had no AI capabilities" beyond its data annotation services and its pilot programs. (Id. ¶¶ 106, 116, 124, 146.) Because TI allegedly had no AI capabilities, Plaintiff contends, the company could not "generate any cost efficiencies from [their] application." (Id. ¶ 106.)

But TI never claimed to be integrating a specific type of AI capability internally. Instead, the statements contained language that TI was "accelerating automation and Generative AI initiatives" (Statement No. 15, id. ¶ 106) and "deploying AI-enabled and automation capability" (Statement No. 26, id. ¶ 123). As the Court has already found, TI was implementing generative AI into solutions such as Fuel iX, and its AI-based data annotation services and pilot programs

cannot be so readily discounted, even if those programs were "nascent" and "experiment[al]." (Id. ¶¶ 4, 59, 61.)

Plaintiff further points to subsequent representations by TI that the cost-saving initiatives were "a bit forward to roll out," "expect[ed] to come through," and would "ultimately be rolled out" as support for the assertion that TI had not yet implemented the measures at the time the alleged actionable statements were made. (Opp'n at 13.) But here, again, once placed into context, those representations do not make TI's earlier statements about its efforts to cut costs misleading. The representations were made by Chande during a 2024 earnings call, in which she told investors:

> [T]here are several components to [the cost efficiency program], some that have taken flight and are going to continue to support Q2. . . . The ones that have taken us slightly longer than expected are ones that we're looking to roll globally and with some of the nuances that we have in each of the regions, working through the systems and the processes there is taking a little longer than expected, but will ultimately be rolled out[.] . . . So those are the ones that are a bit forward to roll out, but we expect to come through.

(AC ¶ 163.) Chande's statement was not an "admission" that TI "had not yet implemented the measures," as Plaintiff claims, but rather an acknowledgment that certain components of TI's plan were taking longer than anticipated while others had "taken flight." (Id.; Opp'n at 13.) And any argument that TI's ultimate failure to reduce its costs in line with earlier

projections does not make those original projections false or materially misleading at the time they were made. "The mere fact that the projections ultimately proved erroneous does not state a claim for securities fraud." Kemp v. Universal Am. Fin. Corp., No. 05-CV-9883, 2007 WL 86942, at *14 (S.D.N.Y. Jan. 10, 2007). Accordingly, the Court is not persuaded that Plaintiff's factual allegations sufficiently support the notion that the alleged statements relating to TI's cost-savings initiatives are actionable.

2. Scienter

Under the heightened pleading standards of Rule 9(b) and the PSLRA, a plaintiff alleging securities fraud must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A); see also In Re Shanda Games Ltd. Sec. Litig., 128 F.4th 26, 51 (2d Cir. 2025). The question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 310 (2007). "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent to deceive,

manipulate, or defraud." JP Morgan Chase Co., 553 F.3d at 198 (internal quotations and citation omitted).

That standard can be satisfied "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Kalnit v. Eichler, 264 F.3d 131, 138 (2d Cir. 2001) (internal quotations and citation omitted). "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible' - it must be cogent and compelling, thus strong in light of other explanations." Tellabs, 551 U.S. at 324. "If an inference of fraudulent intent is not at least as compelling as a contrary inference, it is inadequate, even in a close case." Skiadas v. Acer Therapuetics, Inc., No. 19-CV-06137, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020) (internal quotations and citation omitted).

Here, Plaintiff attempts to satisfy the standard's second prong. Plaintiff alleges that Defendants acted with scienter because they "knew or recklessly disregarded" that the alleged statements were false or materially misleading, knew that those statements would be disseminated to the investing public, and knowingly participated or acquiesced in the dissemination of the statements. (AC ¶ 168.)

"If no motive or opportunity (other than a generalized business motive) is shown, the circumstantial evidence of conscious misbehavior must be correspondingly greater and show highly unreasonable behavior or that which evinces an extreme departure from the standards of ordinary care." Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co., 28 F.4th 343, 355 (2d Cir. 2022) (internal quotations and citation omitted). "The extreme departure approximates actual intent, and not merely a heightened form of negligence." San Antonio Fire & Police Pension Fund v. Dentsply Sirona, Inc., 732 F. Supp. 3d 300, 317 (S.D.N.Y. 2024) (internal quotations and citation omitted). As the Second Circuit has explained:

> Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

Blanford, 794 F.3d at 306.

"[W]here scienter is based on a defendant's knowledge of and/or access to certain facts, Plaintiffs must allege facts showing that: (i) specific contradictory information was available to defendants (ii) at the same time they made their misleading statements." In re Lottery.com, 765 F. Supp. 3d at 349. "Where plaintiffs contend defendants had access to

contrary facts, they must specifically identify the reports or statements containing this information." Novak, 216 F.3d at 309.

Plaintiff groups the factual allegations supporting the contention that Defendants acted with the requisite level of conscious misbehavior or recklessness into three categories: (1) Defendants' disclosures at the end of the Class Period that TI was conducting pilot programs, was harmed by price competition, and had not achieved its cost-cutting goals; (2) Defendants' actions holding themselves out as knowledgeable; and (3) TI's company-wide pivot to AI. (See AC ¶¶ 169-99.)

Notwithstanding the Court's findings stated above that Plaintiff fails to sufficiently plead any actionable statements, the Court cannot say that Plaintiff's circumstantial evidence "taken collectively, give[s] rise to a strong inference of scienter." Tellabs, 551 U.S. at 310.

a) Defendants' May and August 2024 Disclosures

First, Plaintiff argues that Puritt's statement in May 2024 that TI had been offering AI-related "pilots" at discounted prices supports the contention that Defendants knew TI "was running low-margin pilot programs throughout the Class Period, cratering both margins and revenues." (AC ¶¶ 171-72.) Plaintiff further points to statements made in

August 2024, when Puritt explained that TI's competitors' focus on market share over margins had forced TI to cut prices and had put TI in an "unendurable position" of allowing the "complete eradication of margin yields." (Id. ¶¶ 159-60, 174-76.) Puritt told investors that TI "just ke[pt] losing opportunities because of price" and had been "told in the postmortem that [TI was] just too expensive." (Id. ¶¶ 75-76, 158.) Plaintiff contends that "because Defendants admittedly knew [TI] did not have the claimed AI capabilities, they also knew they could not gain the AI-based internal cost efficiencies they touted." (Opp'n at 23.)

As to Puritt's discussion of TI's "pilots," nothing in the pleadings or arguments here indicates that Puritt "knew facts or had access to information suggesting" that his earlier public statements concerning TI's AI capabilities were false or misleading. Blanford, 794 F.3d at 306. Plaintiff argues that the earlier disclosures "did not address [TI's] initiatives or inform investors that [TI] *only* had pilots." (Opp'n at 22 (emphasis in original).) But this argument is unavailing, as TI had other capabilities and generative-AI backed solutions and Puritt never stated that the pilot programs were TI's only AI offerings. Additionally, Plaintiff contends that Puritt "disclosed [the pilot projects] for the

first time at the end of the Class Period." (AC ¶ 59.) But this representation, too, is false. TI disclosed to investors as early as February 2023 and throughout the Class Period that the company might initiate pilots. (See Soloway Decl. Ex. 3 at 10 ("We often face a long selling cycle to secure a new client contract or launch a new program for an existing client[.] . . . If we are successful, a long implementation and contract negotiation period could follow and, in some cases, a pilot program may also occur, all of which may not be successful."); see also Ex. 4 at 6.)

The Court is similarly not persuaded by Plaintiff's argument that Defendants' later disclosures regarding price competition and unsuccessful cost transformation initiatives support an inference of scienter. As already discussed, TI made numerous disclosures warning about the risks of the competitive environment and pricing pressures it faced throughout the Class Period. (See, e.g., Soloway Decl. Ex. 11 at 11 ("[I]n this heightened price-sensitive environment, it's becoming more and more of that Sophie's Choice challenge of just how much of a tradeoff on margin yield through price reductions are we willing to tolerate[.]"); Ex. 12 at 15 ("There is no question that these are levels of price sensitivity that we certainly haven't experienced in the

past."); Ex. 14 at 15 ("[T]here is a pervasive, persistent pressure around more for less.").) Those disclosures undercut any contention that Defendants acted with the "actual intent" to defraud "and not merely a heightened form of negligence." San Antonio Fire & Police Pension Fund v. Dentsply Sirona, Inc., 732 F. Supp. 3d at 317.

Plaintiff's argument regarding TI's cost-savings statements fares no better. Plaintiff contends that "because Defendants admittedly knew [TI] did not have the claimed AI capabilities, they also knew they could not gain the AI-based internal cost efficiencies they touted[.]" (Opp'n at 23.) But the Court has already found that none of the statements Defendants made about TI's AI capabilities were false or materially misleading, and Plaintiff points to no "specific contradictory information" available to Defendants suggesting that the initiatives had no chance of success. In re Lottery.com, 765 F. Supp. 3d at 349.

Therefore, the Court cannot say that Defendants acted recklessly by representing to investors that TI, for example, had "actioned meaningful cost savings" and stood to gain benefits "by deploying generative AI solutions within [its] own operations." (Statement No. 22, AC ¶ 115.) Even if TI ultimately "reduced the in-year financial benefits from [the]

ongoing efficiency and transformation initiatives" due to unsuccessful aspects of the measures or changes in the expected rollout timeline, "[t]he Second Circuit has firmly rejected this 'fraud by hindsight' approach." Podany v. Robertson Stephens, Inc., 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004) (citing Stevelman v. Alias Research, Inc., 174 F.3d 79, 85 (2d Cir. 1999)). "It is not sufficient . . . to allege that an opinion was unreasonable, irrational, excessively optimistic, [or] not borne out by subsequent events." In re Salomon Analyst Level 3 Litig., 350 F. Supp. 2d 477, 489 (S.D.N.Y. 2004).

b) Defendants Held Themselves Out as Knowledgeable

Next, Plaintiff argues that "Defendants regularly provided detailed updates on, and were asked questions by, analysts and media personnel about revenues and margins, and pricing" – evidencing that they were aware of, for example, the "existing underlying issues with the AI pricing," "the levels of customer demand," the impacts on TI's revenues and margins, and the impacts of competitors' pricing pressure on customer demand. (Id. ¶¶ 182-83, 190.) But the general allegations presented in the Amended Complaint fail to sufficiently support an inference of scienter, as Plaintiff points to no "specific contradictory information [Defendants]

had and the connection (temporal or otherwise) between that information and the statements at issue." In re Adient plc Sec. Litig., No. 18-CV-9116, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020) (quoting In re Lululemon Sec. Litig., 14 F. Supp. 3d 553, 581 (S.D.N.Y. 2014)).

As stated, to plead scienter sufficiently under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." JP Morgan Chase Co., 553 F.3d at 198. Allegations that Defendants, for example, "were constantly 'in discussions with clients'" or had "'strong visibility' into their financial and operational results" are insufficient to meet that standard. (AC ¶ 189); see, e.g., City of North Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp., No. 19-CV-10825, 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021) (finding that plaintiffs failed to sufficiently allege scienter despite arguments that defendants were "privy to information about the nature and scope of the . . . program because they were hands-on executives of a company that conducted due diligence and held meetings — before which certain documents were disseminated"); Maloney v. Ollie's Bargain Outlet Holdings, Inc., 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021) (finding

allegations that "executives were 'tight-knit' and 'hands-on,' and therefore must have been aware 'of the critical inventory and supply chain issues [the company] was experiencing during the Class Period'" were insufficient to show that defendants had access to contrary information).

c) <u>TI's Pivot to AI</u>

Finally, Plaintiff contends that "Defendants' realization that AI . . . was the key to [TI's] success" and TI's "major change in focus to pivot to AI" support a strong inference that Defendants understood the "facts regarding the true state of their AI capabilities during the Class Period, including their inability to harness AI to gain cost efficiencies." (AC ¶ 199.) Under the "core operations" doctrine, "a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income." <u>In re Supercom Inc. Sec. Litig.</u>, No. 15-CV-9650, 2018 WL 4926442, at *31 (S.D.N.Y. Oct. 10, 2018) (internal quotations and citation omitted). In other words, the doctrine allows courts to draw an inference of scienter where the misrepresentations and omissions allegedly made by defendants were about a company's core

operations. See In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 353 (S.D.N.Y. 2011).

Notwithstanding that "[i]t remains unresolved in the Second Circuit whether the core-operations doctrine survived the passage of the PSRLA," City of Omaha Police & Fire Ret. Sys., 450 F. Supp. 3d at 423, even if this Court accepted and applied this theory to the case at hand, it would be insufficient to establish scienter in light of the Court's other findings. As courts in this District have held, "the core-operations doctrine would be insufficient by itself to support strong circumstantial evidence of scienter." City of Omaha Police & Fire Ret. Sys., 450 F. Supp. 3d at 424; see also Tyler v. Liz Claiborne, Inc., 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) (explaining that the doctrine only "bolsters the strength of the inference of scienter when plaintiff has *already* adequately alleged facts indicating that defendants might have known their statements were false" (emphasis added)). In short, because Plaintiff has failed to allege that Defendants acted with scienter under the preceding theories of liability, there is no inference for the core-operations doctrine to bolster.

"Regardless of the manner in which a plaintiff attempts to plead scienter, at the end of its evaluation, [a court]

must be convinced that the inference of scienter is at least as compelling as any competing inferences." Fort Worth Employers' Ret. Fund v. Biovail Corp., 615 F. Supp. 2d 218, 225 (S.D.N.Y. 2009) (internal quotations and citation omitted); see also Tellabs, 551 U.S. at 308 ("[A]n inference of scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."). In the matter at hand, the Court is not persuaded that the allegations set forth in the Amended Complaint sufficiently meet this standard.

3. Loss Causation

Finally, Defendants move to dismiss the Section 10(b) claim on the basis that Plaintiff has failed to plead loss causation. (See MTD at 25-27.) Under the PSLRA, "the plaintiff [has] the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C.A. § 78u-4. In light of the Court's findings set forth above that the Amended Complaint does not adequately allege either (1) an actionable material misstatement or omission or (2) scienter, the Court does not reach Defendants' argument that Plaintiff has additionally failed to sufficiently plead loss causation. See, e.g., Oklahoma Firefighters Pension & Ret. Sys. v. Xerox

Corp., 300 F. Supp. 3d 551, 581 (S.D.N.Y. 2018) (declining to reach the issue of loss causation because plaintiff's "Amended Complaint fail[ed] to allege any material misrepresentation or omission by the defendants").

B. SECTION 20(a)

To state a claim under Section 20(a) of the Exchange Act, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (internal quotations and citation omitted). "If plaintiffs have not adequately alleged a primary violation, *i.e.*, a viable claim under another provision of the Securities Act or Exchange Act, then the [Section] 20(a) claims must be dismissed." In re Sanofi Sec. Litig., 87 F. Supp. 3d 510, 527 (S.D.N.Y. 2015). Because Plaintiff has failed to sufficiently allege a primary violation, the Court dismisses Plaintiff's second claim alleging a violation of Section 20(a).

## IV. ORDER

For the reasons stated above, it is hereby

**ORDERED** that the motion (Dkt. No. 35) filed by Defendants TELUS International (CDA) Inc., Jeffrey Puritt, Vanessa Kanu, Gopi Chande, and Michael Ringman to dismiss the Amended Complaint (Dkt. No. 24) of Lead Plaintiff Mohommed Mohiuddin, individually and on behalf of all others similarly situated, is **GRANTED.**

The Clerk of Court is respectfully requested to terminate the motion at docket No. 35.

**SO ORDERED.**

Dated: 11 August 2026
New York, New York

Victor Marrero
U.S.D.J.